# Exhibit A

| Summary report: Litera Compare for Word 11.3.1.3 Document comparison done on 8/18/2025 7:05:27 PM | |
|---|---|
| **Style name:** Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** PENN - Draft Complaint(15820610_26).docx | |
| **Modified filename:** HGV - Amended Complaint(17204974_10).docx | |
| **Changes:** | |
| Add | 466 |
| Delete | 431 |
| Move From | 53 |
| Move To | 53 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 3 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1006 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| HG VORA CAPITAL MANAGEMENT, LLC, HG VORA SPECIAL OPPORTUNITIES MASTER FUND, LTD., and DOWNRIVER SERIES LP – SEGREGATED PORTFOLIO C, on behalf of themselves and derivatively on behalf of PENN ENTERTAINMENT, INC., | Case No.: 5:25-cv-02313-CH |
| Plaintiffs, | **DEMAND FOR JURY TRIAL** |
| -against- | |
| PENN ENTERTAINMENT, INC., JAY SNOWDEN, VIMLA BLACK-GUPTA, ANUJ DHANDA, DAVID HANDLER, MARLA KAPLOWITZ, JANE SCACCETTI, BARBARA SHATTUCK KOHN, RONALD NAPLES, and SAUL REIBSTEIN | |
| Defendants, | |
| -and- | |
| PENN ENTERTAINMENT, INC., | |
| Nominal Defendant. | |

**VERIFIED FIRST AMENDED COMPLAINT**

HG Vora Capital Management, LLC, HG Vora Special Opportunities Master Fund, Ltd., and Downriver Series LP – Segregated Portfolio C (collectively, "HG Vora" or "Plaintiffs") hereby assert the following Verified First Amended Complaint against Defendant and Nominal Defendant PENN Entertainment, Inc. ("PENN" or the "Company"), Jay Snowden, Vimla Black-Gupta, Anuj Dhanda, David Handler, Marla Kaplowitz, Saul Reibstein, Jane Scaccetti,

Ronald Naples, and Barbara Shattuck Kohn (collectively, the "Director Defendants," and, together with PENN, the "Defendants").[1]

**NATURE OF THE CASE**

1.    PENN's recent change to the composition of its Board of Directors (the "Board") is a serious affront to the shareholder franchise.  In advance of PENN's 2025 annual meeting of shareholders (the "2025 Annual Meeting"), Plaintiffs nominated three highly qualified independent candidates for election to the three available seats on the Company's Board: Johnny Hartnett, Carlos Ruisanchez, and William J. Clifford (the "Independent Nominees").  As Plaintiffs would later learn, the Director Defendants did not want one of the three Independent Nominees on the Board—Clifford, a former PENN executive—because they believed his viewpoints were not sufficiently aligned with those of the Director Defendants.

2.    Determined to ignore the will of the shareholders, Defendants took drastic steps to undermine the shareholder franchise and prevent shareholders from ever having the opportunity to vote on Clifford's candidacy.  Specifically, Defendants purported to shrink the size of the Board by one seat, which reduced the number of seats up for election from three to two, and claimed that only two of the three Independent Nominees (Hartnett and Ruisanchez) could stand for election (the "Board Reduction Scheme").  Then, to effectuate this scheme, Defendants filed proxy solicitation materials with the United States Securities and Exchange Commission ("SEC") that omitted material information in violation of the federal securities laws.

3.    1. In Pennsylvania, shareholder rightsDefendants' actions have deprived PENN shareholders of their fundamental right to elect directors of corporations are sacrosanct.  See.

---

[1]  A comparison of this First Amended Complaint to Plaintiffs' original Complaint is attached as Exhibit A.

Those rights have been codified in Pennsylvania's Business Corporation Law ("BCL"), *see* 15 Pa.C.S. § 1725. ~~So essential are they to the proper functioning of Pennsylvania corporations that Pennsylvania courts have described them as "fundamental,"~~, and have been unequivocally guaranteed by Pennsylvania's Supreme Court.  *See Reifsnyder v. Pittsburgh Outdoor Advert. Co.*, 405 Pa. 142, 149 (1961)~~, and necessary to "ensure corporate democracy." *Jewelcor Mgmt., Inc. v. Thistle Grp. Holdings, Co.*, 60 Pa. D. & C.4th 391 (Com. Pl. 2002).  In utter contempt of those core democratic principles, Defendants manipulated the corporate machinery and violated the BCL when they reduced the number of seats up for election at the Company's upcoming annual meeting of shareholders (the "2025 Annual Meeting") in response to HG Vora's nomination of highly qualified independent candidates for election to the Company's Board of Directors (the "Board").  Defendants proceeded to violate the federal securities laws by making materially false and misleading statements and omissions in their proxy materials filed with the United States Securities and Exchange Commission ("SEC") about their misconduct. Defendants' actions~~ ("There is no question that a shareholder may bring a direct action to protect his voting rights.").  Indeed, voting rights are appropriately viewed as *the* "fundamental governance right" that shareholders possess, without which "a shareholder would more closely resemble a creditor than an owner."  *EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 433 (Del. 2012).  In utter disregard of those principles, Defendants enacted the Board Reduction Scheme for the express purpose of preventing shareholders from exercising their most fundamental right. Their conduct cannot stand.

4. ~~2.~~ PENN is a Pennsylvania-incorporated gaming and entertainment company that operates casinos, resorts, and racetracks across North America.  For most of its history, PENN's

cornerstone has been its brick-and-mortar casino business, which consistently turned-out reliable income and steady profits.

5.    ~~3.~~ More recently, PENN began developing its "Interactive" segment, which focuses on digital games and online sports betting.  This segment took on increased importance in January 2020 when the Company promoted Defendant Jay Snowden (its then-Chief Operating Officer) to Chief Executive Officer ("CEO").  Upon his promotion, Snowden quickly announced that the Company would realign its priorities to emphasize digital growth, touting the Company's acquisition of an approximate 36% stake in Barstool Sports, Inc. ("Barstool Sports") and the launch of a mobile sports betting product.

6.    ~~4.~~ In subsequent years, and at the direction of Snowden and the other Director Defendants, PENN continued to pursue an aggressive strategy that prioritized growing its Interactive business at any expense.  This included the reckless spending of nearly $4 billion on poorly negotiated and overpriced deals, gross mismanagement, and steep operating losses.

7.    ~~5.~~ Under Snowden's tenure, PENN has lagged a staggering 121% behind the S&P 500 and 94% behind its peers in the gaming industry.  Notwithstanding that, the Board has continued to enable and encourage Snowden's risky decision-making and mismanagement by lavishing him with an inflated compensation package that includes nearly $200 million in equity grants.  Indeed, a 2023 report from a leading shareholder publication found that Snowden was the third most overpaid CEO of any S&P 500 company.[1][2]

8.    ~~6.~~ To remedy this mismanagement and underperformance, HG Vora believed boardroom change was necessary. On January 29, 2025, HG Vora exercised its right as a

---

[1][2] As You Sow, *The 100 Most Overpaid CEOs*, ~~https://www.asyousow.org/report-page/the-100-most-overpaid-ceos-2023~~ https://www.asyousow.org/report-page/the-100-most-overpaid-ceos-2023 (last visited ~~May 5~~ Aug. 18, 2025).

shareholder to nominate a slate of three highly qualified directors to fill the three seats on PENN's Board that are up for election at the 2025 Annual Meeting. Each of these nominees—Johnny Hartnett, Carlos Ruisanchez, and William Cliffordthree director candidates (the "Independent Nominees")—is, all of whom are independent of bothPENN and HG Vora. Notably, despite making hundreds of investments in its sixteen-year history, including dozens in the gaming sector, this was the first time that HG Vora had ever nominated a director candidate.

7. Recognizing the serious threat that the Independent Nominees posed to the Director Defendants' hold over the Company, on April 25, 2025, the Director Defendants responded by purporting to shrink the size of the Board by one seat, claiming that only two of the three Independent Nominees can stand for election (the "Board Reduction Scheme"). Defendants proceeded to select which two Independent Nominees should serve on the Board. Those actions violated core shareholder rights by enabling Defendants to avoid a contested election for the third open seat and entrench their control of the Board.

9. The Director Defendants recognized the Independent Nominees as a serious threat to their control over the Company. Well aware that they would lose in a free and fair election—years of poor returns and underperformance had led to widespread shareholder dissatisfaction—Defendants knew they needed an edge, so they enacted the Board Reduction Scheme to gain one. They then proceeded to select two of the three Independent Nominees, Hartnett and Ruisanchez, without even attempting to discuss the issue with HG Vora. In doing so, Defendants sought to block a vote on Clifford entirely.

10. HG Vora, however, was committed to the best interests of the Company and protecting the shareholder franchise. It submitted its own valid proxy card, which included all three duly-nominated Independent Nominees, and solicited proxies for each.

11.    The 2025 Annual Meeting was held on June 17, 2025.  At the meeting, PENN's' shareholders voted to elect all three Independent Nominees to the Board, but the Director Defendants recognized the election of only two of them, Hartnett and Ruisanchez; the Board refused to recognize the election of Clifford even though he had been validly nominated and appeared on HG Vora's proxy card. Rather than honor the shareholder vote, Defendants flatly refused to seat Clifford and ordered the independent inspector of elections (the "Inspector") to disregard all votes cast for him—an instruction the Inspector has followed, excluding Clifford entirely from the official Vote Report.

12.    8.While boards are permitted to adjust their own size in certain circumstances, they may not do so in the face of a contested election or to thwart shareholder voting rights. As such, the Board's action "compromisedOtherwise, such conduct "compromise[s] the essential role of corporate democracy in maintaining the proper allocation of power between the shareholders and the Board because that action was taken in the context of a contested election." *MM Cos., Inc. v. Liquid Audio, Inc.*, 813 A.2d 1118, 1129, 1132 (Del. 2003).[23]

13.    Whether Defendants are correct in believing that Clifford is unsuited for Board service—and they are not—is besides the point.  It is a core principle of corporate governance that shareholders, as the owners of the company, elect directors to represent their interests; directors may not undermine that framework by attempting to substitute their own wisdom for that of the shareholders.  *See Vejseli v. Duffy*, 2025 WL 1452842, at *13 (Del. Ch. May 21, 2025) ("Reducing the number of directors so that the Board, rather than the stockholders, could later identify better candidates is not a legitimate corporate purpose. . . .  *The notion that*

---

[23]  Delaware authority is "instructive" on matters of Pennsylvania corporate law.  *Johnson v. Farm J., Inc.*, 2019 WL 3530423, at *4 (E.D. Pa. Aug. 1, 2019).

*directors know better than the stockholders about who should be on the board is no justification at all.*" (emphasis added)); *Warehime v. Warehime*, 2001 PA Super 141, ¶ 40, 777 A.2d 469, 481 (2001), *rev'd on other grounds*, 580 Pa. 201, 860 A.2d 41 (2004) ("[The] directors impermissibly exercised their power to retain their own positions by purposely depriving the majority shareholders of any real opportunity to affect the outcome of any vote.").

14.    ~~9.~~ Defendants' actions also are illegal under the BCL, which requires that classified boards (like PENN's) have directors allocated to classes "as nearly equal in number as possible." 15 Pa.C.S. § 1724(b)(1). Indeed, only last year PENN acknowledged this requirement—which is also codified in its Second Amended and Restated Articles of Incorporation (the "Articles")—when it restructured its three director classes from a 2-3-4 structure to a 3-3-3 structure in response to HG Vora's request that the Company remedy its violation. In blatant disregard of the BCL and the Company's Articles, Defendants undermined that change by dropping a director seat up for election, adopting a 2-3-3 structure in a transparent effort to maintain their grip over the Company.

~~10. To make matters worse, on April 25, 2025, the Company issued a false and highly misleading press release (the "Press Release," attached hereto as Exhibit A) in violation of the federal securities laws governing corporate elections. The Press Release stated that one of the Company's Class II directors (the class up for election at the 2025 Annual Meeting) would retire, effective immediately, that the Board "now comprises eight directors," and that there would only be two Class II director seats available for election at the 2025 Annual Meeting. The Press Release also announced the Company was nominating Hartnett and Ruisanchez, two of the Independent Nominees.~~

11. The Press Release (i) gave the false impression that Defendants' actions were based on an agreement with HG Vora, (ii) did not disclose that the nominees, in fact, had been originally nominated by HG Vora, and (iii) did not state that Defendants had not accepted HG Vora's third nominee, Clifford. Nor did the Press Release explain that the Board had reduced its size by eliminating a Class II director seat that is supposed to be voted on at the 2025 Annual Meeting. Further, the Press Release omitted the true purpose for Defendants' actions and that those actions violated BCL Section 1724(b)(1).

12. On the morning of April 28, 2025, PENN released its definitive proxy statement for the 2025 Annual Meeting (the "Definitive Proxy," attached hereto as Exhibit B), which echoed the same false and misleading statements and omissions contained in the Press Release and likewise violated the federal securities laws. But the Definitive Proxy went even further, as it indicated that the upcoming director election was uncontested (which is not true) by failing to include all three HG Vora-nominated candidates on the Company's proxy card as required by the federal securities laws.

15. 13. The primary purpose of the Board Reduction Scheme was to make it more difficult for a shareholder to nominate director candidates for election to the Board, thereby minimizing any influence the shareholder and its nominees, once elected, could have over the direction of the Company. Indeed, because only three of PENN's nine Board seats are up for election in a given year, it takes, at a minimum, two annual meeting cycles to change over a majority of the Board (assuming the Board does not, once again, illegally reduce its size to avoid such an outcome). By attempting to reduce the number of seats up for election to two, Defendants have greatly enhanced the chances that two years becomes three, or even more. Such

disenfranchisement violates the Director Defendants' fiduciary duty of loyalty by impermissibly placing their interests over those of PENN and its shareholders.

16.    What is more, if the Board Reduction Scheme is permitted to stand it would give Defendants free reign to effectively nullify the shareholder voting franchise.  Under Defendants' logic, a board can perpetuate itself in office indefinitely and without challenge, by determining a particular candidate is ill-suited to serve as a director and preclude any vote on their candidacy by eliminating a Board seat.  To wit, Defendants would be able to reduce the number of Board seats in advance of each shareholder meeting and, following that meeting, reinstate those seats and install directors of their choosing.  These concerns are not academic, as Defendants have already stated their intent to restore the ninth Board seat and install a candidate of their choosing.

17.    ~~14.~~ Plaintiffs accordingly seek, among other things, (1) a declaration that the Board Reduction Scheme is invalid; (2) injunctive relief ordering the Company to either seat Clifford based on the votes cast at the 2025 Annual Meeting, hold a special election, or otherwise provide shareholders an opportunity to vote on a third Class II Director whose term will end in 2028, as soon as practicable; (3) injunctive relief that precludes Defendants from changing the size of the Board or classes thereof in violation of Pennsylvania law through the 2028 annual meeting; (4) a declaration that Defendants' proxy materials violate the federal securities laws, and injunctive relief ordering Defendants to correct ~~the materially false and misleading statements in~~ their proxy materials ~~and include all three Independent Nominees on their proxy card; injunctive relief allowing shareholders an opportunity to elect all three Independent Nominees at the 2025 Annual Meeting, scheduled for June 17, 2025;~~; (5) and damages in an amount to be determined at trial.

## THE PARTIES

18.    ~~15.~~ Plaintiff HG Vora Capital Management, LLC ("HG Vora Capital") is a registered investment adviser that provides discretionary advisory services for investment funds. HG Vora Capital is organized in Delaware and based in New York.  As of April 28, 2025, HG Vora Capital beneficially owned 7,250,000 shares of PENN's common stock, comprising 3,825,000 shares beneficially owned by the Master Fund and 3,425,000 shares beneficially owned by Downriver.

19.    ~~16.~~ Plaintiff HG Vora Special Opportunities Master Fund, Ltd. (the "Master Fund") is an investment fund that operates as a Cayman Islands exempted company.  The Master Fund receives advisory services from HG Vora Capital.  As of April 28, 2025, the Master Fund beneficially owned 3,825,000 shares of PENN's common stock, inclusive of 100 shares held of record.

20.    ~~17.~~ Plaintiff Downriver Series LP – Segregated Portfolio C ("Downriver") is an investment fund that operates as a Delaware limited partnership.  Downriver receives advisory services from HG Vora Capital.  As of April 28, 2025, Downriver beneficially owned 3,425,000 shares of PENN's common stock, inclusive of 100 shares held of record.

21.    ~~18.~~ Defendant PENN is a Pennsylvania corporation that provides entertainment, sports content, and casino gaming experiences throughout North America.  PENN is publicly traded on the NASDAQ under the ticker "PENN."

22.    ~~19.~~ Defendant Jay Snowden is PENN's CEO and President, ~~and has~~ having served as a director of the Company since August 2019.  Snowden is a Class III director.

23.    ~~20.~~ Defendant Jane Scaccetti has served as a director of the Company since 2015.  Scaccetti is a Class III director.

24. ~~21.~~ Defendant Marla Kaplowitz has served as a director of the Company since 2020. Kaplowitz is a Class III director.

25. ~~22.~~ Defendant David Handler has served as a director of the Company since 1994. Handler is a Class I director and has served as Chair of the Board since 2019.

26. ~~23.~~ Defendant Anuj Dhanda has served as a director of the Company since 2024. Dhanda is a Class I director.

27. ~~24.~~ Defendant Vimla Black-Gupta has served as a director of the Company since 2021. Black-Gupta is a Class I director.

28. ~~25.~~ Defendant Barbara Shattuk Kohn ~~has~~ served as a director of the Company ~~since~~from 2004 through the election of her successor at the 2025 Annual Meeting. Kohn ~~is~~was a Class II director.

29. ~~26.~~ Defendant Saul Reibstein ~~has~~ served as a director of the Company ~~since~~from 2011 through the election of his successor at the 2025 Annual Meeting. Reibstein ~~is~~was a Class II director.

30. ~~27.~~ Defendant Ronald Naples had been a director of the Company since 2013, until the Company announced his retirement on April 25, 2025. Naples was a Class II director.

## JURISDICTION AND VENUE

31. ~~28.~~ The Court has jurisdiction over Plaintiffs' claims arising under the federal securities laws pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, because the claims herein arise under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and the rules and regulations promulgated thereunder.

32. ~~29.~~ This Court has supplemental jurisdiction over Plaintiffs' claims arising under state law based on 28 U.S.C. § 1367 because they derive from a common nucleus of operative

fact and are so related to the federal law claims that they form part of the same case or controversy.

33.    ~~30.~~ This Court has personal jurisdiction over the Defendants because each of them has sufficient minimum contacts in the State of Pennsylvania to satisfy Pennsylvania's long-arm statute and constitutional due process requirements as Defendants either reside in Pennsylvania or are directors of PENN, a Pennsylvania corporation.

34.    ~~31.~~ Venue is proper in this District pursuant to 28 U.S.C. § 1391 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because a substantial part of the events giving rise to these claims occurred in this District.  The Company's Fifth Amended and Restated Bylaws (the "Bylaws") also provide that the forum for claims brought under the BCL and claims for breach of fiduciary duty "shall be a state or federal court located within the County of Berks in the Commonwealth of Pennsylvania."

## FACTUAL BACKGROUND

### A.    PENN's Governance Structure

35.    ~~32.~~ Pursuant to Pennsylvania's BCL, each year PENN holds an annual meeting for its shareholders to vote on the election of directors and other corporate matters.  Subject to the requirements of the BCL and the Company's Bylaws, PENN shareholders may propose their own director candidates for election to the Board.

36.    ~~33.~~ Although the Board is the governing body of the Company, responsible for setting strategy and overseeing management, it is the shareholders—as the owners of the Company—that have the right to control the direction that their company takes by nominating and voting for the members of the Board.  The primary way for shareholders to voice their

support for or disagreement with management is by reelecting incumbent directors or voting in new ones.

37. ~~34.~~ Pennsylvania permits corporations to adopt a classified board structure. *See* 15 Pa.C.S. § 1724(b). In contrast to a unitary board, where every board seat is up for election each year, under a classified board director seats are allocated to classes with only a single class up for election each year. This type of structure typically requires at least two election cycles to turn over majority control of a board.

38. ~~35.~~ For this reason, classified boards are widely considered antithetical to shareholder democracy because they impede change by insulating the board of directors and management from shareholder accountability. Institutional Shareholder Services ("ISS")—a highly ~~reputed~~respected, independent shareholder advisory service ~~that~~which provides research and recommendations in advance of annual meetings—~~issues~~has issued a general recommendation for shareholders to vote against classified boards because they are indicative that a board "lacks mechanisms to promote accountability and oversight."[34]

39. ~~36.~~ PENN has a classified board, divided into three classes of directors who serve three-year terms. Prior to the Board Reduction Scheme, the Board's composition was as follows:

| Class II (Election in 2025; Term Expires in 2028) | Class III (Election in 2026; Term Expires in 2029) | Class I (Election in 2027; Term Expires in 2030) |
|---|---|---|
| Barbara Shattuck Kohn | Marla Kaplowitz | David Handler |
| Ronald Naples | Jane Scaccetti | Vimla Black-Gupta |
| Saul Reibstein | Jay Snowden | Anuj Dhanda |

---

[34] ISS, *Proxy Voting Guidelines*, (Jan. 29, 2025, updated Feb. 25, 2025), ~~https://www.issgovernance.com/file/policy/active/americas/US-Voting-Guidelines.pdf.~~https://www.issgovernance.com/file/policy/active/americas/US-Voting-Guidelines.pdf.

40. ~~37.~~ The BCL also imposes certain restrictions on companies that choose to adopt a classified board structure. As relevant here, the BCL mandates that board classes be "as nearly equal in number as possible." 15 Pa.C.S. § 1724(b)(1). This requirement—which also appears in Article 6(a) of PENN's Articles—means that, for a nine-member board divided into three classes, each class ~~needs to~~ must comprise three directors.

41. ~~38.~~ In addition to its classified board structure, PENN's governing documents contain many other provisions that limit shareholder rights. Shareholders cannot take action by written consent, ~~cannot~~ call special meetings, ~~and are unable to~~ or fill Board vacancies. All ~~these~~ those are also anti-shareholder provisions that ISS recommends shareholders vote against.[45]

**B.    PENN's Venture into Online Gaming: Misguided Strategy, Reckless Spending, and the Destruction of Shareholder Value**

42. ~~39.~~ What eventually became PENN started in 1972 with a group of civic leaders who entered the world of thoroughbred horse racing in Grantville, Pennsylvania. In 1982, one of those leaders purchased the Grantville racetrack, and ultimately founded PENN's predecessor as a racetrack operator. Traditionally, PENN's core business has been its brick-and-mortar operations, including casinos, resorts, and racetracks across North America. More recently, it has made investments in online gaming (what PENN deems its "Interactive" segment), beginning with the launch of its HollywoodCasino.com gaming platform in 2019.

43. ~~40.~~ In January 2020, Defendant Snowden took over as CEO. ~~In the decade prior to Defendant Snowden's appointment, the Company successfully managed its profitable regional portfolio of casinos, resorts, and racetracks. However, Defendant~~ Snowden quickly made the Company's Interactive business a priority, announcing during the Company's fourth quarter

---

[45] *See supra* note 3.

2019 earnings call ~~they were~~that PENN was in the midst of an "industry revolution," and emphasizing the importance of expanding the Company's digital offerings, which included a goal to be in the "top three in sports betting market share in every state where we operate . . . both retail and online."   To drive this strategy, on January 29, 2020, PENN announced the acquisition of an approximately 36% interest in Barstool Sports, a digital sports media company, for about $163 million.   In connection with the acquisition, PENN announced it would be launching a Barstool Sports-branded mobile sports betting product later in the year.

44.   ~~41.~~ To incentivize this strategy, in April 2021, the Board awarded Snowden supplemental equity grants worth nearly $200 million keyed to certain price targets.   Rather than promote responsible management, those grants have incentivized reckless spending in a desperate attempt by Snowden to grow PENN's digital business at any expense.

45.   ~~42.~~ The Company's next major acquisition came just a few months later, in August 2021, when the Company announced an agreement to purchase Score Media and Gaming, Inc. ("theScore"), a digital media and sports betting and technology company, for approximately $2.1 billion in cash and stock.   This was an absurd premium, given that the purchase price was more than *90 times* theScore's annualized revenue as of its most recent fiscal quarter prior to the transaction.   PENN's rationale for the acquisition was largely premised on advancing its technological sophistication, leaving many shareholders wondering why this had not been achieved in a more cost-effective manner.

46.   ~~43.~~ In February 2023, PENN acquired the remaining interest in Barstool Sports for approximately $388 million, bringing its total purchase price for the entity to approximately $551 million.   PENN did this despite ample evidence indicating that the acquisition was neither meeting expectations nor driving growth.

47. 44. Despite this sizable investment, just months later, PENN abruptly changed course. The Company announced it would sell Barstool Sports back to its founder for only a dollar in monetary consideration, as well as certain restrictive and other covenants. PENN would ultimately realize a $923 million loss on this strategic blunder.

48. 45. In its place, PENN announced a new venture, an online sports betting partnership with ESPN, and that it had rebranded its online sportsbook as ESPN Bet. Pursuant to the transaction, the Company agreed to make $1.5 billion in cash payments to ESPN over a ten-year term and grant ESPN approximately $500 million of warrants to purchase 31.8 million of the Company's common stock, in exchange for media, marketing services, brand and other rights provided by ESPN.

49. 46. Despite years of effort and investments totaling more than $3.4 billion, PENN's foray into the online sports betting world has been a complete failure. When the Company announced its earnings for the fourth quarter of 2023—the first full quarter following the ESPN partnership—it reported an adjusted EBITDA loss for the quarter of $338.8 million for the Interactive segment. In an exercise of in understatement, when recently commenting on the deal, PENN itself acknowledged that "our market share and financial performance in sports betting to date has not met our expectations."

50. 47. In the aggregate, PENN has woefully underperformed during Snowden's tenure, with shareholder returns lagging 121% behind the S&P 500 and 94% behind its peers in the gaming industry as of April 2025. Yet the Board has continued to reward Snowden with grossly disproportionate pay. Snowden's compensation was four times the average compensation received by CEOs of other comparable companies, despite PENN's substandard performance during his tenure.

51. ~~48.~~ Just last year, ISS gave PENN a score of -100 on its "Pay-For-Performance" evaluation, the lowest possible score reflecting high pay for low performance; shareholder advisory service Glass, Lewis & Co. similarly gave PENN an "F" in this category, explaining that Snowden's "continuing outsized compensation levels come despite performance that is worse than peers."

52. ~~49.~~ The Company's failure to align pay with performance has resulted in PENN having extremely low shareholder support for its Say-on-Pay proposals (which are advisory votes by shareholders on executive compensation). In 2024, for example, the Company's proposal for executive compensation at its annual meeting had only 58% shareholder support.  Just 17 companies in the S&P 600 ~~have~~ had lower shareholder support.

## C.    HG Vora Expresses Interest in Nominating Directors

53. ~~50.~~ As a long-term investor in the Company with substantial experience in the gaming industry and troubled with management's repeated destruction of value for shareholders, HG Vora shared with the Board its views on the Company's investment in the Interactive segment, the ESPN Bet transaction, capital allocation, Board oversight of management, and misalignment with shareholders.  On December 18, 2023, HG Vora met with Snowden to discuss the possibility of HG Vora designating two independent directors, subject to the Board's exercise of its fiduciary judgment and vetting, in advance of the 2024 annual meeting of shareholders.

54. ~~51.~~ Seeing no action being taken in response to these discussions, HG Vora informed PENN that it intended to make a Schedule 13D filing with the SEC which would publicly disclose the discussions with the Company, as required.

55.    ~~52.~~ On December 28, 2023, HG Vora filed a Schedule 13D with the SEC disclosing ownership of approximately 9.6% of the Company's outstanding common stock.[56] The Schedule 13D stated that HG Vora had "requested that the Issuer afford them the right to designate highly qualified directors who would be committed to working with the Issuer's management and fellow Board members to help the Issuer realize its full potential."

56.    ~~53.~~ Around this time, HG Vora also became aware that the Company's Board, which was composed of nine director seats that were unequally allocated among classes, did not comply with the requirements of Pennsylvania law.  Specifically, PENN had a nine-member Board with two Class I directors, three Class II directors, and four Class III directors.

57.    ~~54.~~ On January 12, 2024, HG Vora sent a letter to PENN informing it that its unequal division of directors among classes violated the BCL and the Company's Articles, both of which require that, for companies with classified boards, each class shall be "as nearly equal in number as possible."  15 Pa.C.S. § 1724(b)(1); Article 6(a).  Acknowledging this deficiency, the Company subsequently rebalanced its classes by appointing a new Class I director and, after the retirement of a different Class I director, moving one director seat from Class III to Class I. Notably, the Company did so only *after* the February 7, 2024~~,~~ deadline to nominate Class I directors for election had passed, thereby ensuring that PENN's chosen Class I directors would not face a contested election for three ~~more~~ years.

58.    ~~55.~~ On March 21, 2024, the Company announced that it had increased the size of its Board from nine to ten and added Dhanda as a Class I director.  On April 22, 2024, the Company announced that (i) one of its Class I directors (John Jacquemin) would retire, (ii) it had

---

[56]  Schedule 13D, Penn Entertainment, Inc. (Dec. 28, 2023), ~~https://www.sec.gov/Archives/edgar/data/921738/000121465923016937/j1227232sc13d.htm~~ https://www.sec.gov/Archives/edgar/data/921738/000121465923016937/j1227232sc13d.htm

reallocated Black-Gupta from a Class III director to a Class I director, and (iii) the size of the Board would decrease back to nine after voting concluded at the 2024 annual meeting. Following those changes, each class had three directors.

**D.    Defendants Lobby the Massachusetts Gaming Commission to Prevent HG Vora From Nominating Directors**

59.    56. As a casino operator, PENN's business is regulated by the state gaming authorities in the states in which it operates. One of those authorities is the Massachusetts Gaming Commission ("MGC"). As relevant here, in certain circumstances and as a general proposition, gaming regulations in Massachusetts require institutional owners of 5% or more of an issuer licensed under the MGC to obtain licensure if they seek to exert influence over the issuer.

60.    57. On February 2, 2024, the MGC informed HG Vora that the MGC would need to approve a licensure application (a process HG Vora already had started) before HG Vora could nominate director candidates for PENN's 2024 annual meeting. Because of this, HG Vora was unable to timely nominate director candidates for election at PENN's 2024 annual meeting.

61.    58. Months later, in October 2024, HG Vora's license application with the MGC remained pending. Given that, HG Vora sought an emergency hearing with the MGC so that it could obtain a gaming license or limited relief in Massachusetts and be in a position to nominate candidates for election to the Company's Board at the 2025 Annual Meeting. The hearing was held on December 16, 2024.

62.    59. Representatives of the Company appeared at the hearing to lobby against HG Vora, arguing that HG Vora should not be entitled to licensure in Massachusetts as it would negatively impact the Company's operations. The Company claimed that once a nomination

notice is made, the "proxy fight is started," and that this would "have a dramatic impact on the status quo." The MGC denied HG Vora's request for relief at the meeting.

63. 60. Rather than wait another year to seek much-needed change at the Company, HG Vora chose instead to restructure its investment so that it did not need a license in Massachusetts in order to nominate candidates for election to the Board.

64. 61. On January 14, 2025, HG Vora disclosed in a Schedule 13D Amendment filed with the SEC that it had reduced its ownership of the Company's outstanding common stock by approximately half, to 7,250,000 shares (4.8% of PENN's outstanding common stock). Doing so eliminated any requirement that HG Vora obtain a license in Massachusetts before nominating candidates for election to PENN's Board and, as a result, HG Vora was no longer restricted under applicable gaming regulations in any state where the Company operates from making such nominations.

**E.    HG Vora Nominates Three Highly Qualified Individuals to the Board**

65. 62. On January 29, 2025, HG Vora delivered notice to PENN (the "Nomination Notice") of its intent to nominate three independent individuals to serve as Class II members of the Board at the Annual Meeting Johnny Hartnett, Carlos Ruisanchez, and William Clifford in accordance with the requirements set forth in the Company's Bylaws (the "Nomination Notice"): Johnny Hartnett, Carlos Ruisanchez, and William Clifford. This was not a decision that HG Vora took lightly. HG Vora is not an activist investor. In fact, in its sixteen-year history, this was the first time HG Vora had nominated director candidates at any of the hundreds of companies it has invested in.

66. 63. HG Vora is not seeking control of the Company. Indeed, all its the nominees are independent of HG Vora with no pre-existing business or financial relationships or ties. As

confirmed by the over 200 pages of information in the Nomination Notice, each of the Independent Nominees ~~is~~was eminently qualified.  Each possesses decades of experience in the gaming and hospitality industry and has the ability to bring considerable skill and expertise to the Board and effect positive change at the Company.  Once elected, the Independent Nominees ~~will~~would owe fiduciary duties to the Company only; they ~~will~~would have no financial, contractual, or other obligation to HG Vora.

67.   ~~64.~~ The Independent Nominees ~~possess~~possessed all the key qualifications that the Company ~~has~~had identified for ~~Board members~~directors in its proxy materials.  All three have "Industry Experience (Gaming, Hospitality or Media)," experience in "Strategic Planning/M&A," and experience with "Corporate Governance" and "Corporate Stewardship." Both Clifford and Ruisanchez have extensive experience in "Financial (Includes Capital Markets, Accounting and Tax)," and Hartnett is well versed in "Technology/Digital" and "Risk Management."  In fact, the Company has acknowledged that Hartnett and Ruisanchez "ha[ve] the specific experience, qualifications, attributes, and skills necessary to serve as an effective director."

68.   ~~65.~~ More specifically, Clifford has more than 30 years of experience delivering excellent returns for shareholders in the gaming industry, including a 12-year tenure as Chief Financial Officer ("CFO") of Penn National Gaming (the predecessor entity to PENN), during which time Clifford was instrumental in the Company's exponential growth which drove an approximately 20x return for shareholders, as well as roles as CFO and Treasurer for a gaming-focused real estate investment trust.  He is currently a director for Drive Shack Inc., and previously sat on the board of Intrawest Resorts Holdings, Inc.

69. 66. Similarly, Hartnett has more than 20 years of experience building, scaling, and running online sports betting and gaming businesses, including the successful $770 million acquisition of FanDuel. For five years, he served as CEO for Superbet Betting & Gaming S.A., a technology and entertainment company in the sports and gaming industry, where he oversaw a fourfold increase in the company's revenue. Other roles include Chairman for a mobile top-up company and Chief Development Officer at gambling company Paddy Power Betfair.

70. 67. Ruisanchez has a strong track record of capital allocation and value creation for shareholders and currently runs his own business focused on investing in the hospitality sector and real estate development. Ruisanchez's extensive experience includes his role as founding partner of Sorelle Capital and Sorelle Hospitality, a family business focused on investing in and helping grow companies in the hospitality sector. Prior to founding Sorelle, Ruisanchez served as CFO and director for Pinnacle Entertainment, a gaming business acquired by PENN in 2018.

**F.    Defendants Negotiate in Bad Faith to Try to Get HG Vora to Withdraw the Notice**

71. 68. Rather than constructively engage with HG Vora, Defendants sought to lay the groundwork to reject the Nomination Notice.

72. 69. On February 12, 2025, the Company's outside counsel sent a pretextual letter to HG Vora identifying purported deficiencies in the Nomination Notice (the "February 12 Letter"). A nomination notice is intended to provide the corporation sufficient information to enable an incumbent board to assess the suitability of director candidates for office. Thus, sometimes companies object that a nominating shareholder failed to provide all necessary information. But here, PENN complained about the opposite.

73. ~~70.~~ The Company asserted that *HG Vora provided too much information* in its Nomination Notice, taking issue with responses it claimed were over-inclusive and provided *more* information than was sought. For example, the Company contended that Hartnett's questionnaire was inaccurate because it included his past board memberships for non-public companies in response to a question concerning his board membership for publicly traded and registered investment companies. Elsewhere, the Company objected to, among other things, general statements like "[d]isclosure in any section of this Notice [including exhibits] shall be deemed to apply to all other sections," asserting (without basis) that such cross-referencing was "unduly broad." The Company also reserved its right to "contest or challenge any other aspect of the Notice."

74. ~~71.~~ On February 19, 2025, HG Vora responded to the February 12 Letter and dispelled any notion that the Nomination Notice was deficient, ~~explaining~~ It explained that the original responses provide "more, not less disclosure," and that none of the claimed inaccuracies were in any way inaccurate. HG Vora further called out Defendants' gamesmanship, explaining that waiting "two weeks to send a letter that advances incorrect and trivial matters raises a substantial concern that the Corporation is trying to deny stockholders the right to elect directors that are fully qualified, independent and eligible for the position." Nevertheless, where the Company had indicated a preference for certain language to be modified or removed, the nominees did so to avoid any dispute, and re-executed their questionnaires.

75. ~~72.~~ With nothing left to complain about, the Company proceeded to interview the three Independent Nominees during the first half of March 2025. On March 25, 2025, HG Vora and representatives of the Company held a video conference. The Company explained that it was seeking to avoid a proxy contest and, to do that, it was willing to have one Board member

retire and immediately offer that seat to Hartnett.  In the course of doing so, the Company acknowledged that Hartnett had "exactly the right profile" it was looking to add to the Board.

76. ~~73.~~ Two days later, the parties again met via video conference.  HG Vora declined the Company's offer, with its representative explaining that changing out a single Board seat reflected a lack of recognition of shareholders' views that real change in strategy and restoration of accountability was needed, and~~,~~ instead~~,~~ demonstrated a desire to make as few changes as possible, which would not serve the best interests of shareholders.  HG Vora explained its view that the addition of three new directors was necessary to give shareholders confidence in the Board's oversight of management.

77. ~~74.~~ Indeed, because of PENN's classified Board structure at that time—with three out of nine seats up for election each year—~~giving up~~replacing only a single director seat would mean that the current Board would be able to overcome competing director nominations for *at least* another two years without the possibility of eligible shareholders nominating a majority of the seats on the Board.  All the while, the Board could continue to ignore the voices of its shareholders.

78. ~~75.~~ On April 3, 2025, the parties met again via videoconference and PENN revised its offer.  In addition to adding Hartnett to the Board, representatives of PENN offered to add Ruisanchez to a short list of candidates considered for a second Board seat and permit HG Vora to have input into the process.

79. ~~76.~~ On April 10, 2025, the parties had another video conference.  HG Vora declined the Company's offer, with HG Vora's representative explaining that shareholder interests would best be served by three new independent directors with fresh perspectives.  In a veiled threat to intimidate HG Vora, representatives of the Company warned HG Vora that

gaming regulators could get involved and present gaming regulatory hurdles for HG Vora in their director nominations in the event the parties did not amicably resolve their dispute.  Just days after this call, HG Vora received such a letter from a regulator which prohibited HG Vora from making certain demands on the Company.

80.    77.  On April 15, 2025, the parties met again via videoconference.  During that call, HG Vora's representative noted that, because of the correspondence from the regulator it had received, further settlement proposals would need to be initiated by the Company.  The parties also discussed the Company's obligation to deliver notice of the names of the nominees whom it intends to solicit proxies for in advance of the 2025 Annual Meeting pursuant to the SEC's universal proxy rules.  *See* 17 CFR § 240.14a-19(d).

81.    78.  Later that day, the Company sent HG Vora a notice pursuant to SEC Rule 240.14a-19(d), stating that "the Company is continuing to evaluate the identity of individuals whom it will nominate as directors" at the Annual Meeting and that "the Company currently intends to solicit proxies" for the election of the Company's incumbent Class II directors (Kohn, Naples and Reibstein) at the 2025 Annual Meeting (the "Universal Proxy Notice").   On information and belief, the Company had no such intention.

82.    79.  On April 24, 2025, the parties met again.  The Company offered to immediately seat Independent Nominees Hartnett and Ruisanchez—but not Clifford—as directors.  As part of the agreement, however, HG Vora would have to discontinue its effort to add three new directors to the Board.

83.    80.  When the parties spoke on the morning of April 25, 2025, HG Vora reiterated its belief that adding three new independent directors to the Board was in the best interests of the

Company and its shareholders.  HG Vora's representative also noted that HG Vora was planning to file its preliminary proxy statement for the 2025 Annual Meeting later that day.

84.  81. Later that morning, the Company's representative contacted HG Vora's representative and indicated that the Board would be meeting in the afternoon to consider HG Vora's response.  The Company encouraged HG Vora to hold off on filing its preliminary proxy statement, as doing so could disturb the process of reaching a negotiated resolution.  At no time did the Company indicate it intended to remove a Board seat.  At this point, the Company had not filed its preliminary or definitive proxy statement for the 2025 Annual Meeting.

85.  82. As subsequent events would reveal, the Company's statements encouraging HG Vora to delay filing its preliminary proxy statement plainly were designed to enable the Company to file its proxy materials before HG Vora did so, thereby avoiding the appearance of a contested election.

**G.    Defendants Unilaterally Act to Entrench Themselves in Office By Eliminating a Seat Up For Election and Issue a Misleading Press Release**

86.  83. On April 25, 2025, without any notice to HG Vora, PENN issued the Press Release a press release announcing a "Board Refreshment" and disclosing the Board Reduction Scheme (the "Press Release").  The Press Release announced the retirement of Naples, a Class II director, from PENN's nine-member Board, effective immediately, and stated that the "Board now comprises eight directors."  The Press Release did not disclose that HG Vora had proposed a third candidate or that the Company had rejected that candidate, provide any information about the reduction in Board seats up for election at the upcoming meeting, or even acknowledge that a reduction in Board seats had occurred.  Nor did the Press Release disclose whether the Board had voted to eliminate the ninth Board seat and, if so, the Board's reasons for doing so and whether the reduction was intended to be temporary or permanent.  Indeed, under the Company's Bylaws

and basic principles of corporate law, a director resignation does not reduce the size of the Board.  Instead, the effect of such a resignation is to leave the seat open until a replacement is appointed or elected.

87.    84. Further, contrary to the statements in the Universal Proxy Notice, the Press Release stated that there would be "two Class II director seats available for election at the Annual Meeting," instead of three, and that "the Board intends to nominate Mr. Hartnett and Mr. Ruisanchez to fill the two Class II director seats available for election at the Annual Meeting." The Press Release also included a statement from the Board endorsing the nominations.

88.    85. The Board Reduction Scheme announced in the Press Release is a blatant act of entrenchment designed to insulate the current Board and management from shareholder influence.  Defendants offer offered no justification for the maneuver.  While corporations are permitted to change the size of their board in certain circumstances, they may not do so to reduce a director seat currently up for election in response to a shareholder nomination, as courts repeatedly have found.  *See, e.g.*, *IBS Fin. Corp. v. Seidman & Assocs., L.L.C.*, 136 F.3d 940, 950–51 (3d Cir. 1998) (affirming invalidation of board reduction where "the board reduced its size in order to frustrate the [plaintiff's] attempt to gain a substantial presence on the board" and to "hinder the [plaintiff's] proxy solicitation"); *Pell v. Kill*, 135 A.3d 764, 788 (Del. Ch. 2016) (board improperly "imposed its favored outcome on the stockholders" by "eliminat[ing] the possibility of success for two seats" when it reduced the number of seats up for election from three to one).

89.    86. Importantly, with PENN's classified Board structure, it already takes at least two election cycles to elect new directors comprising a majority of the Board.  However, through

the Board Reduction Scheme, Defendants have given themselves much better odds of turning two election cycles into three before a majority of the Board will turn over.

90. 87. For starters, if—as Defendants claim—only two but not three of the three Independent Nominees arewere elected to the Board as Class II directors in 2025, and an eligible shareholder were then to decide to nominate directors to the Board in 2026, that shareholder would need to make a clean sweep of all three Class III director seats in 2026 (assuming the Board enacts no further schemes to manipulate the seats up for election) for shareholders to elect a majority of five new directors on PENN's purported eight-member Board.

91. 88. Moreover, displacing all three incumbents next year would face steep odds. That is so because CEO Snowden (or his successor) is up for election next year and shareholders typically are reluctant to displace even the most unpopular CEOs at annual meeting elections. By contrast, if all three (rather than two) of the Independent Nominees arethat were elected this year are seated, a majority of five new independent directors could be seated through the election of only two shareholder nominees in 2026, leaving shareholders the option of seeking fundamental change at the Board without displacing the Company's CEO.

92. 89. Perhaps even more significantly, if Defendants get away with this Board Reduction Scheme, there could be no end to their manipulation of the election process. Among other things, afternow that the 2025 Annual Meeting is heldhas occurred, Defendants could simply restore the Class II director size from two to three and appoint a director who will serve out the three-year term until 2028, without any accountability to shareholders. Or, Defendants could again shrink the number of directors up for election at the 2026 annual meeting, even though doing so would even more flagrantly violate Pennsylvania law by preventing the election of a majority of the Board within a two-year cycle.

93. 90. The Board Reduction Scheme, if successful, will also greatly lessen the influence of fresh, independent directors in the boardroom.  Three new directors on a nine-member Board means that only two additional votes are required to obtain the majority needed to take corporate action; with two of purportedly eight seats, three additional votes are required.

91. The Press Release is also materially false and misleading for several reasons.  *First*, while the Press Release acknowledges that the Company and HG Vora did not reach a settlement, it gives the misleading impression that the Company's decision to nominate two of the Independent Nominees was the result of an agreement or understanding with HG Vora.  The Press Release claimed that the Company "intends to nominate Johnny Hartnett and Carlos Ruisanchez for election to its Board of Directors following discussions with [HG Vora]."  The Board's statement that a "costly and distracting proxy fight" would not be in the best interest of PENN is misleading because it implies that a proxy fight had been avoided, whereas nothing of the sort had been achieved.  Critically, the Press Release fails to mention that Defendants rejected Clifford, the third Independent Nominee.

92. *Second*, Defendants' ambiguous statement that the "Board now comprises eight directors" is materially false and misleading concerning how the size of the Board was reduced and how many seats are available at the 2025 Annual Meeting.  Presumably, Defendants' omission was intended to give shareholders the misleading impression that the reduction in Board size happened automatically, rather than by virtue of an intentional act of the Board, to shield itself from accountability to shareholders.

93. In addition, the Company's Bylaws state that, subject to certain exceptions, the size of the Board may be changed "solely by resolution of the board of directors."  Bylaws § 4.03(a).

Here, if no such resolution was passed, the Board Reduction Scheme has no legal effect and PENN's shareholders are entitled to elect a third director at the 2025 Annual Meeting. By omitting to state whether the Board passed any such resolution, the Company has created genuine confusion among shareholders concerning how many Board seats exist.

94. *Third*, assuming the Board did pass a resolution to implement to Board Reduction Scheme, the Press Release is materially false and misleading because it does not provide the reasons for the reduction, nor does it say whether the reduction is intended to be temporary. Shareholders are entitled to know, among other things, if Defendants have acted to thwart shareholder influence. This would be material information to shareholders determining how to cast their vote on the Company's proposed director nominees, as well as the proposed compensation plans for its currently sitting officers and directors.

94. 95. On April 28, 2025, PENN filed its Definitive Proxy with the SEC (the "Definitive Proxy," attached hereto as Exhibit B). The Definitive Proxy, is described as a "solicitation . . . made by PENN Entertainment on behalf of [its] Board of Directors,." doubles down on the materially false and misleading statements in the Press Release.

95. The Definitive Proxy failed to disclose information required by Schedule 14A and the universal proxy rules promulgated in 17 CFR § 240.14a-19 (the "Universal Proxy Rules"). The Universal Proxy Rules apply where, as here, there is a contested election of directors. The election was contested because Plaintiffs solicited proxies for all three Independent Nominees, while Defendants only solicited proxies for Hartnett and Ruisanchez.

96. Like the Press Release, the Definitive Proxy states that PENN's Board "currently consists of eight members," but fails to provide any explanation as to whether the Board

purported to eliminate the ninth Board seat by resolution, again leaving shareholders under the false impression that the Board seat vanished upon the immediate retirement of Director Naples.

97. Sowing further confusion, the Definitive Proxy provides the following infographic illustrating recent Board changes:



The referenced infographic is materially misleading as it does not explain why more directors are departing than are joining.

98. The Definitive Proxy is also materially false and misleading in stating "Our Board of Directors . . . has nominated (i) Johnny Hartnett; and (ii) Carlos Ruisanchez to serve as Class II directors." Yet the Definitive Proxy does not mention that Hartnett and Ruisanchez were first proposed as candidates by HG Vora. By omitting reference to HG Vora, this statement creates the materially misleading impression that no dispute exists between the Company and HG Vora. And by omitting reference to HG Vora's nomination of three Independent Nominees, including Clifford, Defendants apparently seek to frame the 2025 Annual Meeting as uncontested, which is not true. Indeed, Defendants acknowledged precisely the opposite when it issued the Universal Proxy Notice to HG Vora, as this notice is only required in *disputed* elections.

96. 99. The Definitive Proxy also fails to disclose information required by Schedule 14A and the Universal Proxy Rules. Those rules require required PENN to disclose in its Definitive Proxy "a statement directing shareholders to refer to any other soliciting person's

proxy statement for information required by Item 7 of this Schedule 14A."  *See* Item 7(f), 17 C.F.R. § 240.14a-101.  The Definitive Proxy included no such statement.

97.  ~~100.  Those rules~~The Universal Proxy Rules also ~~require~~required PENN to disclose in its proxy card (which was appended to its Definitive Proxy) the nominees of "any person or group of persons that has complied with this section," and to "[c]learly distinguish between the nominees of the registrant [and other nominees]."  17 C.F.R. § 240.14a-19(e).  As is evident from their proxy card, Defendants violated those rules by failing to disclose Clifford's candidacy, omitting Clifford from its proxy card entirely, and failing to distinguish between the Independent Nominees and their own~~.~~:

**PENN ENTERTAINMENT, INC.**

**The Board of Directors recommends you vote FOR each of the nominees listed in proposal 1.**

1.   Election of two Class II directors to serve until the 2028 Annual Meeting of Shareholders and until their respective successors are elected and qualified to serve.

| Nominees: | For | Withhold |
|---|---|---|
| 1a.   Carlos Ruisanchez | ☐ | ☐ |
| 1b.   Johnny Hartnett | ☐ | ☐ |

98.  ~~101.~~On April 28, 2025, after the Company filed its Definitive Proxy, HG Vora sent a letter to the Company identifying the Director Defendants' blatant acts of entrenchment and violations of securities laws and requesting that "PENN and the Board remedy their violations and issue corrective disclosures" (the "Request for Corrective Action").  HG Vora sought confirmation "in writing no later than April 30, 2025 at 5:00 PM EST that PENN and the Board will take [the] necessary actions."

99. ~~102.~~ That same day, HG Vora filed its preliminary proxy statement with the SEC. Its proxy statement expressly stated that "we are soliciting proxies to elect Johnny Hartnett, Carlos Ruisanchez and William Clifford . . . to serve as Class II members of the Board."

100. ~~103.~~ On April 29, 2025, PENN filed a revised proxy card to update the mailing address for return of the proxy card.[67] As with the proxy card appended to its Definitive Proxy, the April 29 proxy card ~~is materially false and misleading because it~~ omits the information required by SEC Rule 14a-19, including the candidacy of Clifford.

101. ~~104.~~ On April 30, 2025, PENN responded to HG Vora's Request for Corrective Action. PENN denied any wrongdoing on behalf of itself and ~~its~~the Board, responding that it believed the Company and the Board have acted in compliance with their fiduciary duties as well as applicable law and would not be taking any corrective ~~actions~~action. The Company provided no explanation for the Board Reduction Scheme. ~~The response was issued solely on behalf of the Company and did not state whether the Board had been given the opportunity to review the Request for Corrective Action.~~

~~105. Tacitly acknowledging that its prior proxy materials were materially false and misleading, however, on May 2, 2025, Defendants issued a supplemental disclosure that corrected some (but far from all) of its false and misleading statements (the "Supplemental Disclosure"). The Supplemental Disclosure stated that the Company's two director nominees, Hartnett and Ruisanchez, "were originally recommended for nomination by HG Vora Special Opportunities Master Fund, Ltd."~~

---

[67] Schedule 14A, Definitive Additional Materials, Penn Entertainment (Apr. 29, 2025) ~~https://www.sec.gov/Archives/edgar/data/921738/000110465925041294/tm2513553d1_defa14a.htm~~https://www.sec.gov/Archives/edgar/data/921738/000110465925041294/tm2513553d1_defa14a.htm.

102.    On May 12, 2025, HG Vora filed its definitive proxy statement with the SEC.  It stated HG Vora was "soliciting proxies to elect Johnny Hartnett, Carlos Ruisanchez and William Clifford to serve as Class II members of the Board."[8]  Appended to the definitive proxy was HG Vora's GOLD universal proxy card (the "HG Vora Universal Proxy"), which included all three Independent Nominees.  As required by the Universal Proxy Rules, the HG Vora Universal Proxy included all duly-nominated candidates and distinguished between the Company's nominees and its own:

| HG Vora's proposal to elect to serve as directors of the Company Johnny Hartnett and Carlos Ruisanchez to hold office until the Company's 2028 Annual Meeting of Shareholders | | |
|---|---|---|
| **HG VORA'S NOMINEES (also nominated by the Company)** | **FOR** | **WITHHOLD** |
| a) Johnny Hartnett | ☐ | ☐ |
| b) Carlos Ruisanchez | ☐ | ☐ |
| HG Vora's proposal to elect to serve as a director of the Company William Clifford to hold office until the Company's 2028 Annual Meeting of Shareholders. This will only be voted by the proxy holder if there are three (3) director seats are up for election. | | |
| **HG VORA'S NOMINEE** | **FOR** | **WITHHOLD** |
| c) William Clifford | ☐ | ☐ |

## H.    Defendants' Concede the Board Reduction Scheme Was Designed to Thwart Clifford

103.    On May 15, 2025, the Board issued a public letter to shareholders wherein they conceded the motive behind the Board Reduction Scheme: keeping Clifford off of the Board.[9]

---

[8]    PENN Entertainment Inc., Schedule 14A, HG Vora Definitive Proxy Statement (May 12, 2025), https://www.sec.gov/Archives/edgar/data/921738/000121465925007411/j512250defc14a.htm.
[9]    PENN Entertainment Inc., Schedule 14A, Definitive Additional Materials (May 15, 2025), https://www.sec.gov/Archives/edgar/data/921738/000110465925049582/tm2515304d1_defa14a.htm.

104. The Board's letter stated that Hartnett and Ruisanchez would "bring relevant expertise and experience in the gaming industry" to the Board, but flatly dismissed Clifford as "unsuited to serve." In support of this conclusion, the letter stated:

   a. "Mr. Clifford had previously volunteered for a PENN Board seat in 2020, and this offer was rejected based on an evaluation of his skills and experiences against the needs of the Board[.]"

   b. "Following his nomination by HG Vora, PENN was willing to reconsider Mr. Clifford's director candidacy. As in 2020, Mr. Clifford's skills and experiences were not determined to be additive or complementary to the Board. In addition, during his interview process, Mr. Clifford failed to demonstrate the base level of open-mindedness required of all directors in order to explore value-generating solutions[.]"

   c. "During his time as Chief Financial Officer at PENN, Mr. Clifford advocated against key initiatives including bringing IT and financial processes in line with the 21st century, the creation of a customer database and related loyalty program, the development of hotels and other amenities at properties and the adoption of standardized and centralized software, systems and shared services. Notably, the execution of most of these initiatives followed Mr. Clifford's departure from PENN and were largely spearheaded by then Chief Operating Officer and current CEO and President, Jay Snowden. These initiatives were essential to driving meaningful margin improvement, and are critical to success in today's competitive market[.]"

   d. "Mr. Clifford lacks digital gaming and online sports betting experience – areas essential to the future of PENN's business and the industry – and his general experience is redundant with the significant real estate and financial expertise already represented on our Board[.]"

105. According to the letter, the Board decided that "it is in the best interest of the Company, all shareholders and other constituents to nominate Messrs. Hartnett and Ruisanchez for election to the Board while, in the absence of a fitting third candidate, reducing the Board size."

106. Put simply, the Board's letter made clear that the purpose of the Board Reduction Scheme was to entrench the Director Defendants in office by blocking shareholders from voting for anyone other than nominees who potentially would support the incumbent Board.

107.    Just days later, on May 19, 2025, Defendants signaled their intent to further manipulate the electoral process by disclosing that following the 2025 Annual Meeting they "will continue to consider opportunities to further refresh the Board."[10]  This statement reflects Defendants' intent to reinstate the ninth Board seat and add a director of Defendants' choosing, with no shareholder oversight or accountability whatsoever.

108.    Alarmed by Defendants' self-serving attempt to entrench themselves in office against shareholders' wishes, independent proxy advisory firms backed Clifford's nomination.

109.    ISS recommended that shareholders vote for Clifford due to his gaming industry experience and the Board's failure to hold management accountable.  As ISS put it:

> The board has emphasized Clifford's lack of open-mindedness. Even if one assumes this is a fair characterization (rather than just a polite way to say that he does not entirely agree with the strategy), there is little evidence that the board has been able to hold management accountable, which suggests that *a director who is not afraid to share a contrarian viewpoint may be a valuable addition. The more important point is that the board requires additional direct gaming industry experience, which Clifford can impart.* He also has experience at the company itself, as a member of senior management and recently as a consultant.
> ~~106. The Supplemental Disclosure does not fully correct Defendants' prior misstatements and omissions  and is materially false and misleading in its own right.  Among other things, the Supplemental Proxy omits the fact that HG Vora had nominated *three* individuals, as set forth in its preliminary proxy filed four days earlier.~~
> (Emphasis added).

110.    Another widely regarded proxy advisory firm, Egan-Jones, likewise recommended that shareholders vote for Clifford due to PENN's "financial underperformance," "significant governance concerns"—including a staggered board, plurality voting, and lack of shareholder rights—and the Company's suspicious decision to "suddenly decrease" the number of seats available at the annual shareholder meeting.

---

[10]  PENN Entertainment, Inc., Schedule 14A, Definitive Additional Materials (May 19, 2025), https://www.sec.gov/Archives/edgar/data/921738/000110465925050240/tm2515503d1_defa14a.htm.

111.    Clifford's nomination and HG Vora's litigation have also garnered broad support from shareholders who are "alarmed" by PENN's poor performance and its leadership's efforts to "insulate themselves from shareholder accountability."[11]  Commentators have likewise praised HG Vora "for waging a war against tyranny."

**I.    Clifford Receives a Majority of Votes at the 2025 Annual Meeting**

112.    On June 17, 2025, the 2025 Annual Meeting was held.

113.    To hold an annual meeting, PENN's Bylaws include a quorum requirement which provides that shareholder meetings "shall not be organized for the transaction of business unless a quorum is present."  Bylaws § 3.04.  The quorum requirement is "a majority of the votes that all shareholders are entitled to cast on a particular matter."  *Id.*

114.    As of the record date for the 2025 Annual Meeting, there were 150,852,769 shares of PENN's common stock outstanding, meaning 75,426,385 shares would be needed for quorum.

115.    Present at the 2025 Annual Meeting, in person or by proxy, were the holders of 117,166,555 shares of PENN common stock.[12]  Of those shares, 66,133,741 were represented on the HG Vora Universal Proxy, which were essential to achieve quorum.  Put differently, if HG Vora's proxy card were invalid, no quorum would have been achieved and no business could have been conducted at the 2025 Annual Meeting.

116.    At the 2025 Annual Meeting, it was deemed that a quorum was present.  Hartnett and Ruisanchez were elected to the Board, receiving 108,409,603 and 108,370,058 votes "FOR," respectively, representing approximately 92.5% of the votes cast.  Clifford received 61,962,937

---

[11]   *See* UNITE HERE, HForm PX14A6G,
https://www.sec.gov/Archives/edgar/data/921738/000147793225003651/unite_px14a6g.htm.
[12]    PENN    Entertainment,    Inc.,    Form    8-K    (June    23,    2025),
https://www.sec.gov/ix?doc=/Archives/edgar/data/921738/000110465925061297/tm2518574d1_8k.htm

"FOR" votes, representing approximately 57% of the votes cast.   PENN's Bylaws state that director candidates "receiving the highest number of votes . . . shall be elected."   Bylaws § 4.02(d).   Accordingly, at the 2025 Annual Meeting, Clifford was duly elected to the Board along with Hartnett and Ruisanchez.

117.    Defendants directed the Inspector not to count or certify "FOR" votes cast for Clifford on the HG Vora Universal Proxy—an order the Inspector  followed, excluding Clifford from the official Vote Report entirely.   Notwithstanding this omission, the Inspector has otherwise counted the HG Vora Universal Proxy for purposes of achieving quorum and for the votes cast for Hartnett and Ruisanchez.

118.    On June 17, 2025, the Company issued a press release disclosing that "PENN shareholders elected the Company's two director nominees, Johnny Hartnett and Carlos Ruisanchez, to serve on the Company's Board of Directors."   The press release omitted any reference to the millions of votes cast on the HG Vora Universal Proxy or the votes cast for Clifford.

119.    On June 20, 2025, representatives of Plaintiffs informed the Inspector that the exclusion of votes for Clifford was unlawful and constituted an abdication of the Inspector's responsibility to count votes impartially.

120.    On June 23, 2025, the Company filed a Form 8-K reporting the voting totals from the 2025 Annual Meeting.[13]  That 8-K counted the votes the HG Vora Universal Proxy for the election of Hartnett and Ruisanchez, as well as the four other proposals up for election at the 2025 Annual Meeting.  Without explanation, it did not count the votes cast for Clifford.

---

[13]    PENN Entertainment, Inc., Form 8-K (June 23, 2025), https://www.sec.gov/ix?doc=/Archives/edgar/data/921738/000110465925061297/tm2518574d1_8k.htm.

121.    Subsequent to the vote certification for the 2025 Annual Meeting, Hartnett and Ruisanchez were seated as directors.  Yet, despite Clifford's clear victory, Defendants refused to seat him.

**DERIVATIVE AND DEMAND ALLEGATIONS**

122.    ~~107.~~ Plaintiffs bring a breach of fiduciary claim derivatively in the right and for the benefit of PENN to redress the breaches of fiduciary duty and other violations of law by the Director Defendants.

123.    ~~108.~~ At all relevant times, Plaintiffs have been PENN shareholders.

124.    ~~109.~~ Demand is excused pursuant to § 1781(b)(1) because, as of the filing of the original Complaint on May 7, 2025, immediate and irreparable harm ~~will occur~~ to the Company was threatened because the shareholder vote at the upcoming 2025 Annual Meeting ~~will~~would otherwise take place based on materially false, misleading, and incomplete information, and the Company ~~will~~would not be able to realize the benefits of three new independent directors on its Board unless and until relief ~~is~~was awarded.  As ~~the balance of votes will be stacked towards~~a result, the incumbent directors~~, their decision making will~~ decision-making would continue to be insulated from shareholder review and ~~will~~would continue to cause harm to the Company and its shareholders.  ~~Time is of the essence, and Plaintiffs do not have months or even weeks to wait while Defendants contemplate a demand.  Plaintiffs are therefore entitled to proceed on their derivative claims.~~Following the 2025 Annual Meeting, such harm has occurred and continues to accrue each day Defendants are permitted to suppress the voting rights of its shareholders.

125.    On May 8, 2025, the Board formed a special litigation committee ("SLC") in response to this action.  On May 15, 2025, the Board appointed Marc Sonnenfeld and Richard Bazelon to the SLC.  Neither of Sonnenfeld or Bazelon are Board members.

126.    The SLC has since informed the Court that they anticipate completing their investigation by the end of October.

127.    Pursuant to 15 Pa.C.S. § 1781(b)(2), Plaintiffs made demand promptly upon commencing this action.  On May 23, 2025, Plaintiffs sent a letter to Defendants demanding that the Board promptly take appropriate action to remediate its wrongdoing in connection with this litigation.  Defendants, however, refused to repeal the Board Reduction Scheme or correct their false and misleading proxy disclosures.  Plaintiffs are therefore entitled to assert their derivative claims.

128.    ~~110.~~ The Board ~~lacks~~ lacked sufficient independence to consider any demand or request for corrective action because:

    a.    The Director Defendants ~~have~~ acted for the primary purpose of entrenching themselves in office;

    b.    The Director Defendants ~~are~~ were interested in maintaining their Board seats and therefore ~~have~~ enacted the Board Reduction Scheme as a defensive measure; ~~and~~

    c.    By selecting Sonnenfeld and Bazelon to the SLC, instead of any of the then-current Board members, the Director Defendants acknowledged they are inherently conflicted due to their personal interest in the asserted claims and, thus, are incapable of independent judgment in the matter; and

    d.    ~~c.~~ The Director Defendants ~~provide no justification whatsoever for~~ have openly stated that they adopted the Board Reduction Scheme for the express purpose of thwarting Clifford's election, which ~~in fact~~ so clearly ~~disenfranchises PENN and its~~ undermines the fundamental voting rights of

PENN's shareholders and is so clearly against the best interests of PENN that it could not have been the exercise of the Director Defendants' valid, good faith, business judgment.

129.    This action is not a collusive action designed to confer jurisdiction on this Court that it would otherwise not have.

## **COUNT I**

**(Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9: The Press Release)**

**(Against all Defendants)**

111. Plaintiffs repeat and reallege each and every allegation as set forth above in this Complaint as if fully set forth herein.

112. Section 14(a) of the Exchange Act provides that it shall be unlawful for any person to solicit any proxy in violation of SEC rules.  15 U.S.C. § 78n(a).

113. SEC Rule 14a-9 prohibits the solicitation of proxies "by means of any . . . communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9(a).

114. As alleged herein, Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder because on April 25, 2025, Defendants and/or their agents prepared, reviewed, approved and/or disseminated a false and misleading proxy statement via the Press Release.

115. The Press Release is materially false and misleading because it, among other things:

a. creates the false impression that Defendants' decision to nominate two of the Independent Nominees for election at the 2025 Annual Meeting was the product of an agreement when it was not, especially because Defendants refused to name Clifford in their proxy materials;

b. creates genuine confusion among the Company's shareholders concerning how many Board seats actually exist and how many seats are properly up for election at the 2025 Annual Meeting;

c. omits that the reduction in seats resulted from intentional Board action, rather than occurring automatically upon the resignation of a director as the Press Release suggests; and

d. omits disclosing the reason for the Board Reduction Scheme, including whether such reduction is intended to be temporary.

116. The false or misleading statements contained in the Press Release were material in that there is a substantial likelihood that a reasonable PENN shareholder would consider them important in understanding their voting rights and deciding how to exercise those rights at the 2025 Annual Meeting, including as to the election of directors and proposals that ask shareholders to approve compensation plans for directors and officers.

117. A reasonable PENN shareholder would consider it important that (i) PENN engaged in its Board Reduction Scheme on the eve of the 2025 Annual Meeting, in a clear effort to entrench its current directors, and (ii) Plaintiffs still intend to nominate all three Independent Nominees for election, despite PENN arbitrarily choosing only two of them to be its own nominees.

118. Defendants were at least negligent in making the false and misleading statements in the Press Release.

119. Defendants' material misrepresentations and omissions have caused Plaintiffs to suffer economic loss. Because of Defendants' Section 14(a) violations, and in an effort to correct against Defendants' false and misleading proxy materials in advance of the 2025 Annual Meeting, Plaintiffs have incurred substantial proxy solicitation expenses and fees in connection with preparing and issuing Plaintiffs' own proxy materials.

120. The Press Release is an essential link in Defendants' efforts to entrench the current Board in office, limit the outside influence of PENN's shareholders, and guarantee Defendants' desired electoral outcome at the 2025 Annual Meeting at the direct expense of PENN's shareholders, who will have to endure a longer period of mismanagement and decline in shareholder value under the current Company leadership.

121. By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

122. Because of the false and misleading statements and material omissions in the Press Release, PENN's shareholders, including Plaintiffs, are threatened with irreparable harm. Without relief, PENN's shareholders, including Plaintiffs, will be deprived of their right to full disclosure and reasonable opportunity to consider and elect three new Board members—all of whom are fully qualified, independent, and eligible for the director positions.

123. Plaintiffs have no adequate remedy at law.

124. For these reasons, in addition to damages, declaratory and injunctive relief should be granted in favor of Plaintiffs.

## ~~COUNT II~~

**(Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9: The Definitive Proxy)**

**(Against All Defendants)**

130.    ~~125.~~ Plaintiffs repeat and reallege each and every allegation as set forth above in this Complaint as if fully set forth herein.

131.    ~~126.~~ Section 14(a) of the Exchange Act provides that it shall be unlawful for any person to solicit any proxy in violation of SEC rules.  15 U.S.C. § 78n(a).

132.    ~~127.~~ SEC Rule 14a-9 prohibits the solicitation of proxies "by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."  17 C.F.R. § 240.14a-9(a).

133.    ~~128.~~ SEC Rule 14a-3 requires that each person solicited shall be concurrently or previously furnished with "[a] publicly-filed preliminary or definitive proxy statement" containing the information specified in Schedule 14A.  17 C.F.R. § 240.14a-3(a)(1).

134.    ~~129.~~ Item 7(f) of Schedule 14A provides that "[i]f a person is conducting a solicitation that is subject to § 240.14a-19, the registrant must include in its proxy statement a statement directing shareholders to refer to any other soliciting person's proxy statement for information required by Item 7 of this Schedule 14A with regard to such person's nominee or nominees."  17 C.F.R. § 240.14a-101.

135. ~~130.~~ SEC Rule 14a-19, in turn, applies where (as here) there is a contested director election.  Rule 14a-19 provides that "the form of proxy of the registrant and the form of proxy of any person soliciting proxies pursuant to this section shall . . . [s]et forth the names of all persons nominated for election by the registrant and by any person or group of persons that has complied with this section and the name of any person whose nomination by a shareholder or shareholder group satisfies the requirements of an applicable state or foreign law provision or a registrant's governing documents as they relate to the inclusion of shareholder director nominees in the registrant's proxy materials" and "[c]learly distinguish between the nominees of the registrant [and] the nominees [of others]."  17 C.F.R. §§ 240.14a-19(e)(1), 240.14a-19(e)(3).

136. ~~131.~~ The Definitive Proxy is a solicitation made by PENN on behalf of the Board. The "Notice of Annual Meeting of Shareholders" contained therein is disseminated "By Order of the Board of Directors."  The Director Defendants prepared, reviewed, approved, disseminated, and/or caused PENN to disseminate ~~this~~ the Definitive Proxy which contained materially false and misleading ~~proxy statement~~ statements and material omissions.

137. ~~132.~~ As alleged herein, Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder because on April 28, 2025, Defendants prepared and filed a false and misleading proxy statement~~,~~ *i.e.,* the Definitive Proxy.

~~133.  The Definitive Proxy is materially false and misleading because it, among other things:~~

~~a. creates the false impression that Defendants decision to nominate two of the Independent Nominees for election at the 2025 Annual Meeting was the product of an agreement when it was not, especially because Defendants refused to name Clifford in their proxy materials;~~

~~b. creates genuine confusion among the Company's shareholders concerning how many Board seats actually exist and how many seats are properly up for election at the 2025 Annual Meeting;~~

~~c. omits that the reduction in seats resulted from intentional Board action, rather than occurring automatically upon the resignation of a director as the Definitive Proxy suggests; and~~

~~d. omits disclosing the motivation for the Board Reduction Scheme, including whether such reduction is intended to be temporary.~~

138. ~~134.~~ The Definitive Proxy is ~~also~~ materially false and misleading as it omits information that the federal securities laws and SEC rules require.  Specifically, the Definitive Proxy does not contain the ~~required~~ references to Plaintiffs' proxy materials that Item 7 of Schedule 14A and SEC Rule 14a-19 require.

139. ~~135.~~ Additionally, PENN's proxy card—appended to the Definitive Proxy and refiled on April 29, 2025—states that "[t]he Board of Directors recommends you vote FOR each of the nominees listed in proposal 1."  Proposal 1 is the "[e]lection of two Class II directors to serve until the 2028 ~~[a]nnual [m]eeting~~Annual Meeting of Shareholders and until their respective successors are elected and qualified to serve."   PENN lists only two individuals under "Nominees": "1a.  Carlos Ruisanchez" and "1b.  Johnny Hartnett," with the option to vote "For" or vote "Withhold."   In violation of Rule 14a-19, PENN omits Clifford, a duly-nominated candidate, from its proxy card, and omits any reference that Ruisanchez and Hartnett were nominated by HG Vora.

140. ~~136.~~ The false or misleading statements contained in the Definitive Proxy are material in that there is a substantial likelihood that a reasonable PENN shareholder would

consider them important in understanding their voting rights and deciding how to exercise those rights at the 2025 Annual Meeting and in future elections, including as to the election of directors and proposals that ask shareholders to approve compensation plans for directors and officers.  Moreover, the omissions in the Definitive Proxy are material because they make other statements in the Definitive Proxy false or misleading.

141.  ~~137.~~ The Defendants were at least negligent in allowing or authorizing the filing of the Definitive Proxy given that it contains multiple material misstatements and omissions.

142.  ~~138.~~ Defendants' material misrepresentations and omissions have already caused Plaintiffs to suffer economic loss.  Because of Defendants' Section 14(a) violation, and in an effort to correct against Defendants' false and misleading proxy materials in advance of the 2025 Annual Meeting, Plaintiffs have incurred substantial proxy solicitation expenses and fees in connection with preparing and issuing Plaintiffs' own proxy materials.

143.  ~~139.~~ The Definitive Proxy is an essential link in Defendants' efforts to entrench the current Board in office, limit the influence of its shareholders, and guarantee Defendants' desired electoral outcome at the 2025 Annual Meeting at the direct expense of PENN's shareholders, who will have to endure a longer period of mismanagement and decline in shareholder value under ~~the~~ current Company leadership.

144.  ~~140.~~ By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

145.  ~~141.~~ Because of the false and misleading statements and material omissions in the Definitive Proxy, PENN's shareholders, including Plaintiffs, have been irreparably harmed and are threatened with future irreparable harm~~.  Without relief, shareholders will be~~ because they have been prevented from ~~voting on~~ having their votes counted for all *three* ~~incumbent~~ Class II

directorsdirector seats.  PENN's shareholders, including Plaintiffs, willwere and continue to be deprived of their right to full disclosure and reasonable opportunity to nominate, consider, and elect three new Board members—all of whom are fully qualified, independent, and eligible for the director positions.

146.    Moreover, if left unchecked, there is a substantial likelihood that Defendants will engage in precisely the same misconduct for PENN's 2026 annual meeting of shareholders.

147.    142. Plaintiffs have no adequate remedy at law.

148.    143. For these reasons, in addition to damages, declaratory and injunctive relief should be granted in favor of Plaintiffs.

## COUNT IIIII

### (Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-19)

### (Against All Defendants)

149.    144. Plaintiffs repeat and reallege each and every allegation as set forth above in this Complaint as if fully set forth herein.

145. Section 14(a) of the Exchange Act provides that it shall be unlawful for any person to solicit any proxy in violation of SEC rules.  15 U.S.C. § 78n(a).

146. SEC Rule 14a-19 applies where (as here) there is a contested director election.  Rule 14a-19 provides that "the form of proxy of the registrant and the form of proxy of any person soliciting proxies pursuant to this section shall . . . [s]et forth the names of all persons nominated for election by the registrant and by any person or group of persons that has complied with this section and the name of any person whose nomination by a shareholder or shareholder group satisfies the requirements of an applicable state or foreign law provision or a registrant's governing documents as they relate to the inclusion of shareholder director nominees in the

registrant's proxy materials" and "[c]learly distinguish between the nominees of the registrant [and] the nominees [of others]."  17 C.F.R. §§ 240.14a-19(e)(1), 240.14a-19(e)(3).

150.  147. Defendants' proxy card—appended to its Definitive Proxy and refiled on April 29, 2025—omits the name of a validly nominated candidate, Clifford, and fails to distinguish between Defendants' nominees and those of Plaintiffs.  It therefore violates Rule 14a-19.

151.  148. These misstatements have Defendants' violations of Rule 14a-19 already have caused Plaintiffs to suffer loss.  Because of Defendants' Section 14(a) violation, and in an effort to correct against Defendants' false and misleading proxy materials in advance of the 2025 Annual Meeting, Plaintiffs have incurred substantial proxy solicitation expenses and fees in connection with preparing and issuing Plaintiffs' own proxy materials.  The Company's proxy card's card omission of Clifford is an essential link in achieving Defendants' desired electoral outcome.

152.  149. By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-19 promulgated thereunder.

153.  Because of these omissions, PENN's shareholders, including Plaintiffs, have been irreparably harmed, and are threatened with future irreparable harm, because they have been prevented from having their votes counted for all *three* Class II director seats.  PENN's shareholders, including Plaintiffs, were and continue to be deprived of their right to full disclosure and reasonable opportunity to nominate, consider, and elect three new Board members—all of whom are fully qualified, independent, and eligible for the director positions.

154.  Moreover, if left unchecked, there is a substantial likelihood that Defendants will engage in precisely the same misconduct for PENN's 2026 annual meeting of shareholders.

155.   150.  Plaintiffs have no adequate remedy at law.

156.   151.  For these reasons, in addition to damages, injunctive relief should be granted in favor of Plaintiffs.

### COUNT IVIII

**(Violation of Shareholder Voting Rights, 15 Pa.C.S. § 1793)**

**(Against All Defendants)**

157.   152.  Plaintiffs repeat and reallege each and every allegation as set forth above in this Complaint as if fully set forth herein.

158.   153.  The BCL provides that "[u]pon the application of any person aggrieved by any corporate action, the court may hear and determine the validity of the corporate action."  15 Pa.C.S. § 1793(a).  Corporate actions include, among others, "the election, appointment, designation or other selection and the suspension or removal of directors or officers of a business corporation."  § 1791(a).  Corporate actions also include actions "that under the bylaws may be, submitted for action to the shareholders, directors or officers of a business corporation."  *Id*.

159.   154.  Courts of the Commonwealth have the powers of a court of equity or chancery insofar as those powers relate to the supervision and control of corporations under 15 Pa.C.S § 104, and have the power and authority to redress legal grievances in accordance with applicable supplemental general principles of law in accordance with 15 Pa.C.S. § 110.

160.   155.  Defendants' adoption of the Board Reduction Scheme is a corporate action because it constitutes the "election" or "other selection" of a director, and because it is an action that under the Bylaws may be acted uponon by directors.

161. ~~156.~~ As shareholders of PENN, Plaintiffs are persons "aggrieved" by Defendants' conduct seeking to entrench themselves _in office_ and prevent Plaintiffs, and other PENN shareholders, from effectively exercising their voting rights in a contested election for directors.

162. ~~157.~~ Accordingly, this Court has the authority pursuant to 15 Pa.C.S. §§ 104, 110 and 1793 to determine the validity of the Board Reduction Scheme.

163. ~~158.~~ The Board Reduction Scheme is invalid under Pennsylvania Law because it is designed to entrench, and ~~would have~~has had the effect of entrenching, the existing Board and management, and is designed to interfere with, and ~~would interfere~~has interfered with, shareholders' ~~right to vote by preventing shareholders from electing all three Independent Nominees~~voting rights by enabling the Board to block Clifford from being seated on the Board even after he was elected with 57% of the votes cast at the 2025 Annual Meeting.

164. Defendants' refusal to seat Clifford, who received a majority of votes at the 2025 Annual Meeting, is likewise improper, as Defendants have no valid basis to reject the votes cast in his favor.

165. ~~159.~~ As a shareholder of PENN, HG Vora is a person "aggrieved" by Defendants' conduct seeking to entrench themselves and prevent HG Vora, and other PENN shareholders, from effectively exercising their voting rights in a contested election for directors.

166. ~~160.~~ Plaintiffs have no adequate remedy at law.

167. ~~161.~~ For these reasons, declaratory and injunctive relief should be granted in favor of Plaintiffs

**COUNT ~~V~~IV**

**(Breach of Fiduciary Duty)**

**(Derivatively on Behalf of PENN Against the Director Defendants)**

51

168. ~~162.~~ Plaintiffs repeat and reallege each and every allegation as set forth above in this Complaint as if fully set forth herein.

169. ~~163.~~ At all relevant times, the Director Defendants have owed PENN fiduciary duties, including duties of care and loyalty, ~~by virtue of~~arising from their ~~roles~~positions as directors.

170. ~~164.~~ The Director Defendants breached their fiduciary duties through the Board Reduction Scheme, which was enacted for the primary purpose of interfering with shareholders' ability to effectively exercise their voting rights in a contested election for directors by eliminating a Board seat up for election after Plaintiffs had nominated ~~a candidate~~Clifford to fill that seat.

171. The Director Defendants also breached their fiduciary duties by failing to seat Clifford, who received a majority of votes cast at the 2025 Annual Meeting and therefore was duly elected as a director of the Company.

172. ~~165.~~ At all relevant times, Plaintiffs have been shareholders of PENN.

173. ~~166.~~ Demand ~~is~~was excused pursuant to § 1781(b)(1) when Plaintiffs first filed because immediate and irreparable harm ~~will~~would occur to the Company because the shareholder vote at the upcoming 2025 Annual Meeting will otherwise take place based on materially false, misleading, and incomplete information, and the Company will not be able to realize the benefits of three new independent directors on its Board unless and until relief is awarded. As the balance of votes ~~will be~~was stacked towards the incumbent directors, their ~~decision making will~~decision-making would continue to be insulated from shareholder review and ~~will~~would continue to cause harm to the Company and its shareholders. ~~Time is of the essence, and Plaintiffs do not have months or even weeks to wait while Defendants contemplate~~

a Following the 2025 Annual Meeting, such harm has occurred and continues to accrue each day Defendants are permitted to suppress the voting rights of its shareholders.

174.    demandPursuant to 15 Pa.C.S. § 1781(b)(2), Plaintiffs made demand promptly upon commencing this action.  Defendants have not taken any corrective action.  Plaintiffs are therefore entitled to proceed onassert their derivative claims.

175.    167. As a result of the Director Defendants' actions, the Company has been and will be damaged.

176.    168. Plaintiffs have no adequate remedy at law.

177.    169. For these reasons, declaratory and injunctive relief should be granted in favor of Plaintiffs.

## COUNT VIV

### (Violation of 15 Pa.C.S § 1724)

### (Against All Defendants)

178.    170. Plaintiffs repeat and reallege each and every allegation as set forth above in this Complaint as if fully set forth herein.

171. The BCL provides that "[u]pon the application of any person aggrieved by any corporate action, the court may hear and determine the validity of the corporate action."  15 Pa.C.S. § 1793(a).  Corporate actions include, among others, "the election, appointment, designation or other selection and the suspension or removal of directors or officers of a business corporation." § 1791(a).  Corporate actions also include actions "that under the bylaws may be submitted for action to the shareholders, directors or officers of a business corporation." Id.

172. Courts of the Commonwealth have the powers of a court of equity or chancery insofar as those powers relate to the supervision and control of corporations under 15 Pa.C.S §

104 and have the power and authority to redress legal grievances in accordance with applicable supplemental general principles of law in accordance with 15 Pa.C.S. § 110.

173. Defendants' adoption of the Board Reduction Scheme is a corporate action because it constitutes the "election" or "other selection" of a director, and because it is an action that under the Bylaws may be acted upon by directors.

174. As shareholders of PENN, Plaintiffs are persons "aggrieved" by Defendants' conduct seeking to entrench themselves and prevent Plaintiffs, and other PENN shareholders, from effectively exercising their voting rights in a contested election for directors.

175. Accordingly, this Court has the authority pursuant to 15 Pa.C.S. §§ 104, 110 and 1793 to determine the validity of the Board Reduction Scheme.

179. 176. The BCL provides that, for corporations that have classified boards of directors, each class "shall be as nearly equal in number as possible." 15 Pa.C.S § 1724(b)(1). PENN's Articles similarly provides provide that directors "shall be classified, with respect to the time for which they severally hold office, into three classes, as nearly equal in number as possible…."

180. 177. PENN had three classes of directors, each with three seats. By purporting to eliminate one of the Class II seats, Defendants caused the classes to become unequal in number, thereby violating the statutory requirements of § 1724 as well as Article 6(a) of PENN's Articles.

181. This Court has the authority pursuant to 15 Pa.C.S. §§ 104, 110 and 1793 to determine the validity of this conduct and to order appropriate relief.

182. 178. Plaintiffs have no adequate remedy at law.

183. ~~179.~~ For these reasons, declaratory and injunctive relief should be granted in favor of Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter an Order:

A. Declaring that the Board Reduction Scheme is invalid;

B. Ordering Defendants to issue corrective disclosures;

~~C. Ordering Defendants to include all three of HG Vora's Independent Nominees on their proxy card;~~

C. ~~D.~~ Ordering the Company to ~~allow shareholders an opportunity to elect all three of the Independent Nominees~~(i) seat Clifford based on the votes cast at the 2025 Annual Meeting, ~~or, failing that, holding~~(ii) hold a special election, (iii) or otherwise ~~providing~~provide shareholders an opportunity to vote on a third Class II Director whose term will end in 2028, as soon as practicable;

D. ~~E.~~ Enjoining Defendants from changing the size of the Board or classes thereof in violation of Pennsylvania law through the 2028 annual meeting;

E. ~~F.~~ Awarding Plaintiffs damages in an amount to be determined at trial;

F. ~~G.~~ Awarding Plaintiffs their costs and disbursements in this action, including reasonable attorneys' and experts' fees; and

G. ~~H.~~ Granting Plaintiffs such other and further relief as this Court may deem just and proper.

Dated: ~~May 7~~August 18, 2025

/s/ ~~DANIEL~~Daniel E. ~~RHYNHART~~Rhynhart
_____
DANIEL E. RHYNHART (PA Bar No. 78248)

Michael E. Swartz (*pro hac vice* ~~forthcoming~~)
Manisha M. Sheth (*pro hac vice* ~~forthcoming~~)
QUINN EMANUEL URQUHART &
SULLIVAN LLP
295 5th Avenue, 9th Floor
New York, New York 10016
Tel: 212-849-7000
michaelswartz@quinnemanuel.com
manishasheth@quinnemanuel.com

Daniel E. Rhynhart (PA Bar No. 78248)
BLANK ROME LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Tel: 215-569-5371
dan.rhynhart@blankrome.com

Richard M. Brand (*pro hac vice* ~~forthcoming~~)
WHITE & CASE LLP
1221 6th Avenue
New York, New York 10020
Tel: 212-819-8200
richard.brand@whitecase.com

*Counsel for Plaintiffs HG Vora Capital Management, LLC, HG Vora Special Opportunities Master Fund, Ltd., and Downriver Series LP – Segregated Portfolio C*