# EXHIBIT A

**CONFIDENTIAL**

**PENN ENTERTAINMENT, INC.**

---

# REPORT OF THE

# SPECIAL LITIGATION COMMITTEE

---

**NOVEMBER 24, 2025**

#125339201v1

## TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................... 1

II.   THE HG VORA CLAIMS.................................................................................. 7

III.  RESPONSE OF THE BOARD AND FORMATION OF THE SLC ................. 10

    A.    Authority of Pennsylvania Special Litigation Committees ............................. 10

    B.    The Formation of the Committee.................................................................... 12

    C.    The Committee Members ............................................................................... 16

    D.    Retention of Dilworth Paxson LLP................................................................ 21

    E.    The Committee Members are Disinterested and Independent ......................... 22

IV.   SCOPE AND CONDUCT OF THE INVESTIGATION .................................. 25

    A.    Regular Meetings .......................................................................................... 26

    B.    Written Materials .......................................................................................... 27

    C.    Communications with Counsel for PENN and HG Vora ................................ 28

    D.    Interviews..................................................................................................... 30

    E.    Retention of Kevin Hayes, Esquire................................................................ 31

    F.    The Committee's Written Report.................................................................... 32

V.    RELEVANT FACTUAL BACKGROUND...................................................... 33

    A.    PENN Entertainment .................................................................................... 33

    B.    HG Vora and PENN's Relationship Before the 2025 Annual Meeting............ 34

    C.    Post-2024 Annual Meeting ............................................................................ 36

    D.    PENN Considers All Three HG Vora Nominees............................................. 38

    E.    PENN Conducts Search For Candidates ......................................................... 42

    F.    The Board Was Informed by Highly Qualified Advisors................................. 42

    G.    PENN and HG Vora's Negotiations ............................................................... 43

    H.    The April 25, 2025 Board Meeting And Decision To Eliminate The Seat....... 45

i

I.    The Lead Up to the 2025 Annual Meeting .............................................................. 50

J.    The 2025 Annual Meeting ...................................................................................... 51

VI.    FINDINGS OF THE SPECIAL LITIGATION COMMITTEE ........................................ 52

A.    Pennsylvania Law Relating to Fiduciary Duties..................................................... 52

1.    The Applicable Burden and Standard To the Board's Decision To Reduce The Size Of The Board ...................................................................................53

   (i)    There Are Critical Differences Between Pennsylvania and Delaware Law on a Board's Fiduciary Duties .................................................. 55

       a.    Pennsylvania Codified Its Business Judgment Rule; Delaware Did Not.............................................................................................. 55

       b.    Pennsylvania Applies a Deferential Standard with No Burden Shifting........................................................................................ 60

       c.    Pennsylvania Enacted the BCL to Empower the Board During Change-of-Control Situations .......................................... 61

   (ii)    Pennsylvania Court Would Likely Apply the Business Judgment Rule... 62

2.    The Committee Considered HG Vora's Counterargument that Delaware's Enhanced Scrutiny Standard Would Apply .............................................64

B.    It Would Not Be in the Best Interests of the Company to Pursue Litigation Against the Board Based on its Decision to Eliminate the Board Seat ................................................. 70

VII.    CONCLUSION.......................................................................................................... 76

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Almusa v. State Board of Medicine*,
    332 A.3d 791 (Pa. 2025) ........................................................56

*AMP Inc. v. Allied Signal, Inc.*,
    No. 98-cv-4109, 1998 WL 778348 (E.D. Pa. Oct. 8, 1998) ...........................................62, 63

*Blasius Indus., Inc. v. Atlas Corp.*,
    564 A.2d 651 (Del. Ch. 1988)............................................54, 60, 68, 69

*Braun v. Herbert*,
    180 A.3d 482 (Pa. Super. Ct. 2018) ........................................................11, 23

*Coster v. UIP Cos., Inc.*,
    300 A.3d 656 (Del. 2023) ........................................................54, 60, 76

*Cuker v. Mikalauskas*,
    547 Pa. 600, 692 A.2d 1042 (Pa. 1997) ........................................ *passim*

*Enterra Corp. v. SGS Assocs.*,
    600 F. Supp. 678 (E.D. Pa. 1985) ........................................................63, 64

*IBS Fin Corp. v Seidman & Assocs., L.L.C.*,
    136 F.3d 940 (3d Cir. 1998)........................................................68, 69

*Lee on Behalf of PPG Indus. Inc. v. McGarry*,
    No. 2:20-cv-75, 2020 WL 7075633 (W.D. Pa. Dec. 3, 2020) .................................................11

*LeMenestrel v. Warden*,
    964 A.2d 902 (Pa. Super. Ct. 2008)........................................................11, 23

*Maffei v. Palkon*,
    339 A.3d 705 (Del. 2025) ........................................................59

*McRitchie v. Zuckerberg*,
    315 A.3d 518 (Del. Ch. 2024)........................................................59

*In re Nine West LBO Securities Litigation*,
    505 F. Supp. 3d 292 (S.D.N.Y. 2020)........................................................58

*Pell v. Kill*,
    135 A.3d 764 (Del. Ch. 2016)........................................................60, 67, 68

*Pittsburgh Hist. & Landmarks Found. v. Ziegler,*
  200 A.3d 58 (Pa. 2019) ..................................................................................11

*Reifsnyder v. Pittsburgh Outdoor Advertising Co.,*
  173 A.2d 319 (Pa. 1961) ................................................................................70

*Stilwell Value Partners I, L.P. v. Prudential Mut. Holding Co.,*
  No. 06-cv-4432, 2007 WL 2345281 (E.D. Pa. Aug. 15, 2007) ................58, 59

*Warehime v. Warehime,*
  722 A.2d 1060 (Pa. Super. Ct. 1998) .............................................................69

*Warehime v. Warehime,*
  761 A.2d 1138 (Pa. 2000) .........................................................................69, 70

*Warehime v. Warehime,*
  777 A.2d 469 (Pa. Super. Ct. 2001) ...............................................................69

*Warehime v. Warehime,*
  860 A.2d 41 (Pa. 2004) ...................................................................................69

**Statutes**

1 Pa. C.S. § 1921(a) ..............................................................................................56, 57

1 Pa. C.S. § 1921(b) ....................................................................................................56

1 Pa. C.S. § 1921(c) ....................................................................................................66

15 Pa. C.S. § 1712 ...................................................................................57, 58, 65, 66

15 Pa. C.S. § 1712 cmt. ...............................................................................................56

15 Pa. C.S. § 1712(a) .............................................................................53, 56, 58, 74

15 Pa. C.S. § 1712(b) ..................................................................................................53

15 Pa. C.S. § 1712(d) ........................................................................................ *passim*

15 Pa. C.S. § 1712(d)(1) .............................................................................................57

15 Pa. C.S. § 1712(d)(2) .............................................................................................57

15 Pa. C.S. § 1712(d)(3) .......................................................................................55, 57

15 Pa. C.S. § 1712(e) ...............................................................................52, 54, 56, 61

15 Pa. C.S. § 1715 .............................................................................................56, 57, 58

15 Pa. C.S. § 1715 cmt. ............................................................................................58

15 Pa. C.S. § 1715(a) ........................................................................................ *passim*

15 Pa. C.S. § 1715(a)(4) ..........................................................................................75

15 Pa. C.S. § 1715(b) ........................................................................................56, 57

15 Pa. C.S. § 1715(c) ................................................................................................57

15 Pa. C.S. § 1715(d) ........................................................................................ *passim*

15 Pa. C.S. § 1715(e) ........................................................................................22, 67

15 Pa. C.S. § 1715(e)(2)(iv) ....................................................................................67

15 Pa. C.S. § 1716 ....................................................................................................58

15 Pa. C.S. § 1717 ............................................................................................53, 56

15 Pa. C.S. § 1721 ....................................................................................................52

15 Pa. C.S. §1721(a) ................................................................................................52

15 Pa. C.S. §1781(c) ................................................................................................25

15 Pa. C.S. §1783 ..........................................................................................5, 10, 25

15 Pa. C.S. § 1783(a) ................................................................................................10

15 Pa. C.S. § 1783(c) ................................................................................................11

15 Pa. C.S. § 1783(c)(1) ..........................................................................................11

15 Pa. C.S. § 1783(c)(2) ..........................................................................................11

15 Pa. C.S. § 1783(d) ................................................................................................11

15 Pa. C.S. § 1783(f)(1) ....................................................................................11, 12

15 Pa. C.S. § 1783(f)(2) ....................................................................................11, 12

15 Pa. C.S. § 1783(f)(3) ....................................................................................11, 12

**Other Authorities**

Kevin M. Rampe, PENNSYLVANIA'S NEW FIDUCIARY DUTY PROVISIONS:
    CHANGING THE RULES IN THE CORPORATION, 55 Alb. L. Rev. 199 (1991) .......................60, 61

REDEFINING PENNSYLVANIA CORPORATE LAW: ELIMINATING CORPORATE
    DIRECTORS' FIDUCIARY, 96 Dick. L. Rev. 231 (1992) ............................................................61

S.B. 1310, 3rd Sess., at 1536 (Pa. 1989)...............................................................................61, 62

Sarah S. Nickerson, THE SALE OF CONRAIL: PENNSYLVANIA'S ANTI-TAKEOVER
    STATUTES VERSUS SHAREHOLDER INTERESTS, 77 Tul. L. Rev. 1369 (1998) ..........................61

## I.    <u>INTRODUCTION</u>

This Special Litigation Committee report is in response to a litigation demand made on the Board of Directors (the "Board") of PENN Entertainment, Inc. ("PENN" or the "Company") by HG Vora Capital Management, LLC, HG Vora Special Opportunities Master Fund, Ltd. and Downriver Series LP – Segregated Portfolio C (collectively, "HG Vora").[1] The demand relates to the decision of the Board to eliminate a Board seat before the 2025 Annual Meeting.

More specifically, on April 25, 2025, PENN announced that the Board had voted to adjust the number of seats available for directors from nine to eight and that the number of Board seats on which shareholders would vote at the Annual Meeting to be held on June 17, 2025 would be two (and not three).[2] As part of this announcement, PENN advised that one of its current directors —whose term was set to expire at the Annual Meeting in June 2025—had retired, and that his Board seat would not be filled. As a consequence, the Board would now be comprised of eight directors instead of nine, and only two directors would be eligible for election at the June 2025 Annual Meeting.

Although the Company's Bylaws expressly permit the Board to expand or reduce the overall size of the Board, HG Vora alleges that the decision violated the Board's fiduciary duties and otherwise gave rise to various shareholder claims. HG Vora's rationale is focused on the timing of the Board's actions. When the Board made the decision to eliminate the Board seat, PENN and HG Vora were in the midst of a dispute with respect to the slate of directors to be voted on at the June 2025 Annual Meeting.

---

[1] As of April 2025, HG Vora beneficially owned 7,250,000 shares of PENN common stock. HG Vora's stock ownership represents approximately 4.8% of the total outstanding shares of PENN. In addition, HG Vora owns derivatives representing an approximate 18% economic interest in the Company.

[2] PENN's Bylaws require a staggered Board election process, whereby directors are split into three classes, each of which are elected at the Annual Meeting for a three-year term.

The dispute between PENN and HG Vora with respect to the composition of the Board started in 2023. At that time, HG Vora owned approximately 10% of PENN voting shares and had received waivers from various state licensing authorities based on its representation that it was a passive institutional investor. Nevertheless, representatives of HG Vora met with the Board in the Fall of 2023. During the meeting, HG Vora requested that PENN engage in a share buyback and increase the Company's leverage. Later in 2023, HG Vora requested that PENN add two HG Vora-nominated directors. HG Vora also requested that one director serve as the chair of a newly created Capital Allocation Committee, and the other director serve on the Nominating and Governance Committee. On December 28, 2023, HG Vora filed a Schedule 13D, which reflected its intent to influence or affect the affairs or operations of PENN. HG Vora then attempted to nominate directors for the 2024 Annual Meeting. However, regulators determined that, by filing its Schedule 13D, HG Vora was out of compliance with its institutional investor waivers. Regulators, therefore, prevented HG Vora from nominating directors at the 2024 Annual Meeting.

After the 2024 Annual Meeting, in an apparent effort to avoid state gaming licensing requirements, HG Vora altered its ownership interest in PENN. HG Vora filed an amendment to its Schedule 13D disclosing that it retained approximately 4.8% ownership of PENN stock and an approximate overall 18% economic interest through derivatives. The specifics of the derivative holdings were not disclosed nor, to PENN's knowledge, have they subsequently been disclosed. In January 2025, HG Vora proposed a slate of three new directors—Johnny Hartnett, Carlos Ruisanchez and William Clifford—for election at the June 2025 Annual Meeting.

In the months leading up to the April 2025 decision, PENN and HG Vora engaged in negotiations regarding the upcoming Board elections. The Board eventually determined that both Mr. Hartnett and Mr. Ruisanchez had the requisite skills and profiles to serve on the Board and

agreed to support their candidacy at the upcoming election. To make way for Messrs. Hartnett and Ruisanchez and to avoid a proxy contest, long-time Board members Barbara Shattuck Kohn and Saul Reibstein, two incumbent directors whose terms were set to expire in June 2025, decided not to stand for election.

The Board, however, determined that Mr. Clifford was unsuited to serve on the Board. Specifically, the Board concluded that Mr. Clifford, a former Chief Financial Officer ("CFO") of PENN who unsuccessfully sought a position on the Board in 2020, lacked digital gaming or sports betting experience or CEO experience and that his skills and experiences were redundant to the financial and real estate experience already represented on the Board. The Board also determined that, while he was CFO of PENN, Mr. Clifford advocated against key initiatives to invest in properties in Pennsylvania and modernize PENN's infrastructure, software and business and that Mr. Clifford failed to demonstrate an appropriate level of open-mindedness about the Company's future strategy.

Shortly before the April 25, 2025 Board meeting, Ronald Naples, who had served on the Board since 2013, resigned from the Board effective immediately. After extensive efforts with a recruiting firm, which had been ongoing, the Board had not identified a suitable alternative candidate in time for the June 2025 elections. At the April 25, 2025 Board meeting, the Board determined that Mr. Naples' Board seat would be eliminated. The end result was that the overall size of the Board was reduced from nine to eight (the number had varied for years), and the number of directors up for election at the June 2025 Annual Meeting was reduced from three to two. The Board made its decision with advice from both internal and external legal and financial advisors. After considering the various options, the Board made the decision to eliminate the Board seat, concluding that the elimination of the seat was in the best interests of the Company. PENN issued

a press release and subsequent proxy statement announcing these changes and listing Messrs. Hartnett and Ruisanchez as PENN's nominees for the upcoming elections. HG Vora also issued a proxy statement soliciting proxies for its three nominees (Messrs. Hartnett, Ruisanchez and Clifford), although there were only two board seats available.

On May 7, 2025, HG Vora sued in the Eastern District of Pennsylvania (the "HG Vora Federal Action"), naming PENN and the formerly constituted nine-person Board as defendants. The Complaint consisted of six causes of action. The first three causes of action asserted claims for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), and SEC Rule 14a-9, claiming PENN's press release and proxy statement regarding the Annual Meeting contained numerous false and misleading statements regarding the Board's decision to reduce the size of the Board and the related elections. HG Vora did not make any attempt to enjoin the June 2025 Annual Meeting and director elections from going forward based on these allegedly false and misleading statements. Messrs. Hartnett and Ruisanchez were duly elected as members of the Board at the June 2025 Annual Meeting. Although there was not a third seat available, Mr. Clifford received a significant number of shareholder votes as a result of HG Vora's proxy solicitation, albeit less than Messrs. Hartnett and Ruisanchez.

The remainder of the causes of action in the HG Vora Federal Action purported to be direct and/or derivative claims, including a derivative claim for breach of fiduciary duty against the Board members. In the derivative claim, HG Vora asserted that the directors breached their fiduciary duty when they acted to reduce the size of the Board from nine to eight (and by extension, the June 2025 slate from three to two). HG Vora asserted that the Board's action was for the primary purpose of interfering with HG Vora and other shareholders' ability to exercise their voting rights in a contested election for an expected three Board seat slate. On May 23, 2025, HG

Vora sent a "Litigation Demand" letter to PENN, essentially incorporating its Complaint and demanding the Board act consistent with the derivative claims set forth therein.[3]

In response to HG Vora's Complaint, and in accordance with the Pennsylvania Business Corporation Law (the "BCL"), the Board formed a Special Litigation Committee (the "Committee") composed of two disinterested and independent individuals. 15 Pa. C.S. § 1783. The Committee's mandate was to conduct a thorough investigation into the derivative claims, make a determination as to whether the claims had merit and decide whether it was in the best interests of the Company to pursue them (or take other actions). After evaluating potential candidates, the Board appointed two long-time distinguished attorneys—Marc Sonnenfeld, Esquire and Richard Bazelon, Esquire—each with over 50 years of commercial litigation experience to serve as the Special Litigation Committee. Messrs. Sonnenfeld's and Bazelon's litigation practices included many cases involving corporate governance and fiduciary duty. Neither Mr. Sonnenfeld nor Mr. Bazelon is affiliated with the Board and are otherwise fully independent and disinterested. After evaluating other firms, the Committee retained Dilworth Paxson LLP, a Philadelphia-based law firm with substantial corporate investigation and special litigation committee representation experience, to assist it in the investigation.

Based on the Committee's investigation, which included interviews with numerous, relevant individuals, a review of the relevant documents and materials, research of the applicable

[3] On August 18, 2025, during the Committee's investigation, HG Vora filed an Amended Complaint. The core allegations and claims in the Complaint and Amended Complaint are substantively similar. The Amended Complaint contained two significant changes. First, Plaintiff removed Count I, which asserted a violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 for purported misrepresentations in PENN's April 25, 2025 press release. Second, because Plaintiff filed the Amended Complaint after the 2025 Annual Meeting, the Amended Complaint contained allegations that William Clifford received votes at the Annual Meeting, notwithstanding the fact that there were only two seats up for election. The Committee considered the claims in the Amended Complaint as part of its overall investigation, review and determinations.

law and the retention of an outside consultant experienced in gaming regulatory matters, the Committee has concluded that it would not be in the best interests of the Company to pursue the derivative claims. The Committee determined that the Board acted in good faith within its business judgment and in furtherance of what it believed was the best interests of PENN in its decision to eliminate the Board seat and reduce the overall size of the Board from nine to eight. A major consideration in the Board's decision was the Board's belief that, under the circumstances, it was necessary to avoid the Company's exposure to potential regulatory risk, which could jeopardize its gaming licenses, its most important assets. At all times, the Board acted with the advice of legal and gaming experts.

As a threshold matter, there is a significant issue as to which legal standard applies to the Board's decision to eliminate the Board seat. HG Vora, in its pleadings and related communications, has consistently taken the position that a Pennsylvania court would apply standards developed by Delaware courts with respect to Delaware corporations. These standards, which have evolved over decades of Delaware jurisprudence, require the Board to demonstrate a compelling reason when a Board takes action in the middle of a proxy fight to eliminate a Board seat. Moreover, Delaware shifts the burden to the Board to demonstrate that its actions were compelling and reasonable in relation to the threat posed—a more difficult standard to meet than the business judgment rule.

Pennsylvania corporate law is, however, different from Delaware law on this point. Pennsylvania supports the application of the business judgment standard to a decision such as the one the Board made in these circumstances. Moreover, in Pennsylvania, the burden is on the challenger to prove that the Board's decision was uninformed or irrational. The Committee's conclusion that the Pennsylvania business judgment standard would apply to the Board's decision

in this instance is material to its overall conclusion.

The Committee, based on its review of the legal standards and facts, has determined that the Board acted on an informed basis, in good faith (i.e., not in bad faith) and for the best interests of the Company in the exercise of its business judgment. Further, given the regulatory risks involved in allowing Mr. Clifford to be elected unopposed, the Committee concludes that the decision was not irrational. The Committee also believes that, even if HG Vora had a cognizable claim, it would not be in the Company's best interest to pursue a breach of fiduciary duty claim.[4]

This Report provides the findings of the Committee's investigation and its determination as to the merits of the fiduciary duty claims raised by HG Vora.

## II.    THE HG VORA CLAIMS

HG Vora filed its original Complaint in the Eastern District of Pennsylvania on May 7, 2025. The Complaint asserts six counts: Count I for Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 based on PENN's April 25, 2025 press release, Count II for Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 based on PENN's definitive proxy materials, Count III for Violation of Section 14(a) of the Exchange Act and SEC Rule 14-19, Count IV for Violation of Shareholder Voting Rights, Count V for Breach of Fiduciary Duty and Count VI for Violation of § 1724 of the BCL. The Complaint asserts these claims against all of the Board members involved in the April 25, 2025 decision to eliminate the Board seat, as well as Mr. Naples who had resigned before that meeting (collectively, the "Director Defendants").

Count V is a derivative claim brought against the Director Defendants. The Complaint alleges that the Director Defendants violated their fiduciary duties to PENN's shareholders by

---

[4] This section is meant as a general summary and is not intended to be comprehensive.

removing the Board seat in advance of the 2025 Annual Meeting. HG Vora contends that the Director Defendants eliminated the Board seat for the primary purpose of interfering with shareholders' ability to vote in a contested election for directors. HG Vora alleges that the Board's elimination of the seat will result in entrenchment because PENN's classified board structure necessitates two election cycles before shareholders can elect a new majority. HG Vora explains that, with an eight-person Board following the elimination of the seat, all three of a shareholder's nominees would need to be elected at the 2026 Annual Meeting for there to be a new majority on the Board. HG Vora adds that, if the Board is permitted to eliminate a seat, the Board could perpetually manipulate the number of seats to maintain an incumbent majority. Lastly, HG Vora contends that the elimination of the seat results in the two new directors, Johnny Hartnett and Carlos Ruisanchez, having less influence over the Board than if all three of Vora's nominees were added to a nine-person Board.

Following its Complaint, HG Vora filed a Motion for Expedited Trial and Early Case Management Conference on May 14, 2025. PENN filed a Motion to Stay all of the claims in HG Vora's Complaint on May 19, 2025. After the parties submitted briefing on the respective motions, on July 3, 2025, the Court denied HG Vora's Motion for Expedited Trial. By the same order, the Court granted PENN's Motion to Stay as it related to Count V of HG Vora's Complaint but denied the remainder of the Motion. The Court initially stayed the proceedings related to Count V until August 1, 2025. On August 5, 2025, the Board filed a Motion to Extend the Stay, seeking a ninety-day extension.

After filing the Complaint and Motion for Expedited Trial and Early Case Management Conference, HG Vora sent PENN a litigation demand letter (the "Demand Letter") on May 23,

2025. The Demand Letter incorporated the claims in the Complaint and attached the Complaint as an exhibit.

Before the Court ruled on the Motion to Extend the Stay, HG Vora filed the Amended Complaint on August 18, 2025. While similar to the Complaint, the Amended Complaint made certain important changes. HG Vora removed Count I of the Complaint entirely and retained the other five claims. Factually, because HG Vora filed the Amended Complaint after the 2025 Annual Meeting, HG Vora added allegations related both to PENN's and its own proxy materials, as well as allegations related to the events at the Annual Meeting. The additional allegations boil down to two key facts: (1) HG Vora contends that PENN's May 12, 2025 shareholder letter concedes that the Board eliminated a Board seat to prevent Clifford's election, and (2) HG Vora adds that Mr. Clifford received a majority of votes at the 2025 Annual Meeting.

Two days later, on August 20, 2025, the Court granted the Board's Motion to Extend the Stay and extended the stay until November 5, 2025. On September 18, 2025, the Board filed a Motion to Dismiss the Amended Complaint.[5]

The Committee considered all of the HG Vora breach of fiduciary duty claims included in both the original Complaint, Amended Complaint and Demand Letter as part of its investigation in forming its conclusions contained in this Report. Although of somewhat less relevance, the Committee also actively monitored other developments in the litigation, paying particular attention to the briefing of PENN and HG Vora with respect to PENN's Motion to Dismiss the original Complaint and, later, the Amended Complaint.

---

[5] The Committee monitored the HG Vora Federal Action and its pleadings as the litigation progressed.

III.    **RESPONSE OF THE BOARD AND FORMATION OF THE SLC**

Because PENN is a Pennsylvania corporation, Pennsylvania law controls. Section 1783 of the BCL, which codified many of the standards adopted in the seminal Pennsylvania Supreme Court decision *Cuker v. Mikalauskas*, 547 Pa. 600, 692 A.2d 1042 (Pa. 1997), sets forth the standards for evaluating a corporation's decision to pursue or terminate a proposed shareholder derivative litigation. 15 Pa. C.S. § 1783. After the Board received the HG Vora Federal Action, it exercised its option to form a special litigation committee to evaluate the derivative claims consistent with these statutory procedures.

A.    **Authority of Pennsylvania Special Litigation Committees**

Section 1783 of the BCL sets forth the governing standards and requirements related to the board of directors of a Pennsylvania corporation's decision to form a special litigation committee in response to a shareholder's demand to bring action to enforce any right of such corporation. 15 Pa. C.S. § 1783. Subsection (a) of Section 1783 grants a corporation the ability to form an independent special litigation committee to investigate claims asserted in a shareholder demand. § 1783(a). Among other actions, Section 1783 permits a special litigation committee to make a determination or a recommendation to the board of directors as to whether pursuing any of the claims on behalf of the corporation would be in the best interests of the corporation. § 1783(a).

A court's analysis with respect to the formation of a special litigation committee is mainly focused on the qualifications of the special litigation committee's members and the processes taken by the special litigation committee in conducting its investigation. Assuming that the members and processes are consistent with the requirements of Pennsylvania law, courts will not second guess the special litigation committee's determination or recommendation as to the appropriate response if made in good faith, independently and with reasonable care. § 1783(a).

10

Subsection (c) of Section 1783 mandates that the special litigation committee shall consist of two or more individuals who: (1) are not interested in the claims asserted in the demand or action; (2) are capable as a group of objective judgment in the circumstances; and (3) may, but need not, be shareholders or directors. 15 Pa. C.S. § 1783(c). Subsection (d) of Section 1783 governs the make-up of the members of the special litigation committee, allowing that the committee may be appointed by a majority of the directors not named in the subject shareholder action or, if all directors are named, by a majority of the directors so named. 15 Pa. C.S. § 1783(d).

Under Pennsylvania law, courts traditionally evaluate a board of directors' response to shareholder demand letters by looking at the following factors: (1) whether the committee was assisted by counsel; (2) whether the committee prepared a written report; (3) whether the committee was disinterested and independent; (4) whether the committee conducted an adequate investigation; and (5) whether the committee rationally believed its decision was in the best interests of the corporation. *Cuker*, 692 A.2d at 1048; *LeMenestrel v. Warden*, 964 A.2d 902, 912 (Pa. Super. Ct. 2008); *Pittsburgh Hist. & Landmarks Found. v. Ziegler*, 200 A.3d 58, 85 (Pa. 2019).

If a court determines that a special litigation committee was properly formed under Sections 1783(c)(1) and (2) of the BCL and the committee conducted its investigation and made its recommendation in good faith, independently and with reasonable care, then a court will not look beyond the special litigation committee's determination as to the appropriate response to the shareholder demand(s). 15 Pa. C.S. § 1783(f)(1)–(3); *see also Lee on Behalf of PPG Indus. Inc. v. McGarry*, No. 2:20-cv-75, 2020 WL 7075633 (W.D. Pa. Dec. 3, 2020) (affirming dismissal after special litigation committee determined that officer who directed subordinates to override internal controls did so without awareness of senior management or audit committee and despite company settling related securities class action for $25 million); *Braun v. Herbert*, 180 A.3d 482 (Pa. Super.

11

Ct. 2018) (affirming dismissal of derivative complaint and refusing to overrule business judgment to not pursue litigation by independent and disinterested special committee).

The key issue, therefore, is not *per se* the ultimate determination or conclusion of the special litigation committee, but rather, whether the process followed by the committee demonstrated that the committee was properly formed and that the special litigation committee's investigation was thorough and conducted in good faith with reasonable care. If a court finds that the members of the committee met the statutory qualifications and the committee conducted its investigation and made its recommendation in good faith, independently and with reasonable care, a court shall uphold the determination of the committee. 15 Pa. C.S. § 1783(f)(1)–(3).

### B.    The Formation of the Committee

On May 7, 2025, HG Vora commenced the HG Vora Federal Action. Shortly thereafter, the Board discussed and considered the Company's response to the claims. After deliberation, the Board voted unanimously to form the Committee. Consistent with the BCL, the Board's May 8, 2025 resolution forming the Committee included broad authority for the Committee to investigate the claims and to make an independent determination as to whether pursuing those claims would be in the best interests of the Company (or take other actions). The Board's May 8, 2025 resolution approving the formation of the Committee states:

**UNANIMOUS WRITTEN CONSENT**
**OF THE**

**BOARD OF DIRECTORS OF**
**PENN ENTERTAINMENT, INC.**
**A Pennsylvania corporation**

**May 8, 2025**

The undersigned, being all the members of the Board of Directors (the "Board") of PENN Entertainment, Inc., a Pennsylvania corporation (the "Company"), in accordance with Sections 1727(b) of the Pennsylvania Business Corporation Law of 1988, as amended, and in lieu of a meeting of the Board, hereby unanimously

consent to and adopt the resolutions attached hereto as Exhibit A with full force and effect as if they had been duly adopted at a duly convened meeting of the Board.

## Exhibit A

Resolutions re Special Litigation Committee of the Board Formation of Special Litigation Committee

WHEREAS, on May 7, 2025, HG Vora Capital Management, LLC, HG Vora Special Opportunities Master Fund, LTD., and Downriver Series LP-Segregated Portfolio C (collectively, "HG Vora"), on behalf of themselves and derivatively on behalf of Penn Entertainment, Inc. ("PENN" or "Company") initiated a lawsuit in the United States District Court for the Eastern District of Pennsylvania captioned HG Vora Capital Management, LLC, et al. v. PENN Entertainment, Inc., et al., No. 5:25-cv-2313 (the "Litigation") and claiming, among other things, that members of PENN's Board of Directors (the "Board") breached their fiduciary duties (the "Claims") to PENN by authorizing the reduction in the size of the Board from nine members to eight members and agreeing to nominate Johnny Harnett and Carlos Ruisanchez as candidates for the two open board seats at the 2025 annual meeting; and

WHEREAS, HG Vora has not yet made a demand on the Company to initiate a lawsuit against the Board for the Claims, but the Company has the right under 15 Pa. C.S. § 1783 to form a special litigation committee of the Board to investigate the Claims; and

WHEREAS, after consideration of relevant facts and circumstances, the Board deems it advisable and in the best interest of the Company to constitute a special litigation committee of individuals who have no interest in the asserted claims and are capable of independent judgment in the matter (the "Committee") to examine, review, and analyze the facts and circumstances surrounding the Claims in the Litigation, any related actions that may be filed and any other claims or demands otherwise asserted ("Related Claims or Demands"), and to determine on behalf of the Company what actions, if any, the Board should take in response thereto.

NOW, THEREFORE, BE IT RESOLVED, that pursuant to 15 Pa. C.S. § 1783, the Board has determined to constitute a Committee, which shall consist of two (2) disinterested individuals, to examine, review, and analyze the facts and circumstances surrounding the Claims and the Litigation, any Related Claims or Demands;

FURTHER RESOLVED, that the Committee is hereby authorized, and shall have the responsibility, to: (1) review and investigate all of the Claims and any Related Claims or Demands; (2) determine what action, if any, the Board should take in response to the Claims, the Litigation, or any Related Claims or Demands, which actions may include, but not be limited to, commencing litigation to pursue any meritorious claims or declining to commence litigation or seeking to dismiss the

13

Litigation or any other litigation brought on behalf of the Company that may be pending prior to the conclusion of its investigation; and (3) take any and all other actions as may be necessary or appropriate in its judgment to carry out the duties of the Committee contemplated by these resolutions and by 15 Pa. C.S. § 1783;

FURTHER RESOLVED, that such Committee is hereby authorized and empowered to engage such experts and advisers, including independent legal counsel, as the Committee shall deem necessary or desirable in order to assist it in the discharge of its responsibilities;

FURTHER RESOLVED, that the Committee is hereby authorized and empowered to enter into such contracts providing for the retention, compensation, reimbursement of expenses and indemnification of such experts and advisors, including independent legal counsel, as the Committee shall deem necessary or desirable;

FURTHER RESOLVED, that all costs and expenses incurred by the Committee, including costs and expenses of counsel and other advisors retained by the Committee, shall be borne by the Company;

FURTHER RESOLVED, that the officers, agents, and employees of the Company, and each of them are hereby authorized and directed to assist the Committee and to provide it with all information and documents that the Committee deems appropriate and shall request with respect to the subject matter of the Claims, the Litigation, or any Related Claims or Demands, including without limitation participating in interviews by the Committee; and

FURTHER RESOLVED, that the Committee be and hereby is authorized and empowered to take such actions and execute and deliver such further agreements, instruments, and filings (including filings with appropriate courts of competent jurisdiction) as may be necessary and appropriate to carry out the purposes of the foregoing resolutions.

Appointment to Committee

WHEREAS, the Board deems it advisable and in the best interest of the Company that the Committee shall consist of two individuals meeting the qualification requirements set forth in 15 Pa. C.S. §1783(b) and appoints each of David Handler, Barbara Shattuck Kohn, and Jane Scaccetti to identify, interview and present to the Board their recommendation for appointment to the special litigation committee candidates that have no interest in the asserted claims and are capable of independent judgment in the matter.

NOW, THEREFORE, BE IT RESOLVED, that the Board hereby appoints David Handler, Barbara Shattuck Kohn, and Jane Scaccetti to identify, interview, and present to the Board their recommendation for appointment to the special litigation committee candidates that have no interest in the asserted claims and are capable of independent judgment in the matter.

14

[May 8, 2025 Resolution is attached hereto.]

As provided for in the May 8, 2025 resolution, a committee of the Board was charged with identifying, interviewing and presenting to the Board a recommendation for appointment of members to the Committee. After vetting independence and determining whether each could fully engage in the process, the committee of the Board recommended Marc Sonnenfeld, Esquire, and Richard Bazelon, Esquire, to serve as members of the Committee. By resolution on May 14, 2025, the Board then adopted that recommendation:

## UNANIMOUS WRITTEN CONSENT
## OF THE

### BOARD OF DIRECTORS OF
### PENN ENTERTAINMENT, INC.
### A Pennsylvania corporation

### May 14, 2025

The undersigned, being all the members of the Board of Directors (the "Board") of PENN Entertainment, Inc., a Pennsylvania corporation (the "Company"), in accordance with Sections 1727(b) of the Pennsylvania Business Corporation Law of 1988, as amended, and in lieu of a meeting of the Board, hereby unanimously consent to and adopt the resolutions attached hereto as Exhibit A with full force and effect as if they had been duly adopted at a duly convened meeting of the Board.

### Exhibit A

Resolutions re Appointment of Marc Sonnenfeld and Richard Bazelon to Special Litigation Committee of Board of Directors

WHEREAS, on May 8, 2025, the Board of PENN Entertainment ("PENN" or "Company") passed a resolution ("SLC Formation Resolution") authorizing the formation of a special litigation committee under 15 Pa. C.S. § 1783 (the "Committee") to examine, review, and analyze the facts and circumstances surrounding the breach of fiduciary duty claims asserted by HG Vora Capital Management, LLC, HG Vora Special Opportunities Master Fund, LTD., and Downriver Series LP-Segregated Portfolio C (collectively, "HG Vora") derivatively on behalf of PENN Entertainment, Inc. ("PENN" or "Company") in a lawsuit filed in the United States District Court for the Eastern District of Pennsylvania captioned *HG Vora Capital Management, LLC, et al. v. Penn Entertainment, Inc., et al.,* No. 5:25-cv-2313 (the "Litigation"), and any related

actions that may be filed and any other claims or demands otherwise asserted ("Related Claims or Demands"), and to determine on behalf of the Company what actions, if any, the Board should take in response thereto; and

WHEREAS, the SLC Formation Resolution further authorized David Handler, Jane Scaccetti, and Barbara Shattuck Kohn (the "SLC Formation Committee") to identify, interview and present to the Board their recommendation for appointment to the special litigation committee candidates that have no interest in the asserted claims and are capable of independent judgment in the matter; and

WHEREAS, after identifying five viable candidates and interviewing three, the SLC Formation Committee recommends that the Board appoint Marc Sonnenfeld, Esq. and Richard Bazelon, Esq. to the Committee. The SLC Formation Committee has determined that Messrs. Sonnenfeld and Bazelon have no interest in the asserted claims and are capable of independent judgment in the matter.

NOW, THEREFORE, BE IT RESOLVED, that the Board appoints Marc Sonnenfeld, Esq. and Richard Bazelon, Esq. to the Committee authorized by the SLC Formation Resolution; and

FURTHER RESOLVED, that the Committee consisting of Messrs. Sonnenfeld and Bazelon shall have all the responsibility, authority, and power set forth in the SLC Formation Resolution and in 15 Pa. C.S. § 1783.

## C.    **The Committee Members**

The Committee members have extensive knowledge and experience in Pennsylvania corporate litigation and practice, each with over 50 years of experience. Neither Mr. Sonnenfeld nor Mr. Bazelon have been or are members of the Board, and neither was involved in any aspect of the Board's decisions at issue. A brief summary of their professional backgrounds follows.

**Marc Sonnenfeld, Esquire –** Before his retirement in 2021, Mr. Sonnenfeld was a partner in the Philadelphia office of Morgan, Lewis & Bockius LLP ("Morgan Lewis"). Mr. Sonnenfeld began as a commercial litigator at the firm in 1974 and was named partner in 1978, ultimately heading the firm's securities litigation practice in Philadelphia. Mr. Sonnenfeld has been a member of the Pennsylvania Bar since November 17, 1971, and has also been admitted to practice in Massachusetts, Florida, the District of Columbia, the Supreme Court of the United States and various federal district courts and courts of appeals, including but not limited to the United States

16

District Court for the Eastern District of Pennsylvania and the United States Court of Appeals for the Third Circuit. After his retirement from Morgan Lewis in September 2021, he maintained the title of "Counsel" until September 30, 2024.

Mr. Sonnenfeld received a Bachelor of Arts with Honors from Swarthmore College in 1968 and a Juris Doctor from Harvard Law School in 1971. He served as Law Clerk to the Honorable Joseph S. Lord, III, then Chief Judge of the United States District Court for the Eastern District of Pennsylvania, from 1972 to 1973. Mr. Sonnenfeld is a Fellow of the American College of Trial Lawyers and the International Academy of Trial Lawyers. He is a member of and has participated in the activities of various legal organizations, including the University of Pennsylvania American Inn of Court. For eight years, Mr. Sonnenfeld served on the national board of trustees of the American Inns of Court Foundation. Mr. Sonnenfeld also served as a judge *pro tem* in the Court of Common Pleas of Philadelphia and as an expert witness in the United States District for the Eastern District of Pennsylvania and the Court of Common Pleas of Philadelphia.

In 2010, Mr. Sonnenfeld was recognized by the Philadelphia Bar Association with its Wells Fargo Fidelity Award for "leadership, teamwork and commitment to the legal profession by helping to develop and maintain the Commerce Case Program of the Philadelphia Court of Common Pleas." He served as Chair of the Board of Governors of the Philadelphia Bar Association and Chair of its Professional Responsibility Committee. Mr. Sonnenfeld also served as a member and ultimately chair of a hearing committee of the Disciplinary Board of the Supreme Court of Pennsylvania. In 2017, he was recognized by The Legal Intelligencer with its Lifetime Achievement Award.

Mr. Sonnenfeld served as lead counsel in numerous trials in his 50-year career and had an active trial and appellate practice. One of these trials was the subject of a book. *See* Herbert Stern

& Stephen A. Saltzburg, TRYING CASES TO WIN: ANATOMY OF A TRIAL (Aspen Law & Business 1999). Mr. Sonnenfeld's practice focused on shareholder litigation under the federal securities laws and state corporate law, including the defense of more than 50 putative federal securities class actions. Mr. Sonnenfeld had a nationwide practice representing corporate clients, including Fortune 500 companies. *See*, *e.g.*, *Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952 (7th Cir. 2012); *Doshi v. General Cable*, 823 F.3d 1032 (6th Cir. 2016); *Retail Wholesale & Department Store Union Local 338 Retirement Fund v. Hewlett Packard*, 845 F.3d 1268 (9th Cir. 2017).

Mr. Sonnenfeld also has extensive experience with shareholder litigation under state corporate law, including derivative actions, in Pennsylvania and elsewhere. Mr. Sonnenfeld represented the Pennsylvania Chamber of Business & Industry as *amicus curiae* in *Cuker v. Mikalauskas* (*supra*), successfully advocating the adoption of provisions of the American Law Institute's Principles of Corporate Governance addressing derivative litigation subsequently enacted as amendments to the BCL. Mr. Sonnenfeld also represented the defendants in *Lemenestrel v. Warden* (*supra*), which is the leading Pennsylvania authority addressing the investigation and determination of a special litigation committee. He is also the author of "The New Pennsylvania Business Corporation Law: What Litigators Need to Know," 61 Pa. Bar Assoc. Quarterly 31 (January 1990).

In New Jersey, Mr. Sonnenfeld represented shareholders in a case of first impression to determine how in a statutory appraisal action the court should determine the fair value of shares of the dissenting shareholders. *See Lawson Mardon Wheaton, Inc. v. Smith*, 734 A.2d 738, 160 N.J. 383 (1999). In Delaware, Mr. Sonnenfeld represented the defendants in a derivative action

addressing the issue of demand futility under Delaware law. *See Zucker v. Andreessen*, No. 6014, 2012 WL 2366448 (Del. Ch. June 21, 2012).

Mr. Sonnenfeld has vast appellate experience, including appearing as *amicus curiae* in several significant cases in state and federal courts, representing the positions of organizations such as the Philadelphia Bar Association, the Chamber of Commerce of the United States, the Pennsylvania Chamber of Business & Industry, the Greater Philadelphia Chamber of Commerce, the League of Women Voters and the American Beverage Association.

Additionally, Mr. Sonnenfeld served on the Board of Managers of Swarthmore College for sixteen years and was Vice Chair of the Finance Committee and Chair of the Audit Committee.

**Richard Bazelon, Esquire** – Mr. Bazelon has practiced commercial litigation since 1969. He started his career as a law clerk for the Honorable Edmund B. Spaeth, Jr. on the Pennsylvania Court of Common Pleas from 1968 to 1969. Mr. Bazelon then worked at Dilworth, Paxson, Kalish, Levy & Kauffman, where he was named a partner after six years. Mr. Bazelon worked there for fourteen years until 1983.[6] In 1983, Mr. Bazelon founded Bazelon Less & Feldman ("BLF"), where he continues to practice as a partner. Mr. Bazelon has extensive experience in litigating complex commercial suits.

Mr. Bazelon has successfully litigated a number of precedent-setting cases in Pennsylvania and New Jersey. He litigated *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494 (3d Cir. 1998) and *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 251 F.3d 153 (3d Cir. 2000), which involved two successful jury trials and established the precedent that coercive use of market power in one market to require patronage in a separate market is actionable under Pennsylvania

---

[6] Mr. Bazelon has no formal relationship with or financial interest in Dilworth Paxson LLP.

19

law even where it does not constitute unlawful tying under antitrust laws.

Mr. Bazelon helped secure a victory in *Sons of Thunder v. Borden, Inc.*, 690 A.2d 575 (1997), where the New Jersey Supreme Court upheld a verdict and damage award for breach of specific contract provisions, and a separate verdict and damage award under the same contract for breach of the implied duty of good faith and fair dealing.

Mr. Bazelon has represented a commercial property owner in several precedent setting cases, emanating from a condemnation in 1996. In *Condemnation of 110 Washington Street, Borough of Conshohocken, Pennsylvania*, 767 A.2d 1154 (Pa. Cmwlth. 2001), Mr. Bazelon achieved a successful challenge to condemnation to establish the principle that a condemnor cannot cede decisions concerning the condemnation to a private party to whom the condemnor intends to convey the property.

In 2011, the United States Court of Appeals for the Third Circuit held that the taking of title during the five years of the condemnation case was a "per se taking," for which the condemnee was entitled to just compensation under the Fifth Amendment to the United States Constitution. The Court of Appeals further held that the condemnee could proceed with its takings claim in federal court. *R & J Holding Company v. The Redevelopment Authority of the County of Montgomery*, 370 F.3d 420 (3d Cir. 2011). Following completion of discovery concerning damages, the case settled in May 2014 on terms favorable to BLF's clients.

Mr. Bazelon has successfully represented major law firms accused of violating fiduciary obligations. In 2001, following several weeks of trial, a compulsory non-suit was entered in favor of a law firm client, and affirmed on appeal. In 2005, summary judgment was entered in favor of a law firm client in a lawsuit by a major corporation.

During January to June 2012, Mr. Bazelon served as counsel to the special litigation

committee of Harleysville Mutual Insurance Company in connection with litigation brought by policyholders concerning the merger between the Harleysville and Nationwide insurance companies. Mr. Bazelon also served as counsel to the special litigation committee of Orrstown Financial Services, Inc. in Shippensburg, Pennsylvania.

In addition to his substantive legal practice, Mr. Bazelon is also involved in several professional organizations. Mr. Bazelon has served on faculties of the American Law Institute – American Bar Association, Philadelphia Bar Association, Pennsylvania Bar Institute and New Jersey Institute for Continuing Education on subjects of trial advocacy and commercial litigation.

He was a Lecturer in Law, Appellate Advisory, at the University of Pennsylvania Law School from 1982 to 1983, and served as a reporter for the Commission on Uniform State Laws from 1982 to 1984.

He served as Chairperson of the Redevelopment Authority of the City of Philadelphia from January 1984 to January 2001. He was a Board member of the Public Interest Law Center of Philadelphia from 1975 to 2013, and Chairperson in 1975. He served as a Trustee of the Philadelphia Bar Foundation in 2000 and 2001. Mr. Bazelon has served as the Chairperson of Beech Interplex Corporation, a community development organization in North Philadelphia formed by the William Penn Foundation, for approximately seventeen years.

D.    **Retention of Dilworth Paxson LLP**

The Committee members retained independent counsel to assist the Committee in its investigation. As part of this process, the Committee reviewed its authorization and considered several firms for both the requisite level of experience and the lack of any potential conflicts. The Committee placed emphasis on finding representation that had Pennsylvania special litigation committee experience.

After due consideration, including an in-person meeting by the Committee with Joseph H. Jacovini, Thomas S. Biemer and John J. Higson, the Committee retained Dilworth Paxson LLP ("Dilworth") to serve as its independent counsel. Dilworth is independent and has no conflicts of interest. The Committee concluded that Dilworth could represent it in an unbiased, independent manner. The Committee also considered it particularly important that Dilworth has significant experience in both Pennsylvania corporate practice and, specifically, significant experience representing special litigation committees formed under Pennsylvania law. Dilworth partners Joseph H. Jacovini, Thomas S. Biemer and John J. Higson were primarily retained to advise the Committee based upon their extensive experience representing special litigation committees, particularly for Pennsylvania corporations.

### E.    The Committee Members are Disinterested and Independent

Section 1715(e) of the BCL provides factors to determine a director's disinterestedness. Courts that have reviewed these factors have observed that a director is deemed interested if: (1) the director or officer, or an associate of the director or officer, is a party to the transaction or conduct; (2) the director or officer has a business, financial or familial relationship with a party to the transaction or conduct, and that relationship would reasonably be expected to affect the director's or officer's judgment with respect to the transaction or conduct in a manner adverse to the corporation; (3) the director or officer, an associate of the director or officer or a person with whom the director or officer has a business, financial or familial relationship, has a material pecuniary interest in the transaction or conduct (other than usual and customary directors' fees and benefits) and (if present) that interest and that relationship would reasonably be expected to affect the director's or officer's judgment in a manner adverse to the corporation; or (4) the director or officer is subject to a controlling influence by a party to the transaction or conduct or a person who has a material pecuniary interest in the transaction or conduct, and that controlling influence could

reasonably be expected to affect the director's or officer's judgment with respect to the transaction or conduct in a manner adverse to the corporation. *See*, *e.g.*, *Lemenestrel*, 964 A.2d at 918–19 (quoting 2 ALI Principles, Corporate Governance § 1.23 (1994)).

A few important points should be emphasized in this regard. Mere service on a board (neither Mr. Sonnenfeld nor Mr. Bazelon are members) does not make the special litigation committee member interested. *Lemenestrel*, 964 A.2d at 919. Moreover, the fact that a committee member is named as a defendant—again, neither Mr. Sonnenfeld nor Mr. Bazelon are named—in the derivative action is not disqualifying. Rather, there need to be particular facts alleged regarding that individual that raise a significant prospect that the individual would be adjudged liable to the corporation or its shareholders. *Id.* The relevant inquiry is whether a committee member is beholden to an interested party. *Braun*, 180 A.3d at 488 n.4 (remarking that member independence relates to whether a committee member is "under the control of nonmembers"); *Lemenestrel*, 964 A.2d at 921–22 (rejecting lack of independence claims because members of litigation committee had no direct involvement in the alleged self-dealing and friendship between wife of committee member and wife of defendant director was not sufficient to establish disqualifying personal relationship).

In accordance with the prevailing legal principles, the Committee members have undergone multiple levels of review to ensure compliance with the BCL. Messrs. Sonnenfeld and Bazelon were initially vetted by Company Board members and their counsel for disinterestedness and independence at the time of the Committee's formation in May 2025. This included a detailed questionnaire. The Board concluded that Messrs. Sonnenfeld and Bazelon were disinterested and independent and could properly serve as members of the Committee under Pennsylvania law.

As part of the Committee process, and as an additional check to ensure disinterestedness

23

and independence of each Committee member, Dilworth conducted a separate analysis. Dilworth interviewed each member, reviewed their backgrounds and considered any potential facts that could affect their ability to serve as disinterested, independent members of the Committee.

This analysis revealed that neither Mr. Sonnenfeld nor Mr. Bazelon have ever been employed by PENN and have no business or familial relationships with any members of the PENN Board or management. Neither Mr. Sonnenfeld nor Mr. Bazelon have ever served on the Board or were involved in any way with the Board's decisions at issue. Neither Mr. Sonnenfeld nor Mr. Bazelon have any direct business relationships with PENN, members of the Board or management. While members of the Committee may have had some contact with certain members of the Board given their involvement in the legal and business community for the last 50 years, none of those relationships would reasonably be expected to affect that Committee member's independent judgment with respect to the transaction or the shareholder claims.

Moreover, neither Mr. Sonnenfeld nor Mr. Bazelon directly own any PENN common stock. Mr. Sonnenfeld and Mr. Bazelon are being compensated for their time devoted to the investigation as Committee members, but no compensation is tied to any investigation result.

Mr. Sonnenfeld and Mr. Bazelon are unquestionably independent and disinterested and can serve as members of the Committee. At a regular meeting of the Committee on May 28, 2025, the Committee and Dilworth reviewed the results of the independence interviews and the applicable legal standards governing a determination of disinterestedness and independence. After considering the applicable criteria for determining disinterestedness and independence, it was determined by Dilworth that each member of the Committee met the applicable legal standards, qualified as disinterested and independent and could properly serve on the Committee and discharge the duties delegated to them by the Board. After discussion, the members of the

Committee concurred.

## IV.    SCOPE AND CONDUCT OF THE INVESTIGATION

The Committee's investigation was conducted in accordance with § 1783 of the BCL, the *Cuker* decision and Pennsylvania law. The main question to be answered by the Committee is whether prosecution of any of the breach of fiduciary duty claims presented by HG Vora is in the best interests of the Company. Section 1781(c) of the BCL requires that the demand give notice to the Board, with reasonable specificity, of the essential facts relied upon to support each of the claims made therein. 15 Pa. C.S. § 1781(c). HG Vora's claims are set forth in its original Complaint, Amended Complaint and Demand Letter and are summarized above. The Committee reviewed and considered all of these claims as part of its investigation. Both PENN and HG Vora also filed a series of motions and briefs in support of their positions in the HG Vora Federal Action. The Committee monitored the parties' filings in the HG Vora Federal Action, reviewed all of the pleadings and considered the parties' positions in drafting the Report. Dilworth also had phone calls with counsel for both HG Vora and PENN and received follow-up information from both parties' counsel. As part of this consideration, the Committee was routinely advised by counsel of the governing legal principles throughout the investigation and those principles informed the Committee's analysis and conclusions in this Report.

The Committee, with the assistance of counsel, conducted a thorough, extensive investigation into the relevant allegations and claims. As part of this process, the Committee, with the assistance of counsel, used its judgment to determine the scope of its inquiries for information. At the end of the process, the Committee was satisfied it obtained and considered the relevant information needed to make the determination required of it by its enabling resolution.

A.    **Regular Meetings**

On May 20, 2025, the Committee and Dilworth participated in the first of a series of regular meetings. The Committee and Dilworth discussed the responsibilities of the Committee members, the legal standards governing the review under the BCL, *Cuker* and its progeny, additional relevant case law and authority and the procedures that Dilworth advised should be followed during the investigation. The proposed process included a review of relevant documents, interviews with relevant individuals, legal research and deliberations between Dilworth and the Committee. The Committee and Dilworth agreed during this initial call that it would be beneficial to conduct regular meetings so that Committee members would be fully informed and actively participate throughout the process.

Throughout the course of the investigation, the Committee and Dilworth conducted regular meetings, usually weekly or bi-weekly and by remote video.[7] The Committee and Dilworth kept minutes of these meetings, and the minutes of each meeting were reviewed and subsequently approved at the following meeting. While information was largely shared during regular meetings, there were ongoing communications between the Committee members and Dilworth where information was shared. During all of these meetings, the Committee and Dilworth discussed the HG Vora claims, the progress of the investigation and related matters. The Committee and Dilworth discussed the type of information being compiled during the investigation and considered other information to be compiled and individuals to interview. Committee members Messrs. Sonnenfeld and Bazelon attended fully all Committee meetings and all interviews.

---

[7] The Committee and Dilworth held twenty-two formal meetings.

26

B.    **Written Materials**

The Committee sought and reviewed a large group of written materials from both internal and external sources. The Committee requested a significant quantity of materials directly from the Company that it considered relevant to the investigation. The written materials requested from the Company included, but were not limited to:

1) All meeting minutes, whether of the entire Board or committee, that reflect discussion of the Board's "refreshment" of its members;

2) All meeting minutes, whether of the entire Board or committee, that reflect discussion of HG Vora and/or any of its affiliates or associated individuals or entities;

3) All documents related to Ron Naples' decision to retire from the Board;

4) All documents/communications related to consideration of any candidate standing for election to the Board at the 2025 Annual Meeting;

5) All documents/communications related to the Board's determination that a candidate for election to the Board at the 2025 Annual Meeting was or was not qualified;

6) All documents concerning the Board's consideration or actions concerning the matter of whether to fill the Board seat vacated by the retirement of Ron Naples;

7) All legal opinions relied upon by the Board regarding its fiduciary obligations regarding its decision to not fill and/or eliminate the Board seat vacated by the retirement of Ron Naples; and

8) All communications between the Company/Board and HG Vora (including any representatives or affiliates) regarding candidates for election to the Board or Board composition.

Some of these requests required the Company to perform targeted electronic searches of relevant custodians—primarily the members of the Board—on the relevant issues. The Company cooperated in the written materials requests and provided responses to the Committee's requests.

The Committee and Dilworth also obtained and reviewed a significant amount of publicly available information regarding the Company, the proxy fight and related information. These documents included numerous Company SEC filings and reports from the proxy advisory firms

ISS and Glass Lewis. Other public documents for additional background information were also compiled and reviewed during the course of the investigation.

The Company's outside counsel, as a practice, provided materials directly to Dilworth. Dilworth then loaded materials onto a shared database. The Committee had access to the database and reviewed relevant documents throughout the process with its counsel. Dilworth also provided the Committee with hard copies of relevant materials. The Committee and Dilworth also frequently discussed specific documents, materials and related issues during their regular meetings and provided materials via electronic delivery or in hard copy form.

### C. Communications with Counsel for PENN and HG Vora

As part of the investigative process, Dilworth also had numerous, informal discussions and written correspondence with the Company's outside counsel to obtain access to background information on the primary issues and additional information that the Committee was interested in reviewing. Dilworth briefed the members of the Committee regarding these discussions during the regular meetings.

Dilworth also communicated, both orally and in writing, with counsel for HG Vora. On May 29, 2025, Dilworth sent a letter to counsel for HG Vora advising them that it had been retained to represent the Committee in connection with its investigation of the claims and that it would welcome the opportunity to speak with counsel regarding HG Vora's position on the issues. Dilworth's letter also requested that, if HG Vora or its counsel had any information that they believed the Committee should review, or individuals that they believed should be interviewed, that information should be forwarded to Dilworth for the Committee's consideration.

On June 20, 2025, counsel for HG Vora sent a letter to the Committee. The letter commented that the Committee did not provide an update on the investigation. The letter also suggested that the Committee review the recommendation from the proxy advisory firm ISS for

the 2025 Annual Meeting and attached a copy of the recommendation. The Committee had previously reviewed ISS's recommendation prior to the letter, but the Committee reviewed the recommendation again at the request of HG Vora's counsel.

Counsel for HG Vora agreed to a remote video conference with Dilworth that took place on July 8, 2025. During the conference, counsel discussed the primary legal issues, and Dilworth provided an update on the investigation. Dilworth also reiterated that the Committee would consider any additional information HG Vora believed to be relevant or individuals to interview. Counsel for HG Vora subsequently provided the Committee with a legal memorandum which outlined relevant aspects of its clients' positions. The Committee reviewed and considered that information.

There were several subsequent communications between HG Vora counsel and Dilworth. Dilworth kept counsel for HG Vora updated as to the status of the investigation. An additional phone conference took place between counsel for HG Vora and Dilworth on September 30, 2025. During this discussion, counsel further discussed relevant issues and Dilworth, on behalf of the Committee, requested information which HG Vora declined to provide. The specific information requested included the written interim authorization provided by Pennsylvania Gaming Control Board to HG Vora and the specific circumstances of HG Vora's decision to nominate Mr. Clifford. The Committee and counsel subsequently determined that, while the information requested could have been potentially helpful to the Committee, it was not necessary for the Committee's investigation and for the Committee to complete its investigation.[8]

_____

[8] Notably, the Committee did not take an adverse inference against HG Vora for failing to provide the information.

29

D.  **Interviews**

Beginning in late July 2025, the Committee started the process of interviewing individuals identified as having potentially relevant information related to the claims and the Committee's investigation. These interviews, which primarily consisted of interviews with members of the Board and management during the relevant period, were as follows:

- Marla Kaplowitz, Board Member (July 30th);

- Jay Snowden, Chief Executive Officer ("CEO") and President (August 8th);

- Vimla Black-Gupta, Board Member (August 12th);

- David Handler, Chair of the Board and Board Member (August 14th);

- Barbara Kohn, Former Board Member (August 14th);

- Saul Reibstein, Former Board Member (August 20th);

- Ronald Naples, Former Board Member (August 29th);

- Anuj Dhanda, Board Member (September 4th);

- Jane Scaccetti, Board Member (September 9th);

- Thomas Auriemma, Esquire, Independent Chair, Compliance Committee (September 11th);

- Christopher Soriano, Esquire, Chief Compliance Officer (September 19th);

- Peter Carlino, Chairman Emeritus (September 29th); and

- Jay Snowden (follow-up interview) (October 15th).

Both members of the Committee participated in all the interviews. Dilworth prepared written summaries of the interviews and discussed the substance of the interviews with the Committee

members during regular Committee meetings.[9]

In several instances, the Committee sought interviews with individuals not affiliated with the Company, including Mr. Clifford and a representative from HG Vora, but could not secure participation from the requested individuals. After discussion, the Committee and Dilworth concluded that, while it could have been potentially helpful to speak with these individuals, their participation in an interview was not necessary for the Committee to complete its investigation.[10]

### E.    Retention of Kevin Hayes, Esquire

Pursuant to its enabling resolution, the Committee has the authority to retain outside consultants to assist the Committee on relevant matters. Throughout the investigation, the Committee and Dilworth discussed whether the Committee should retain any consultants to assist the Committee and counsel with the investigation. In September 2025, the Committee determined to retain an independent outside consultant to advise the Committee and counsel on potentially relevant issues related to the regulatory process in the gaming industry. That consultant, Kevin Hayes, Esquire, is a gaming law attorney with over nineteen years of experience in the gaming industry. Mr. Hayes served as the first Director of Gaming Operations for the Pennsylvania Gaming Control Board and has vast knowledge of regulatory processes in the gaming industry. The Committee and Dilworth retained Mr. Hayes independently and without input from any of the parties.

As part of this retention, counsel provided Mr. Hayes with relevant materials to review. The Committee and Dilworth held a series of conferences with Mr. Hayes to discuss relevant

---

[9] The Committee has concluded that each of the individuals interviewed were forthcoming, knowledgeable and credible with respect to the information provided to the Committee.

[10] Again, the Committee did not take an adverse inference against HG Vora for its failure to participate in the interview process.

issues. Overall, the Committee's conclusion is that the consultation services provided by Mr. Hayes assisted the Committee in its review and determination of relevant issues related to the gaming industry.

### F.      The Committee's Written Report

As set forth above, the Committee engaged in an extensive, careful and comprehensive review of the relevant issues consistent with its mandate and Pennsylvania law. Throughout the process, the Committee, with the assistance of counsel, reviewed the information learned and the applicable legal standard to make a determination as required by its enabling resolution. After the Committee was satisfied that its investigation was substantially complete, the Committee and counsel discussed the proposed determination of the Committee.

Based on the findings of the investigation, the Committee and Dilworth began working on a draft report which ultimately would summarize the findings and recommendation of the Committee. A draft of the report was reviewed in detail by Committee members. The Committee and Dilworth conducted several meetings to review and discuss the draft report. Dilworth then revised the report to reflect the Committee members' comments and resubmitted it to the Committee. The Committee made further revisions and unanimously approved a resolution adopting the report.

The Committee, through Dilworth, made the draft report available to counsel for both PENN and HG Vora before final completion.[11] With assistance from counsel, the Committee considered comments to the draft report provided by counsel for PENN and HG Vora.

---

[11] After reviewing the draft report, counsel for HG Vora requested that the Report note HG Vora's disagreement with the Committee's conclusions and rationale underpinning those conclusions.

## V.    RELEVANT FACTUAL BACKGROUND

A summary of the key events and issues is included below.[12]

### A.    PENN Entertainment

PENN Entertainment, Inc. is North America's leading provider of integrated entertainment, sports content and casino gaming experiences. PENN operates in 28 jurisdictions throughout North America, with a diversified portfolio of casinos, racetracks, online sports betting and iCasino offerings under various brands. PENN focuses on organic cross-sell opportunities through its market-leading retail casinos, sports media assets and technology, including a fully integrated digital sports and iCasino betting platform and an in-house iCasino content studio. The Company's portfolio also includes a customer loyalty program, offering its approximately 32 million members a unique set of rewards and experiences.

PENN is headquartered in Berks County, Pennsylvania. PENN's roots trace back to the Penn National Race Course, established in 1972 in Grantville, Pennsylvania by a group of Central Pennsylvania business leaders. PENN has since grown into a publicly traded company with over 20,000 employees and a large, diverse gaming footprint in North America. PENN's shares currently trade on the NASDAQ Stock Market. PENN operates 42 brick-and-mortar casinos and racetracks across 19 states (including four casinos in Pennsylvania), while also developing an online gaming and sports betting presence.

PENN operates in a highly regulated industry and must obtain and maintain gaming licenses from state gaming authorities in each jurisdiction in which it operates. The state gaming authorities have broad discretion in issuing and renewing gaming licenses and look at, among other

---

[12] This section is designed to be a general summary, and the failure to include a particular fact should not be interpreted as a failure by the Committee to consider that fact.

things, the character and integrity of the applicant. Many of the states in which PENN operates require PENN stockholders who own more than a certain percentage of voting stock—typically 5%—to also obtain state gaming licenses. If such a stockholder is an institutional investor who holds the stock for passive investment purposes only, the stockholder can apply for an "institutional investor waiver" in lieu of obtaining a gaming license.

The Board currently consists of eight members with wide-ranging backgrounds, including expertise in the gaming industry. Seven are unaffiliated with management and independent under NASDAQ rules. In accordance with its governing documents and Pennsylvania law, PENN's Board is separated into three classes, with each class serving a three-year term. PENN Articles of Incorporation § 6(a); PENN Bylaws § 4.03(d). At each of PENN's annual shareholder meetings, PENN's stockholders vote on the class of directors up for election or reelection that year.

Over the last several years, the Board has focused on a refreshment process to further diversify the experience and skillset of its Board members. Since 2020, the Board has added five new members, including the two candidates elected at the 2025 Annual Meeting. Throughout this period, the Board's size has fluctuated between seven and ten members.

## B.    HG Vora and PENN's Relationship Before the 2025 Annual Meeting

HG Vora is a registered investment adviser. HG Vora was founded by Parag Vora, who remains its manager. On February 14, 2023, HG Vora filed a Schedule 13G disclosing a 6.6% ownership interest in PENN. As an institutional investor, HG Vora's Schedule 13G represented that it did not intend to influence or control PENN.

In addition to its 13G, HG Vora signed institutional investor waivers in the jurisdictions in which PENN operated that require such waivers. By signing these waivers, HG Vora notified these jurisdictions that it would be a *passive* institutional investor in PENN. According to the waivers,

34

if HG Vora changed its intention with respect to PENN, it needed to notify the state regulators immediately.

Unsatisfied with the performance of PENN's share price, in September 2023, HG Vora, while still bound by its institutional investor waivers, sent a letter to PENN expressing its concerns. Shortly thereafter, David Handler, the chairman of the Board, invited members of HG Vora, including its founder Parag Vora, to meet with the Board. During the meeting, Mr. Vora requested that PENN engage in an aggressive share buyback to increase PENN's share price.

Later that year, on December 18, 2023, PENN's CEO Jay Snowden attended dinner with Parag Vora. During the course of this dinner, Parag Vora, on behalf of HG Vora, raised the idea of nominating directors and influencing corporate governance at PENN. Mr. Snowden asked Mr. Vora to reduce this request to writing. The following day, Mandy Lam, HG Vora's General Counsel, emailed Mr. Snowden with the three requests: (1) the right for HG Vora to appoint two Class III directors to the Board and for the Board to be downsized over a reasonable period of time; (2) the right for one of HG Vora's appointees to serve on the Nominating and Governance Committee; and (3) the establishment of a Capital Allocation Committee, with one of HG Vora's appointees to serve as the chair of the committee. At the time this request was made, HG Vora's institutional investor waivers remained in place.

On December 28, 2023, HG Vora filed a Schedule 13D with the Securities and Exchange Commission ("SEC"), disclosing for the first time its intent to influence or affect the operations of PENN. HG Vora's 13D conveyed that HG Vora now had over 18% ownership in PENN. HG Vora failed to notify state regulators of its intent to file a Schedule 13D before doing so. HG Vora's 13D was inconsistent with and, perhaps, directly violated the institutional waivers HG Vora signed in the various jurisdictions. In other words, HG Vora represented that it would be a passive investor

35

for licensing reasons but filed a document which indicated that it fully intended on taking a more active role in influencing or affecting the operations of PENN. This action concerned both members of the PENN Board and management, particularly individuals in the regulatory compliance group.

After filing the 13D and expressing its intention to influence or affect the operations of PENN, HG Vora received letters from several state regulators, including New Jersey, Indiana, Louisiana, Illinois, Massachusetts and Missouri. These letters informed HG Vora that, by filing its Schedule 13D, HG Vora was out of compliance with its institutional investor waiver. States, including Missouri,  rescinded HG Vora's institutional investor waiver and required it to apply for a license. As a result of its regulatory violations, HG Vora was unable to nominate directors at PENN's 2024 Annual Meeting.[13]

## C.    Post-2024 Annual Meeting

On November 19, 2024, HG Vora requested permission from Massachusetts to submit "recommended" Board candidates for the 2025 Annual Meeting. Pursuant to its standard practice, the Massachusetts Gaming Commission held a public meeting on December 16, 2024 to consider the request. Representatives of PENN attended the hearing. Three days later, on December 19, 2024, the Massachusetts Gaming Commission informed HG Vora that it would not complete its licensure review before the February 4, 2025 deadline to submit candidates for nomination at the

---

[13] In March 2024, the SEC fined HG Vora $950,000 for its failure to timely disclose its ownership in Ryder System Inc. before making an acquisition bid for the company. Specifically, an entity owning more than 5% of a public company's stock must file a Schedule 13D to announce its intention to influence or control the company. The SEC determined that HG Vora formed a control purpose no later than April 26, 2022, meaning it should have filed a Schedule 13D by May 6, 2022. However, HG Vora did not file a Schedule 13D until May 13, 2022, the same day it sent a letter to Ryder offering to buy all of its shares. Because HG Vora filed the Schedule 13D after the required date, the SEC found it violated federal disclosure laws and fined it in the amount of $950,000. The Board was aware of this incident during its discussions with HG Vora.

2025 Annual Meeting. The Massachusetts Gaming Commission, therefore, denied HG Vora's request.

On January 14, 2025, HG Vora filed an amendment to its Schedule 13D disclosing that it restructured its ownership to 4.8% and retained its remaining economic interest in PENN in derivatives. PENN has not learned the identity of the entities to which HG Vora transferred its shares, which now have a voting interest in the Company. On the same day, the Massachusetts Gaming Commission de-designated HG Vora from its licensing requirements because it was now below the 5% threshold requirement for licensure in the state. Notably, other states, including Ohio, Pennsylvania, New Jersey, Missouri, Illinois, Michigan and Nevada, still required HG Vora to obtain licenses notwithstanding that it was now below their 5% statutory threshold.

During the Fall of 2024 and Spring of 2025, Parag Vora called Peter Carlino, PENN's founder and the chair emeritus of PENN's Board, several times.[14] Mr. Vora voiced his concerns over the performance of PENN's share price to Mr. Carlino and communicated his idea for a share buyback. Mr. Vora also expressed his frustration with the duration of the licensing process. Over the course of these calls, Mr. Vora informed Mr. Carlino that he had two goals with respect to PENN: (1) remove the current management, and (2) take control of the Company to force a sale. Mr. Carlino notified Mr. Snowden of these conversations. Mr. Snowden was also contacted directly by individuals in the industry who informed him that Parag Vora had contacted them about purchasing PENN. Mr. Snowden reported these conversations to the Board and its regulatory advisors.

---

[14] Mr. Carlino submitted a signed statement to the Pennsylvania Gaming Control Board on August 14, 2025. In his signed statement, Mr. Carlino provided the details of his conversations with Mr. Vora. The facts included in Mr. Carlino's signed statement and his interview with the Committee were consistent.

### D.    PENN Considers All Three HG Vora Nominees

HG Vora delivered its notice of intent to nominate William Clifford, Johnny Hartnett and Carlos Ruisanchez to the Board at the 2025 Annual Meeting on January 29, 2025.

Mr. Clifford was the Chief Financial Officer of Penn National Gaming for twelve years before joining Gaming & Leisure Properties Inc. ("GLPI"), the Real Estate Investment Trust spin-off of PENN. Mr. Clifford left GLPI and returned to PENN for a brief period as a consultant. When Mr. Clifford was departing from his role as a consultant, he expressed his interest in joining the Board to Jay Snowden. Mr. Snowden presented Mr. Clifford's interest to the Board, but the Board ultimately determined that Mr. Clifford was unsuited to join it.

Mr. Hartnett has over twenty years of experience in online sports betting and gaming, including serving as the CEO of Superbet Betting & Gaming S.A. Mr. Hartnett has expertise in the digital aspects of the gaming industry.

Mr. Ruisanchez also has experience in the gaming industry. He served as the CFO of Pinnacle Entertainment before its acquisition by PENN in 2018.

Following the HG Vora nominations, the Board started its customary practice of reviewing Board nominees. PENN's standard practice has multiple steps. First, the Compliance Committee engages a third-party to conduct a formal background check on the candidates. The Compliance Committee then reviews the background check and interviews the candidates to determine if the candidate is an Unsuitable Person or would create an Unsuitable Situation. PENN's Gaming Compliance Review and Reporting Plan, which serves as the operative document for PENN's compliance efforts, defines the terms Unsuitable Person and Unsuitable Situation. Under the Gaming Compliance Review and Reporting Plan, an Unsuitable Person is:

(a) A person (1) who has been denied a license or registration by any Gaming Authority for reasons relating to personal suitability, (2) whose license or registration has been revoked by any Gaming Authority or (3) who has been

determined to be unsuitable or unqualified to be associated with a gaming enterprise by any Gaming Authority; or (b) A person whom the Company determines is unsuitable to be a business associate of the Company based on that person's past activities, associations or financial practices.

The Gaming Compliance Review and Reporting Plan defines an Unsuitable Situation as:

(i) engaging in business with an Unsuitable Person; (ii) materially failing to comply with the gaming laws or regulations of any Gaming Authority or the terms and conditions of any license, permit, registration or other authority to conduct gaming operations issued by any Gaming Authority; (iii) a material violation of this Compliance Plan; (iv) materially failing to apply with the applicable law; or (v) any situation that the Compliance Committee determines materially adversely impacts on the ability of the Company to obtain or maintain any gaming license, permit, registration or other authority to conduct gaming operations.

Subsection (v) is a catchall provision that provides the Compliance Committee broad discretion in deciding whether a situation is Unsuitable.

If the Compliance Committee determines that state regulators likely will not deem a candidate as an Unsuitable Person, the Nominating and Governance Committee interviews the candidate for fitness on the Board. The Independent Chair of the Compliance Committee, Thomas Auriemma, typically attends the interviews for further follow up on a Suitability Determination. Then, Jay Snowden and/or David Handler conducts a final interview.

On March 3, 2025, Marla Kaplowitz and Vimla Black-Gupta, both members of the Nominating and Governance Committee,[15] interviewed Carlos Ruisanchez. Due to a scheduling conflict, Mr. Auriemma separately interviewed Mr. Ruisanchez on March 7, 2025. Mr. Snowden interviewed Mr. Ruisanchez on March 13, 2025. After Mr. Ruisanchez's interviews were complete, Ms. Kaplowitz, Ms. Black-Gupta and Mr. Snowden presented the results of their

---

[15] Before his retirement, Ronald Naples also served as a member of the Nominating and Governance Committee. Because he was up for reelection at the 2025 Annual Meeting, Mr. Naples recused himself from the interview process to avoid a conflict of interest.

interviews with Mr. Ruisanchez to the Board. The interviewers concluded that Mr. Ruisanchez could be a beneficial addition to the Board.

Ms. Kaplowitz, Ms. Black-Gupta and Mr. Auriemma jointly interviewed Johnny Hartnett on March 6, 2025. Mr. Snowden interviewed Mr. Hartnett on March 10, 2025. After Mr. Hartnett's interviews were complete, Ms. Kaplowitz, Ms. Black-Gupta and Mr. Snowden presented the results of their interviews with Mr. Hartnett to the Board. The interviewers concluded that Mr. Hartnett would be a beneficial addition to the Board.

On March 10, 2025, Ms. Kaplowitz, Ms. Black-Gupta and Mr. Auriemma interviewed William Clifford. Mr. Snowden then interviewed Mr. Clifford on March 11, 2025. After Mr. Clifford's interviews were complete, Ms. Kaplowitz, Ms. Black-Gupta and Mr. Snowden presented the results of their interviews with Mr. Clifford to the Board. All interviewers concluded that Mr. Clifford was unsuited to join the Board and recommended against his nomination.[16] After discussion, all members of the Board concurred.

The Board found that Mr. Clifford was unsuited for the Board because he had antiquated views of PENN and the gaming industry as a whole; Mr. Clifford was unwilling to compromise on those views; and Mr. Clifford's skillset was redundant. Throughout their interviews with the Committee, the Board members explained that Mr. Clifford opposed two key strategies at PENN: (1) the transition of PENN from a holding company to an operating company, and (2) PENN's digital strategy. The Board members explained that, during Mr. Clifford's tenure at PENN, PENN acted mainly as a holding company. PENN owned various brick-and-mortar casinos, but it left the operation of those casinos to the casinos themselves. Because the operation of the casinos were

---

[16] The Nominating and Governance Committee did not conclude that Mr. Clifford was an Unsuitable Person as that term is defined in PENN's Gaming Compliance Review and Reporting Plan.

decentralized, PENN's operating systems were also decentralized. When PENN started to transition into an operating company, it also started to implement centralized operating systems. Mr. Clifford opposed the transition and the accompanying systems. However, the Board believes PENN's strategic shift directly led to the Company's growth and success.

The Board members also informed the Committee that PENN has recently embarked on an omni-channel strategy that would increase the Company's presence in the digital gaming industry. Members of the Board who interviewed Mr. Clifford told the Committee that, during his interviews, Mr. Clifford expressed strong opposition to PENN's digital strategy. Mr. Clifford preferred that PENN revert to its original business model as a decentralized holding company for brick-and-mortar casinos. The Board members viewed Mr. Clifford's opinions as diametrically opposed to PENN's direction, with several Board members saying Mr. Clifford had a "closed mind."

The Board further felt that Mr. Clifford was unwilling to compromise on his views. Conversely, the members of the Board who interviewed Messrs. Hartnett and Ruisanchez felt that both candidates had strong views, but both demonstrated an open mind.

The Board also determined that Mr. Clifford's skillset was redundant. At the time Mr. Clifford was nominated, Saul Reibstein served on PENN's Board. Mr. Reibstein was Mr. Clifford's successor as PENN's CFO and had vast experience in the gaming industry. Even after Mr. Reibstein decided not to stand for reelection, Mr. Clifford's skills and experience overlapped with those of Carlos Ruisanchez, who also had significant experience as the CFO of Pinnacle Entertainment.[17]

---

[17] Notably, one of the Board members who interviewed Mr. Clifford informed the Committee that Mr. Clifford appeared to "represent one shareholder," i.e., HG Vora.

### E.    PENN Conducts Search For Candidates

Before the 2025 Annual Meeting, as part of the long standing Board refreshment process, PENN performed its own director search to find suitable candidates to nominate. To assist it with this search, PENN engaged the search firm Heidrick & Struggles. PENN also received suggestions from its advisors Evercore and Goldman Sachs. PENN sought candidates with: (1) former or current C-suite experience, (2) public board experience, and/or (3) digital/interactive experience. While PENN identified two candidates that it had interest in, both were ultimately unable to serve on the Board.

Throughout the Committee's interview process, various members of the Board, including members of the Nominating and Governance Committee, explained that PENN struggled to find qualified candidates because of the intensity and difficulties of the licensing process. Each of PENN's Board members must be licensed in each of the jurisdictions in which PENN operates, and the Board members described this process as highly burdensome and highly intrusive. The Board members explained that it is difficult to find qualified candidates, and when the Board finds candidates, many are unaware of the burden of the licensing process. During interviews, the Board informs candidates of the licensing process and candidates are typically unwilling to participate. Members of the Board also told the Committee that its director search became even more difficult after HG Vora's nominations because the potential for a proxy contest significantly deters suitable candidates from seeking consideration for the Board. For these reasons, PENN's independent director search came up fruitless by the time of the 2025 Annual Meeting.

### F.    The Board Was Informed by Highly Qualified Advisors

During the course of the nomination, interview and decision-making processes, the Board consulted with both internal and external experts. PENN received financial and strategic advice from Goldman Sachs and Evercore. Both entities joined the Board for several meetings and gave

presentations to the Board about the impact of various alternatives. PENN also received legal and strategic advice from its counsel at Wachtell, Lipton, Rosen & Katz. PENN received regulatory advice from its counsel at Ballard Spahr.

In addition to receiving regulatory advice from outside counsel, the Board also received regulatory advice from Christopher Soriano, its Chief Compliance Officer, Chris Rogers, its General Counsel, and Thomas Auriemma, the Independent Chair of its Compliance Committee. Mr. Soriano serves as PENN's primary contact with state regulators, and he speaks with state regulators frequently.

The Committee found it relevant that its independent expert consultant, Kevin Hayes, is familiar with Mr. Soriano's reputation in the industry and holds him in the highest professional regard. This was considered material given that Mr. Soriano played a significant role in advising the Board with respect to its decision to eliminate a Board seat before the election of directors at the Annual Meeting in April, 2025.

### G.    PENN and HG Vora's Negotiations

Following the nominations and concurrent with the interviewing process, HG Vora and the Board were in contact with both one another and state regulators. Similarly, the Board and officers met regularly with its advisors regarding the Annual Meeting issues.

As PENN's primary point of contact with state regulators, Mr. Soriano frequently spoke with regulators during this period. On March 24, 2025, Mr. Soriano spoke to Cyrus Pitre, the Chief Enforcement Counsel of the Pennsylvania Gaming Control Board. Mr. Pitre informed Mr. Soriano that, while HG Vora did not have a license to nominate directors, Pennsylvania would imminently be providing interim authorization (i.e., a temporary license) with conditions to HG Vora. Mr. Pitre informed Mr. Soriano that one condition prohibited HG Vora from engaging in "governance discussions." Mr. Soriano informed PENN of this. As relayed by Mr. Soriano, no governance

"means no negotiations to change the size or structure of the board, no material alterations to the charge of any existing committee, no disproportionate voting rights, no special affirmative or negative consent rights over capital allocation or other strategic matters, and no right of the nominees to share confidential information with Vora." In short, Pennsylvania wanted to make sure that "nobody pulls a fast one," in Mr. Soriano's words. As part of the interim approval, Pennsylvania advised Mr. Soriano that HG Vora had represented to it that it only intended to submit nominations and run the proxy contest and not obtain any "extraordinary rights." Mr. Soriano shared this information with Mr. Snowden, Mr. Handler and PENN's counsel.

On March 25, 2025, advisors for PENN and HG Vora met with one another. PENN offered to add Mr. Hartnett to the Board, and HG Vora rejected the offer. The advisors met again on March 27, 2025, where HG Vora counteroffered for PENN to accept two of its three nominees if PENN agreed to issue a joint statement with HG Vora that PENN would hire bankers to perform a strategic review of the Company. PENN rejected this offer.

On April 1, 2025, HG Vora received its interim authorization from Pennsylvania to nominate directors with conditions, including the condition that HG Vora refrain from engaging in discussions regarding "governance." PENN and HG Vora's advisors met again to discuss settlement on April 10, 2025. PENN offered to add Mr. Hartnett and work with HG Vora to find a mutually agreeable second candidate, with Mr. Ruisanchez serving as the lead contender. In violation of the conditions of its interim authorization, HG Vora responded to this offer stating that, if PENN agreed to accept only two of HG Vora's candidates, HG Vora—in seemingly direct contradiction to the restrictions placed on it by the Pennsylvania regulators—also wanted governance rights. Among others, these governance rights included having Parag Vora serve as a

Board observer and the Company engaging an investment bank to undertake a strategic analysis of the Company.

On April 17, 2025, HG Vora's regulatory counsel emailed Mr. Pitre to confirm his understanding of Pennsylvania's conditions of HG Vora's interim authorization. Mr. Pitre responded that, "[t]here should be no corporate governance discussions as part of negotiations."

HG Vora and PENN's advisors conversed one final time on April 24, 2025. PENN offered immediately to appoint both Messrs. Hartnett and Ruisanchez to the Board without the governance rights requested. HG Vora rejected this offer and informed PENN that it was prepared to engage in a proxy contest.

## H.    The April 25, 2025 Board Meeting And Decision To Eliminate The Seat

By letter dated April 25, 2025, Ronald Naples retired from the Board. Mr. Naples informed the Committee that he had always intended to retire from the Board at some point during 2025, but that HG Vora's nominations and the ongoing negotiations, in conjunction with his growing health concerns, accelerated his decision to retire before standing for reelection at the 2025 Annual Meeting. Saul Reibstein and Barbara Shattuck Kohn decided not to stand for reelection. Mr. Reibstein and Ms. Kohn explained to the Committee that, while both initially wanted to stand for reelection, neither wanted to partake in a proxy contest because they serve on the boards of other public companies.

Later that day, the Board met. The Board was faced with a difficult decision at that meeting. HG Vora nominated three directors, and as of the morning of April 25, 2025, PENN had three open board seats up for election at the 2025 Annual Meeting. However, the Board already determined that Mr. Clifford was unsuited to serve on the Board, and PENN was unable to find a suitable candidate through its own search. Accordingly, PENN intended to nominate only Messrs.

Hartnett and Ruisanchez. This meant that PENN had to make a decision: it could either do nothing and allow Mr. Clifford to be elected, or it could eliminate a Board seat.

PENN's advisors from Goldman Sachs, Evercore and Wachtell, Lipton, Rosen & Katz were present. Mr. Handler commenced the meeting by informing the Board of the conversation between PENN's advisors and HG Vora's advisors on the previous day. Mr. Handler also informed the Board that Mr. Naples decided to retire, and that Mr. Reibstein and Ms. Kohn decided not to stand for reelection.

In addition, the Board considered whether allowing Mr. Clifford to be elected to the Board under the circumstances could pose a potential regulatory problem for the Company. As the Board explained, protecting the Company's gaming licenses, and not exposing the Company to regulatory risk, is material to the Company's business. PENN's employment of Christopher Soriano as Chief Compliance Officer and its relationship with Thomas Auriemma as the independent chair of its Compliance Committee is designed to ensure regulatory compliance. Both have excellent reputations and extensive experience with state gaming authorities, including enforcement.

Here, the Board's actions were taken with due consideration of legitimate regulatory concerns related to HG Vora's conduct. As explained by members of the Board in their interviews, Christopher Soriano advised them of the regulatory risks posed by Mr. Clifford's election, which factored substantially into the Board's decision. The potential regulatory risks stemmed from the Board's belief—as informed by its internal and external advisors, most prominently Mr. Soriano —that doing nothing and allowing Mr. Clifford to essentially join the Board unopposed as HG Vora's nominee who could expand the influence, control and governance of the Company by HG

Vora could pose a real risk to PENN from a regulatory standpoint, given the ongoing regulatory concerns.

More specifically, the regulatory concerns arose from the fact that Mr. Clifford had already been determined to be an unsuitable candidate for the Board. That decision was unanimous. Compounding this determination was the fact that Mr. Clifford was HG Vora's nominee. As Mr. Soriano and Mr. Auriemma explained to the Committee, this posed regulatory problems in view of the actions of HG Vora leading up to the Board meeting and in view of HG Vora's intent to exercise governance and control of PENN.

Specifically, HG Vora had previously signed institutional waivers in which it pledged to the applicable jurisdictions that it would remain a passive investor and not attempt to interfere with the control and governance of PENN. HG Vora apparently violated these waivers when Parag Vora, on behalf of HG Vora, raised the idea of nominating directors and influencing corporate governance at PENN to Jay Snowden at dinner on December 18, 2023. Mr. Vora's request was sent to Mr. Snowden the following day via email by Mandy Lam, HG Vora's General Counsel. As stated above, the email contained three requests, all directly related to PENN's governance: (1) the right for HG Vora to appoint two Class III directors to the Board and for the Board to be downsized over a reasonable period of time; (2) the right for one of HG Vora's appointees to serve on the Nominating and Governance Committee; and (3) the establishment of a Capital Allocation Committee, with one of HG Vora's appointees to serve as the chair of the committee.

HG Vora had a history of pushing the boundaries of gaming control restraints. HG Vora seemingly violated its institutional investor waivers in late December 2023 when it filed its Schedule 13D with the SEC disclosing its then 18% ownership interest and its intent to influence or affect the operations of PENN. HG Vora did not inform the state regulators of the 13D and that

—again, seemingly contrary to the institutional waivers—HG Vora intended no longer to be a passive investor. HG Vora then sought to nominate a slate of directors for the 2024 election cycle but was quickly informed by the relevant jurisdictions that it could not as it would likely be a direct violation of the institutional waivers. HG Vora ultimately did not attempt to nominate directors during the 2024 elections, but its conduct gave rise to legitimate concerns among members of the Board and management, particularly individuals in the regulatory compliance group.

During 2024, HG Vora continued in its efforts to influence or affect the operations of PENN as an unlicensed entity, despite the institutional waivers and promise to be passive. In early 2025, after it was again advised that it could not nominate directors at the 2025 Annual Meeting under its current status, HG Vora announced that it no longer directly held 18% of PENN stock. Instead, after moving a significant portion of its holding into derivatives, HG Vora now directly owned slightly less than 5% of PENN voting stock with an economic interest in the remainder of the shares. HG Vora overall through the derivative instruments still had an economic interest of 18% in the Company but only held 5% directly. HG Vora at the time and even now has not provided any real visibility into the precise nature of its derivative holdings. Massachusetts seemingly accepted this general arrangement, allowing HG Vora to nominate directors for the 2025 slate. The members of the Board and the regulatory compliance group, nevertheless, maintained their legitimate concerns about the nature of HG Vora's holdings.

In Pennsylvania, HG Vora was conditionally approved to nominate and support a slate of directors. But, of paramount importance, there were express conditions on this conditional approval. Most prominently, the Pennsylvania regulators were clear that, while HG Vora could nominate and support candidates, HG Vora—as an unlicensed entity—could not be involved with influencing governance. Almost simultaneous with the Pennsylvania restriction on HG Vora's

ability to be involved with governance issues, HG Vora directly sought to influence the governance of PENN. More specifically, as part of negotiations with PENN during which HG Vora suggested changes to governance, HG Vora's counsel communicated with Mr. Pitre and inquired whether HG Vora could indeed suggest governance changes as part of its negotiations with PENN. Mr. Pitre's response was an unequivocal no and that the restrictions placed on HG Vora were "self-explanatory"—"there should be no corporate governance discussions as part of negotiations." Despite the clear restrictions, HG Vora had requested governance changes as part of its discussions with PENN in March/April 2025. This request gave further rise to the concerns of the members of the Board and the regulatory compliance group as to the conduct of HG Vora.

An added concern during this time were statements made by Mr. Vora to Mr. Carlino that HG Vora wanted changes to governance and that it intended to take control of the Company to force a sale. Again, these statements seemingly contradicted the restrictions placed on HG Vora and concerned the members of the Board and the regulatory compliance group regarding conduct violating regulatory restrictions.

In short, the Board was faced with a situation in which HG Vora, a company that the Board viewed as having a controversial regulatory history, was attempting to force PENN to accept a director whom PENN had found unsuitable. At the April 25, 2025 Board meeting, all of these issues were discussed by the Board. Mr. Soriano, an expert in the field of regulatory compliance, advised the Board that allowing Mr. Clifford to run unopposed and get elected to the Board as HG Vora's candidate under the above circumstances posed a potential risk to the Company from a regulatory compliance standpoint. As HG Vora's candidate, the Board viewed Mr. Clifford as

someone who may intend to influence the control and governance of PENN on HG Vora's behalf.[18] Mr. Soriano, in his experience, told the Committee that the regulators would expect PENN to take reasonable, even cautious, steps to avoid any potential problem from a regulatory standpoint. In his words, regulators require gaming companies to exercise "business probity."

At the April 25, 2025 Board meeting, the Board unanimously voted to eliminate one of the three Board seats otherwise subject to election at the Annual Meeting in June. The elimination of the Board seat was intended, in large part, to avoid a potential issue from a regulatory perspective, and it essentially sought to mitigate against the risk.

## I.    **The Lead Up to the 2025 Annual Meeting**

After the Company's decision to nominate Mr. Hartnett and Mr. Ruisanchez and eliminate a board seat, HG Vora embarked on a proxy campaign. In May 2025, it filed a fight deck titled, "Genuine Change Is Needed At PENN." HG Vora's fight deck, as well as its accompanying proxy materials, solicited proxies for Johnny Hartnett, Carlos Ruisanchez and William Clifford. In response, PENN issued a Fact Sheet on May 15, 2025. On May 19, 2025, PENN issued an addendum to the Fact Sheet. The addendum clarified to shareholders that both PENN and HG Vora nominated two of the same directors: Messrs. Hartnett and Ruisanchez. It also clarified that HG Vora solicited proxies for a third candidate—William Clifford—notwithstanding that only two seats were available at the election.

Several proxy advisory firms issued reports on the proxy contest. ISS recommended a vote for Mr. Clifford, although it recognized that it was unclear whether Mr. Clifford could be elected at the meeting. Conversely, Glass Lewis recommended a vote only for Messrs. Hartnett and

---

[18] In contrast, the Board considered Messrs. Hartnett and Ruisanchez to be independent and open-minded and not beholden to HG Vora's views.

Ruisanchez. The Glass Lewis report expressed concerns over the decision to eliminate the seat. However, Glass Lewis concluded that it "did not find sufficient evidence that the board acted in bad faith or with the primary purpose of entrenchment." Glass Lewis Report p. 22.[19]

### J.    The 2025 Annual Meeting

PENN held its 2025 Annual Meeting on June 17, 2025. To hold an annual meeting, PENN's Bylaws include a quorum requirement which provides that shareholder meetings "shall not be organized for the transaction of business unless a quorum is present." Bylaws § 3.04. The quorum requirement is "a majority of the votes that all shareholders are entitled to cast on a particular matter." *Id.* As of the record date for the 2025 Annual Meeting, there were 150,852,769 shares of PENN's common stock outstanding, meaning 75,426,385 shares would be needed for quorum.

Holders of 117,166,555 shares of PENN common stock, in person or by proxy, were present at the 2025 Annual Meeting. Of those shares, 66,133,741 were represented on the HG Vora Universal Proxy. At the 2025 Annual Meeting, it was deemed that a quorum was present. Mr. Hartnett and Mr. Ruisanchez were elected to the Board, receiving 108,409,603 and 108,370,058 votes "FOR," respectively, representing approximately 92.5% of the votes cast. Although only two seats were up for election, Mr. Clifford received 61,962,937 "FOR" votes, representing approximately 57% of the votes cast. Because only two seats were up for election at the 2025 Annual Meeting, only Messrs. Hartnett and Ruisanchez were elected to the Board and were subsequently seated as directors.

---

[19] The full quote from the Glass Lewis report reads as follows: "Despite these concerns, we do not find sufficient evidence that the board acted in bad faith or with the primary purpose of entrenchment. The Company did evaluate all three HG Vora nominees, including through interviews, and provided detailed rationale for its decision. Moreover, the addition of Hartnett and Ruisanchez appears likely to enhance board oversight of PENN's capital allocation and digital strategy – two areas central to shareholder concerns and long-term value creation." Glass Lewis Report p. 22

## VI.    FINDINGS OF THE SPECIAL LITIGATION COMMITTEE

In this section, the Committee summarizes its conclusions with regard to HG Vora's claims and allegations of fiduciary violations contained in the HG Vora Federal Action Complaint. The Committee has concluded, based upon its review of the shareholder claims, allegations, factual materials and legal authority, that it would not be in the best interests of the Company to pursue the HG Vora claims or take other action.

### A.    Pennsylvania Law Relating to Fiduciary Duties

The duties of the Company's directors and officers are governed by and subject to the applicable provisions of the BCL and relevant common law. Section 1721 of the BCL provides that the powers of a corporation are exercised by or under the authority of, and the business and affairs of every business corporation shall be managed under the direction of, a board of directors. 15 Pa. C.S. §1721(a). PENN's Bylaws are consistent with this provision.

The business judgment rule is a doctrine which insulates officers or directors of a corporation from liability for business decisions made in good faith. *See Cuker*, 692 A.2d at 1045. Pennsylvania's business judgment rule is codified in 15 Pa. C.S. § 1712(d). If the conditions in Section 1712(d) are satisfied, it is presumed that directors have acted in the best interests of the corporation and in good faith. §1712(d). The burden of proof rests on the party challenging the action of the board. § 1712(e).

A significant, overriding principle in any analysis of whether a board properly exercised its business judgment and fulfilled its fiduciary duties under Pennsylvania corporate standards is to whom those standards and duties apply. Unlike corporate standards in other jurisdictions such as Delaware, the BCL provides that directors of a Pennsylvania corporation owe fiduciary duties only to the corporation itself:

A director of a business corporation shall stand in a fiduciary relation to the

> corporation and shall perform his duties as a director, including his duties as a member of any committee of the board upon which he may serve, in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances.

15 Pa. C.S. § 1712(a). Similarly, Section 1717 provides, "The duty of the board of directors, committees of the board and individual directors under Section 1712 (relating to standard of care, justifiable reliance and business judgment rule) is solely to the business corporation and not to any shareholder or creditor or any other person or group . . . ." § 1717. There is a clear distinction between Pennsylvania and Delaware law on the issue of to whom a director's fiduciary duty is owed. For reasons explained in more detail below, this distinction directly impacts the Committee's analysis.

Section 1712(a) also provides that in performing duties, a director shall be entitled to rely in good faith on information, opinions, reports or statements prepared or presented by relevant officers or employees of the corporation, counsel and other professionals. 15 Pa. C.S. § 1712(a); *see also* 15 Pa. C.S. § 1715(a) (noting that a director may also consider other factors such as long and short-term goals of the company and resources of the company). A director is not considered to be acting in good faith, however, if he or she has knowledge concerning the matter in question that would cause the director's reliance to be unwarranted. 15 Pa. C.S. § 1712(b).

1. **The Applicable Burden and Standard To the Board's Decision To Reduce The Size Of The Board**

As referenced in the introduction to this Report, a threshold issue is the standard that governs the Board's decision to eliminate a Board seat before the June 2025 Annual Meeting. PENN's position is that the Pennsylvania business judgment rule should apply. In its pleadings and in substantive materials provided to the Committee, HG Vora primarily relies upon the standard developed by Delaware courts for Delaware corporations. The Committee believes that a

court applying Pennsylvania law would apply the business judgment standard rather than Delaware's enhanced scrutiny standard.

Application of Pennsylvania's business judgment standard and Delaware's enhanced scrutiny standard differ on two significant issues: (1) which party has the burden of proof, and (2) what the parties are required to prove. On the first issue, Pennsylvania's business judgment rule provides that the person challenging a board's decision has the burden of proof. 15 Pa. C.S. § 1712(e). Conversely, under Delaware's enhanced scrutiny standard, the board has the burden of proof. *See Coster v. UIP Cos., Inc.*, 300 A.3d 656, 672-73 (Del. 2023). On the second issue, under Pennsylvania law, the party challenging the board's conduct has the burden of proving that the board was uninformed, acted in bad faith or acted irrationally. § 1712(d). In contrast, Delaware requires the board to prove that its action served a compelling interest and that the action was reasonable in relation to the threat posed. *See Coster*, 300 A.3d at 672-73. The application of Pennsylvania's business judgment standard is much more deferential to a board's decision to eliminate a board seat.

The Committee's conclusion is that, consistent with the Pennsylvania BCL and Pennsylvania case law, a court applying Pennsylvania law would apply the business judgment standard to the PENN's Board decision to eliminate the Board seat, and that the burden would be on the challenging shareholder. Stated differently, the Committee's conclusion is that a court applying Pennsylvania law would likely not shift the burden nor apply the heightened, compelling reasons standards set forth in such Delaware cases as *Blasius*, *Unocal* and/or *Coster*—as HG Vora suggests. With the application of the business judgment rule, the Committee's further conclusion is that HG Vora would not meet its burden in proving that the Board breached any applicable fiduciary duty and that pursuing litigation against members of the Board would not be in the best

54

interests of the Company. A more detailed analysis follows.

> (i)    **There Are Critical Differences Between Pennsylvania and Delaware Law on a Board's Fiduciary Duties**

HG Vora and PENN vigorously disagree on whether a Pennsylvania court would rely on Delaware standards in analyzing the facts of this case. Pennsylvania and Delaware corporate law differ from one another significantly. With respect to the issues presented by HG Vora's derivative claim, Pennsylvania and Delaware differ in three significant ways: (1) Pennsylvania's business judgment rule is codified in its Business Corporation Law, whereas Delaware's business judgment rule is a creature of the common law; (2) the Pennsylvania BCL applies a deferential standard to a board's decision making, whereas Delaware courts shift the burden to the board on certain corporate decisions to prove a compelling interest; and (3) the Pennsylvania legislature specifically amended the BCL to enhance the power of the board facing change-of-control situations, whereas Delaware applies a heightened scrutiny in such situations.

> a.    **Pennsylvania Codified Its Business Judgment Rule; Delaware Did Not**

Pennsylvania's business judgment rule is codified in Section 1712(d). It provides:

> A director who makes a business judgment in good faith fulfills the duties under this section if:
> (1) the subject of the business judgment does not involve self-dealing by the director of an associate or affiliate of the director;
> (2) the director is informed with respect to the subject of the business judgment to the extent the director reasonably believes to be appropriate under the circumstances; and
> (3) the director rationally believes that the business judgment is in the best interests of the corporation.

15 Pa. C.S. § 1712(d). The 2022 Committee Comment to § 1712 explains that the phrase "rationally believes" as used in § 1712(d)(3) is intended "to give a director a safe harbor from liability for business judgments that might arguably fall outside the term 'reasonable' but are not so removed from the realm of reason when made that the business judgment rule should be

unavailable." § 1712 Committee Comment. Section 1712(e) adds that the party challenging a director's business judgment bears the burden of proving that the director breached the duty of care and legally caused damages to the corporation in a damage action. § 1712(e). Additionally, the BCL states that boards of Pennsylvania corporations owe fiduciary duties solely to the corporation. §§ 1712(a), 1717.

According to Pennsylvania's principles of statutory interpretation, statutes should be construed to ascertain and effectuate the intention of the Pennsylvania legislature. 1 Pa. C.S. § 1921(a). Courts interpreting Pennsylvania statutes treat the plain language of the statute as the best indication of the legislature's intent. *See Almusa v. State Board of Medicine*, 332 A.3d 791, 799 (Pa. 2025). If the statutory language is clear and unambiguous, it must be followed. § 1921(b). By clear and unambiguous terms, Section 1712(d) does not limit the situations in which the business judgment rule applies. Instead, it simply says that the business judgment rule applies to a director's decision as long as it meets the requirements of the statutory provision. In accordance with these principles, the Committee believes that the Pennsylvania legislature intended for the business judgment rule to apply to all rational director decisions made in good faith, without self-dealing and on an informed basis.

Section 1715 permits a board to consider a variety of factors in determining what is in the best interest of the company when exercising its business judgment. Section 1715(a) states that directors can consider: (1) the effects of a decision on all of the Company's stakeholders; (2) the short-term and long-term interests of a corporation; (3) the resources, intent and conduct (past, stated and potential) of any person seeking to acquire control of the corporation; and (4) all other pertinent factors." 15 Pa. C.S. § 1715(a). Section 1715(b) provides that none of the factors listed in Section 1715(a) are controlling, and a board need not consider one over another. § 1715(b).

56

Section 1715(d) further explains that the business judgment rule expressly applies in control situations. Section 1715(d) states:

> In assessing whether the standard set forth in section 1712 . . . has been satisfied, there shall not be any greater obligation to justify, or higher burden of proof with respect to, any act as the board of directors, any committee of the board or any individual director relating to or affecting an acquisition or potential or proposed acquisition of control of the corporation than is applied to any other act as a board of directors, any committee of the board or any individual director.

§ 1715(d). Section 1715(d) emphasizes that even in the specific circumstances where other jurisdictions (particularly Delaware) apply heightened scrutiny, Pennsylvania will not. § 1715(d).

The Committee believes that the Pennsylvania legislature clearly intended for Section 1715(a)-(d) to reinforce Section 1712. In addition to the principles set forth above, Pennsylvania's statutory interpretation principles mandate that a statute should be construed to give effect to all its provisions. 1 Pa. C.S. § 1921(a). Therefore, to the extent possible, the provisions of Title 15 Chapter 17 of the Pennsylvania BCL should be read within the context of one another, not in a vacuum. With this in mind, Section 1715, which specifically references Section 1712, should be interpreted together with Section 1712. Section 1712 specifies that the business judgment rule applies to all board decisions made in good faith if three conditions are present: (1) there is no self-dealing; (2) the directors are informed; and (3) the directors rationally believe it is best interest of company. § 1712(d)(1)-(3). Section 1715 reinforces that, in determining what is the best interest of the company, even when other jurisdictions might apply a form of heightened scrutiny, courts should not apply any heightened scrutiny to a board's decision "relating to or affecting an acquisition or potential or proposed acquisition of control of the corporation." § 1715(d). Read

together, the Committee believes that Section 1715(d) reinforces Section 1712, providing further support for the application of the business judgment rule.[20]

The Committee's interpretation is supported by the Committee Comment to Section 1715, as well as the case law interpreting the BCL. The 2022 Committee Comment explains that the 2022 amendment to the BCL removed the first sentence of Section 1715(d), which used to read, "Absent breach of fiduciary duty, lack of good faith or self-dealing, any act as the board of directors, a committee of the board or an individual director shall be presumed to be in the best interests of the corporation." This sentence was removed specifically because it was replaced by Section 1712(d). § 1715 Explanatory Comment. The only reason that Section 1715(d) omits reference to other actions besides those related to a potential takeover is that Section 1712 was added to broadly cover directors' duties, and the drafters chose to include the business judgment rule in that Section instead. The Committee Comment, therefore, clarifies that Section 1715(d) was not intended to be a carve out to Section 1712(d) but should instead be read in conjunction with it. Courts interpreting Title 15 Chapter 17 of the BCL have taken the same approach. *See*, *e.g.*, *Stilwell Value Partners I, L.P. v. Prudential Mut. Holding Co.*, No. 06-cv-4432, 2007 WL 2345281, at *10 (E.D. Pa. Aug. 15, 2007) ("[T]he intent of [Section 1717] was to supplement the

---

[20] The Committee also believes that the Pennsylvania legislature's response to the Southern District of New York's holding in *In re Nine West LBO Securities Litigation*, 505 F. Supp. 3d 292 (S.D.N.Y. 2020) demonstrates the legislature's intent for a broad application of the business judgment rule. In *In re Nine West*, the court declined to apply Pennsylvania's business judgment rule to a board's decision to sell a company. *Id.* at 312. Specifically, the court held that the board's failure to make a reasonable investigation into the solvency of the acquiring company rendered the business judgment rule inapplicable to the board's decision under those circumstances. *Id.* Shortly thereafter, in response to the court's decision in *In re Nine West*, the Pennsylvania legislature amended Section 1712(a). 15 Pa. C.S. § 1712 2022 Committee Comment. The Committee Comment explained that the Pennsylvania legislature intended to clarify that a director's duty to perform a "reasonable investigation" is limited to the issues required by Pennsylvania's statutory law or to the factors allowed by Section 1715(a) or Section 1716. In other words, the Pennsylvania legislature viewed the Southern District of New York's opinion as a misguided limitation on the application of Pennsylvania's business judgment rule. The legislature, therefore, amended Section 1712(a) to ensure courts did not impermissibly limit the scope of the application of the business judgment rule.

corporate constituency provisions [Sections 1712 and 1716] and clarify that lawsuits predicated on an independent fiduciary duty to shareholders may not be brought."). The court in *Stilwell* grouped the purposes of Sections 1715 and 1717 together. *See id.*

Section 1715(d) provides further deference to boards' decision-making by imposing a "clear and convincing evidence" standard on the challenging party. Section 1715(d) states:

> Notwithstanding section 1712(d) and the preceding provision of this subsection, any act as the board of directors, a committee of the board or an individual director relating to or affecting an acquisition or potential or proposed acquisition of control to which a majority of the disinterested directors shall have assented shall be presumed to satisfy the standard set forth in section 1712 or 1728, unless it is proven by *clear and convincing evidence* that the disinterested directors did not assent to such act in good faith after reasonable investigation. (emphasis added).

§ 1715(d). The Pennsylvania legislature's decision to impose the "clear and convincing evidence" standard on the challenging party is notable, not only because it differs from the standard applied by Delaware courts, but because it is a more difficult standard to meet than the "preponderance of the evidence" standard typically applied in civil cases.

Delaware has no comparable statutory scheme. Instead, Delaware courts crafted the business judgment rule as a matter of common law. Delaware's business judgment rule "creates a presumption 'that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *Maffei v. Palkon*, 339 A.3d 705, 728 (Del. 2025) (internal citations omitted). When applying the business judgment rule, a Delaware court will defer to the board's judgment if the board's decision is attributable to a rational business purpose. *Id.* Furthermore, in exercising their business judgment, directors subject to Delaware law must seek to maximize the company's value over the long-term for the benefit of the company's shareholders. *See McRitchie v. Zuckerberg*, 315 A.3d 518, 564 (Del. Ch. 2024).

Thus, unlike Delaware law, Pennsylvania's business judgment rule is codified by statute, and, when exercising its business judgment, a board of directors subject to Pennsylvania law owes fiduciary duties solely to the corporation and need not give preference to any shareholders, employees, suppliers, customers or creditors of the corporation.

b.    **Pennsylvania Applies a Deferential Standard with No Burden Shifting**

While the business judgment rule applies in both jurisdictions, Pennsylvania and Delaware law vary significantly when Delaware's heightened scrutiny applies. This difference is most evident when there is a challenge to a board's decision made in the takeover context.[21] Delaware courts apply three levels of scrutiny to board decisions: (1) the business judgment rule, (2) enhanced scrutiny, and (3) entire fairness. *Pell v. Kill*, 135 A.3d 764, 784 (Del. Ch. 2016). Enhanced scrutiny applies "[w]hen a stockholder challenges a board action that interferes with the election of directors or a stockholder vote in a contest for corporate control." *Coster v. UIP Cos., Inc.*, 300 A.3d 656, 672 (Del. 2023) (applying a modified review of the one set forth in *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.3d 946 (Del. 1985)). Under the enhanced scrutiny standard, the board bears the burden of proof. *Id.* The board's burden is two-fold: first, the board must prove that it faced an actual threat to an important corporate interest; and second, the board must prove its response was reasonable in relation to the threat posed. *Id.* at 672-73. Traditionally, courts defined the second burden as a "compelling justification." *See Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 661 (Del. Ch. 1988).

---

[21] *See* Kevin M. Rampe, Pennsylvania's New Fiduciary Duty Provisions: Changing the Rules in the Corporation, 55 Alb. L. Rev. 199, 214 (1991) ("Pennsylvania and Delaware corporate law vary significantly in the takeover context.").

Conversely, Pennsylvania's BCL rejects burden shifting in the same context. As noted above, under the BCL, even in a takeover situation, the party challenging the board's conduct has the burden of proving that the board breached its fiduciary duty, and that the board's breach legally caused damages to the corporation in a damage action. 15 Pa. C.S. § 1712(e). Section 1715 makes clear that "there shall not be any greater obligation to justify, or higher burden of proof with respect to, any act of the board of directors . . . relating to or affecting an acquisition or potential or proposed acquisition of control of the corporation than is applied to any other act as a board of directors . . . ." § 1715(d). Commentators overwhelmingly agree that Section 1715(d) is an express rejection of Delaware's heightened scrutiny approach.[22] As stated above, Section 1715(d) also differs from Delaware law by imposing a "clear and convincing evidence" standard on the party challenging the board's conduct.

### c.    Pennsylvania Enacted the BCL to Empower the Board During Change-of-Control Situations

The differences between Pennsylvania and Delaware law with respect to enhanced scrutiny can be explained by the legislative intent of the BCL. Pennsylvania's BCL was enacted to empower boards of Pennsylvania corporations to combat change-of-control attempts where the board believes doing so is in the best interest of the corporation. *See* S.B. 1310, 3rd Sess., at 1536 (Pa. 1989) ("[T]he key objective of this legislation is to discourage corporate raiders from manipulating Pennsylvania corporations for short-term profits at the expense of persons with a longer term interest in the corporation and the community."); *see also id.* at 1539 (citing in approval the

---

[22] *See* Rampe, *supra* note 10, at 215 ("In contrast to Delaware, however, Pennsylvania law also applies the business judgment rule to shareholder challenges of board action in the takeover context."); *see also* REDEFINING PENNSYLVANIA CORPORATE LAW: ELIMINATING CORPORATE DIRECTORS' FIDUCIARY, 96 Dick. L. Rev. 231, 244 (1992) ("The Pennsylvania Takeover Act of 1990 expressly repudiates [Delaware's] higher standard of care."); Sarah S. Nickerson, THE SALE OF CONRAIL: PENNSYLVANIA'S ANTI-TAKEOVER STATUTES VERSUS SHAREHOLDER INTERESTS, 77 Tul. L. Rev. 1369, 1383 (1998) ("Section 1715(d) of the PBCL rejects the enhanced scrutiny of the *Unocal* test.").

61

approach taken by Japanese companies to block corporate raiders from acquiring a board seat).

When enacting the BCL and its amendments, the Pennsylvania legislature recognized that boards

subject to Pennsylvania law would have much greater protection than those subject to Delaware

law in the takeover context. *See id.* at 1958 ("I have talked to some corporate leaders and they are

looking at this bill, and they are Delaware corporations and they will opt out of Delaware to opt

into Pennsylvania to take the benefit of Senate Bill No. 1310, as long as it serves them well.").

In short, the Pennsylvania legislature intended to reject Delaware's approach to reviewing

a boards' decisions in the takeover context. Instead, the Pennsylvania legislature hoped that its

statute would empower boards to prevent takeovers, protect the long-term interests of

Pennsylvania companies, and attract successful corporations to move to Pennsylvania for the

protections of the BCL.

### (ii) Pennsylvania Court Would Likely Apply the Business Judgment Rule

Although the Committee recognizes that there is no Pennsylvania case law directly on

point, Pennsylvania courts have applied the business judgment rule in similar circumstances. For

example, in *AMP Inc. v. Allied Signal, Inc.*, No. 98-cv-4109, 1998 WL 778348, at *8 (E.D. Pa.

Oct. 8, 1998), Judge Giles of the Eastern District of Pennsylvania applied the business judgment

rule to a defensive measure taken by a board of directors of a target company in response to an

attack on a poison pill and held that the measure was not a breach of fiduciary duty. There, a

shareholder announced it would commence a tender offer for the outstanding shares of the

company. *Id.* at *1. The shareholder also announced that it was prepared to initiate a consent

solicitation to amend the company's by-laws in order to expand the board, obtain a majority of

directors then have those directors accept the takeover bid. *Id.* In response, the board amended its

poison pill to remove a "dead-hand" provision and render the poison pill non-redeemable and non-amendable if the shareholders gained a board majority. *Id.* at *2.

The court ultimately found that the board's amendments to its poison pill did not constitute a breach of fiduciary duty. The court started its analysis by stating that the board's defensive measure was presumed to be in the best interest of the company because the board's decision "related to or affected a potential acquisition or control" of the company. *Id.* at *6 (citing 15 Pa. C.S. § 1715(d)). The court then noted that, despite the shareholders' insistence that this was not a change of control attempt, the board "could reasonably anticipate that, if elected, the action of [shareholders]'s interested director majority with respect to the poison pill would be tantamount to a vote on merger." *Id.* at *7. The court further explained that "the present disinterested [company] board is not required to disregard experience and believe that a Trojan Horse brought within their walls is intended as a gift to corporate governance." *Id.* Based upon these findings, the court held that, at that stage of the litigation, the board did not breach its fiduciary duty. *Id.* at *8.

Similarly, although decided before the *Cuker* decision and the amendments to the BCL, Judge Broderick of the Eastern District of Pennsylvania applied the business judgment to a defensive measure in *Enterra Corp. v. SGS Assocs.*, 600 F. Supp. 678, 691 (E.D. Pa. 1985). There, the court considered whether, despite a standstill agreement limiting how much stock an investor may acquire, a board of directors has a fiduciary duty to inform its shareholders of the investor's offer to purchase the corporation's stock in excess of the limitation provided in the agreement, and to give the shareholders the opportunity to accept or reject the offer. *Id.* at 684. The court answered this question in the negative. *Id.* at 691. In doing so, the court applied the business judgment rule. *Id.* at 686. As *Enterra* was decided before *Cuker*, the court correctly predicted that the Pennsylvania Supreme Court would apply the business judgment rule, even when a decision is

made in the takeover context. *Id.* The court explained that "[c]ourts applying the business judgment rule have upheld a wide variety of sometimes drastic defensive tactics undertaken by a target company to prevent a takeover bid . . . ." *Id.*

These cases demonstrate that courts applying the BCL have consistently utilized the business judgment standard when deciding whether a board of directors breached its fiduciary duty in a control attempt.

### 2.    The Committee Considered HG Vora's Counterargument that Delaware's Enhanced Scrutiny Standard Would Apply

The crux of HG Vora's Breach of Fiduciary Duty claim is what HG Vora calls "the Board Reduction Scheme." Am. Compl. ¶ 2. HG Vora argues that, by reducing Board seats from nine to eight, the Board disenfranchised PENN's shareholders in violation of the Board's fiduciary duty. *Id.* ¶ 170 ("The Director Defendants breached their fiduciary duties through the Board Reduction Scheme, which was enacted for the primary purpose of interfering with shareholders' ability to effectively exercise their voting rights in a contested election for directors by eliminating a Board seat up for election after Plaintiffs had nominated a candidate to fill the seat."). HG Vora does not argue that the Board engaged in self-dealing or that it was uninformed. Instead, HG Vora argues that the Board could not believe the decision to reduce board seats was in the best interest of PENN because the Board's primary purpose was entrenchment.

The Committee thoroughly considered HG Vora's argument that Delaware's enhanced scrutiny standard would apply to the Board's decision to eliminate the Board seat. The Committee, with the assistance of counsel, reviewed all of the pleadings and briefing in the litigation. In addition, counsel held several phone conferences with counsel for HG Vora where these substantive issues were discussed. At the request of the Committee, HG Vora further provided the Committee with a legal memorandum outlining all the reasons why it believed that its position

64

was correct. The Committee considered all of this information but is not swayed to change its conclusion as explained in the previous section.

Despite the explicit language of Section 1712, HG Vora cites to Section 1715(d) to argue that the business judgment rule should not apply because the shareholder nominations were not "relat[ed] to or affecting an acquisition or potential or proposed acquisition of control" of PENN. The Committee is skeptical of this argument. First, the allegations in HG Vora's Amended Complaint themselves demonstrate that HG Vora viewed its nominations at the 2025 Annual Meeting as the first step towards taking control of PENN. For example, in Paragraphs 89-91 of the Amended Complaint, HG Vora alleges that the Board's decision resulted in entrenchment because "an eligible shareholder" will need to seat three directors at the 2026 Annual Meeting to gain a five-to-three majority on the Board, whereas, if all of HG Vora's nominees were seated, only two new directors would need to be seated for the Board to have a new majority. Am. Compl. ¶¶ 89-91. Though HG Vora argues that it did not intend to gain control of PENN through these nominations, its argument is further contradicted by the statements made by Parag Vora to Peter Carlino about his intent to take control of the Company, about which Mr. Carlino signed a written statement for the Pennsylvania Gaming Control Board. It is also contradicted by HG Vora's attempted nominations at the 2024 Annual Meeting, which, if effective, could have allowed HG Vora to gain control of the Board at the 2025 Annual Meeting. The allegations in the Amended Complaint, Mr. Vora's statements and HG Vora's conduct, taken together, lead the Committee to believe that HG Vora intended for its nominations at the 2025 Annual Meeting to be the first step towards taking control of the Board.

However, even if HG Vora is correct that the facts here do not fall within Section 1715(d), i.e., a control attempt, then the Committee's analysis shifts to whether the Pennsylvania legislature

intended for the business judgment rule to apply only in the takeover context or whether it intended for the business judgment rule to apply more broadly. HG Vora argues that, because Section 1715(d) refers only to conduct relating to acquisitions, the Pennsylvania legislature did not intend for it to apply to other board actions, such as actions interfering with shareholder franchise.

The Committee does not believe that, if Section 1715(d) does not apply, a Pennsylvania court would apply enhanced scrutiny. Rather, this presents a scenario contemplated by 1 Pa. C.S. § 1921(c), when the statutory language is not explicit on a certain issue. More specifically, it presents the question of whether the Pennsylvania legislature's express reference to an acquisition in Section 1715(d) demonstrates its intent that Pennsylvania courts should follow Delaware's enhanced scrutiny regime in other situations.

Because the Committee has already determined that Section 1712 applies broadly, Section 1715(a) permits a board to consider a variety of factors and Section 1715(d) reinforces Section 1712, the Committee is unpersuaded by HG Vora's argument. The fact that the legislature specifically stated that heightened scrutiny does not apply in the takeover context does not logically mean that heightened scrutiny may apply in other contexts. Instead, the Pennsylvania legislature likely intended for Section 1712 to cover all conduct that meets its three-pronged test and simply added Section 1715(d) to further solidify and emphasize its position that Delaware's enhanced scrutiny standard also does not apply in an acquisition situation. Moreover, given the fact that enhanced scrutiny expressly does not apply in the most contentious shareholder situation, i.e., the takeover context, it defies reason that enhanced scrutiny would apply in less contentious situations.[23] The greater always includes the lesser.

---

[23] Takeovers frequently involve contested director elections.

The Committee also considered HG Vora's contention that the Board's decision to eliminate a seat resulted in entrenchment. The Committee does not believe that the Board's conduct can be fairly characterized as entrenchment. Among other things, the Board accepted two of HG Vora's three nominees. Moreover, before 2025, the Board added three other new members. With the addition of Messrs. Hartnett and Ruisanchez, the Board has added five new members over the last several years. The Board has made a deliberate effort to refresh its members and diversify the skillset of its directors. The Committee therefore does not believe the decision to eliminate the Board seat constitutes entrenchment.[24]

Relying on its argument that the business judgment rule as set forth in the BCL does not apply to the Board's decision, HG Vora cites to a series of Delaware cases holding that it is a breach of fiduciary duty for a board to prevent the election of a director, which is a fundamental shareholder right. For example, HG Vora frequently cites to the Delaware Chancery Court's holding in *Pell v. Kill*, 135 A.3d 764 (Del. Ch. 2016). The court in *Pell* applied the enhanced scrutiny test to a board's decision to remove a seat during a proxy contest. *Id.* at 786. In applying the enhanced scrutiny test, the court held that defendants bear the duty of proving that "(1) their motivations were proper and not selfish, (2) that they 'did not preclude stockholders from exercising their right to vote or coerce them into voting a particular way', and (3) that the directors' actions 'were reasonable in relation to their legitimate objective.'" *Id.* at 787 (internal citations omitted). The court added that, when a vote involves an election of directors or corporate control, the directors' justification must be compelling. *Id.* The court determined that defendant breached

---

[24] Section 1715(e) provides that a director should not be deemed to be other than disinterested solely because of the director's interest in retaining the status or position of director. 15 Pa. C.S. § 1715(e)(2)(iv). Because PENN nominated two of HG Vora's nominees and reseated no incumbent directors, the Committee concludes that the Board members were not interested parties, nor did they entrench themselves when they eliminated the Board seat.

its fiduciary duty in two ways: (1) eliminating two seats up for election and preventing stockholders from voting for those seats, and (2) preventing the plaintiff from establishing a new majority on the board with no compelling reason. *Id.*

*Pell* is distinguishable in two significant ways. First, the court in *Pell* applied Delaware's enhanced scrutiny standard, meaning the burden shifted to the Board to prove a compelling justification for its actions. Unlike in *Pell*, a court applying Pennsylvania's business judgment rule would place the burden on the shareholder. Second, unlike the company in *Pell*, PENN arguably had a compelling interest in protecting its licenses and reputation with regulators, as will be discussed in further detail below.

HG Vora also relies on the Third Circuit's decision in *IBS Fin Corp. v Seidman & Assocs., L.L.C.*, 136 F.3d 940, 942 (3d Cir. 1998). In *IBS,* the Third Circuit applied the enhanced scrutiny standard set forth in the Delaware Chancery Court's decision in *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 659 (Del Ch. 1988), which requires boards to show a "compelling interest," to a board's decision to remove a seat in the election context. *IBS*, 136 F.3d at 942. The company argued that the court should apply New Jersey's business judgment rule rather than Delaware's enhanced scrutiny standard. Specifically, the company wanted the court to apply the business judgment rule as set forth in N.J.S. 14A:6-1(3), which states:

> If on the basis of the factors described in subsection 2 of this section, the board of directors determines that any proposal or offer to acquire the corporation is not in the best interest of the corporation, it may reject such proposal or offer. If the board of directors determines to reject any such proposal or offer, the board of directors shall have no obligation to facilitate, remove any barriers to, or refrain from impeding the proposal or offer.

N.J.S. 14A:6-1(3). The court declined to apply the business judgment rule, reasoning that the board was not faced with a proposal or offer to acquire the corporation. *IBS*, 136 F.3d at 950. After

determining that there were no New Jersey cases addressing the applicable level of scrutiny, the court looked to Delaware law to conduct its analysis. *Id.*

Unlike N.J.S. 14A:6-1, where no heightened scrutiny applies for "proposals or offers to acquire the corporation," Pennsylvania's statute is much broader. Section 1715(d) applies to actions "relating to or affecting an acquisition or potential or proposed acquisition of control." 15 Pa. C.S. § 1715(d). In *IBS*, the Third Circuit found that the shareholder nominations were a "step towards control of the board," recognizing that director nominations could ultimately lead to control of a corporation. However, it determined that a "step towards control" did not constitute a "proposal or offer to acquire the corporation." Thus, unlike New Jersey's limited statute that applies only to "proposals or offers to acquire the corporation," Section 1715(d) would likely have covered the conduct in *IBS*, in which case the Third Circuit would have applied the business judgment rule.

HG Vora further relies on the Pennsylvania Superior Court's opinion in *Warehime v. Warehime*, 777 A.2d 469, 478 (Pa. Super. Ct. 2001) for the proposition that Pennsylvania courts find *Blasius* persuasive. However, as recognized by HG Vora, the Pennsylvania Supreme Court reversed the Superior Court's decision in *Warehime*. *See Warehime v. Warehime*, 860 A.2d 41, 47 (Pa. 2004) ("*Warehime II*"). The Supreme Court's decision marked the second time in the *Warehime* litigation that it reversed a holding of the Pennsylvania Superior Court. Importantly, in *Warehime v. Warehime*, 722 A.2d 1060, 1071 (Pa. Super. Ct. 1998), the Pennsylvania Superior Court determined that, despite the voting trustee acting on a good faith belief that the voting plan was in the best interest of the company, the trustee breached his fiduciary duty to the trust beneficiaries. *Id.* The Pennsylvania Supreme Court reversed this decision and remanded to the Superior Court, leading to the decision in *Warehime II*. *See Warehime v. Warehime*, 761 A.2d

1138, 1141 (Pa. 2000). The Supreme Court, relying on the trust's provision absolving the trustee of responsibility for consequences of decisions made in good faith, found that the trustee acting in good faith meant that he did not breach his fiduciary duties to the beneficiaries. *Id*.

HG Vora also relies on *Reifsnyder v. Pittsburgh Outdoor Advertising Co.*, 173 A.2d 319, 322 (Pa. 1961) for its contention that "[t]he right to vote is basic and fundamental to most shares of stock . . . ." *Id.*. HG Vora contends that *Reifsnyder* supports its argument that shareholders can bring direct actions to protect their voting rights. However, the Committee concludes that *Reifsnyder* does not warrant the application of Delaware's enhanced scrutiny because it was decided well before the enactment of the BCL amendments, and the factual circumstances under which it was decided are drastically different than the factual circumstances here.

After reviewing HG Vora's arguments as to why a Pennsylvania court would apply Delaware law and upon its own analysis, the Committee is unpersuaded by the argument. Instead, the Committee concludes that a court would likely apply Pennsylvania's business judgment rule to the decision to eliminate the Board seat.[25]

### B.    It Would Not Be in the Best Interests of the Company to Pursue Litigation Against the Board Based on its Decision to Eliminate the Board Seat

The Committee's conclusion is that it would not be in the best interests of the Company to pursue litigation based on the Board's decision to eliminate the Board seat. To rebut the presumption of the business judgment rule and prove that the Board breached its fiduciary duties, a shareholder needs to prove either: (1) the Board acted in bad faith, or (2) the Board acted

---

[25] This summary is not intended to address every case and authority cited by HG Vora, all of which the Committee considered. Instead, it is intended to provide a general overview of HG Vora's arguments.

irrationally. Based on the circumstances presented here, the Committee cannot conclude that the Board acted in bad faith or irrationally.[26]

The Board's decision to eliminate the seat was based on a variety of factors, most prominently the regulatory risk posed to the Company. That risk included allowing Mr. Clifford, a candidate found to be unsuited by the Board and the nominee of a controversial, unlicensed shareholder seemingly determined to influence corporate governance, to be elected to the Board. The Board's decision is supported by certain other considerations.

First, the Committee determined that the judgment of PENN's Nominating and Governance Committee and Board as a whole that Mr. Clifford was unsuitable was made in good faith and was well within their business judgment. As explained above, the Board believed that Mr. Clifford was unsuited because he had antiquated views of PENN and the gaming industry as a whole. Members of the Board informed the Committee that Mr. Clifford opposed key strategies at, had a closed mind and did not bring a skillset to the Board that would benefit the Company.[27] The Board's determination that Mr. Clifford was unsuited to serve on the Board is classic business judgment.[28]

Second, the Committee determined that the Board did not breach its fiduciary duties, either through bad faith or by acting irrationally, in deciding to eliminate the Board seat. The BCL entitles the Board to consider a variety of factors when determining whether a decision is in the best interest of the company, including (1) the effects on shareholders, employees, suppliers, customers,

---

[26] In any event, the Committee has concluded that the Board was well-informed by knowledgeable advisors and senior management and that an allegation of self-dealing is not warranted under the circumstances.

[27] Conversely, the members of the Board who interviewed Messrs. Hartnett and Ruisanchez felt that both candidates had strong views, but both demonstrated an open mind.

[28] Notably, HG Vora's Amended Complaint does not challenge the Board's determination that Mr. Clifford was unsuited for the Board.

creditors and the community, (2) the short-term and long-term interests of the corporation, (3) the resources, intent and conduct (past, stated and potential) of any person seeking to acquire control of the corporation, and (4) all other pertinent factors. § 1715(a). The Board considered each in making its decision.

For example, during their interviews with the Committee, members of the Board informed the Committee that the Board strongly disagreed with HG Vora's request for PENN to engage in a significant share buyback. The Board members explained that a large buyback benefitted only HG Vora because HG Vora planned to sell its shares in PENN if the share price increased, but many of PENN's shareholders intend to hold their shares for a long period. The Board members also explained that, while HG Vora's proposed share buyback could increase the share price in the short-term, the increased debt leverage required to do so would harm the long-term financial health of the Company and that PENN needed that capital to re-invest into PENN's operations. The Board similarly considered HG Vora's intent and conduct with respect to its intention to acquire control of PENN. Notably, HG Vora's founder and principal, Parag Vora, told Peter Carlino that he intended to take control of PENN, remove management and, in Mr. Carlino's words, "sell PENN for parts."

The Board also viewed HG Vora's history of apparent disregard of regulatory restrictions as significant. This history was troubling and known to the Board. HG Vora likely violated its institutional investor waivers in the 2023-2024 timeframe when it sought to nominate directors to the Board and otherwise influence the governance of the Company.[29]

---

[29] For further discussion, see pages 47-49.

When HG Vora altered its ownership interest in PENN by utilizing derivatives, the Board did not consider this maneuver to eliminate the potential regulatory risks. By virtue of its conversion, HG Vora owned less than 5% of PENN's voting shares, meaning it technically did not need licenses under many state statutes.[30] However, HG Vora's remaining 13% ownership did not disappear. Rather, HG Vora retained its full 18% economic interest while transferring the voting shares to unknown entities. Because PENN does not know who owns HG Vora's voting shares, PENN does not know who has influence or control over PENN or over HG Vora. HG Vora could be beholden to unknown entities, and if HG Vora was able to force Mr. Clifford on to the Board, PENN could open itself to expanding influence by unknown, unlicensed forces.

State regulators heavily scrutinize who licensees affiliate with and, in some circumstances, remove a company's licenses for affiliating with the wrong entity. Here, not only did the Board have concern that an affiliation with HG Vora itself posed a regulatory risk, but PENN had a realistic concern that an unlicensed, potentially Unsuitable Person was exercising influence over both PENN and HG Vora. Therefore, by converting its ownership into derivatives to elude certain jurisdictions' licensing requirements, HG Vora enhanced the risk that its affiliation with PENN could expose PENN to regulatory violations.

Significantly, HG Vora continued to seemingly violate regulators' directives throughout the course of the parties' negotiations. On April 1, 2025, HG Vora received its interim authorization from Pennsylvania to nominate and support candidates under the condition that HG Vora could not engage in discussions regarding "governance." Despite this directive, HG Vora

---

[30] It is worth noting that, while HG Vora's conversion to derivatives exempted it from some jurisdictions' licensing requirements, it did not do so for all. During his interview with the Committee, Mr. Soriano explained that many statutes permit state regulators to exercise discretionary authority on whether to require an investor to obtain a license, regardless of the extent of their ownership. Mr. Soriano informed the Committee that regulators in multiple states required HG Vora to obtain a license even after it converted its ownership to get below the 5% threshold.

conveyed a counteroffer to PENN that included HG Vora's right to certain corporate governance matters if PENN decided to accept only two of HG Vora's nominees. PENN's advisors informed HG Vora that its offer violated the conditions of its interim authorization, yet HG Vora insisted that the parties continue their negotiations unrestricted by the conditions imposed on them by Pennsylvania regulators.

Though many of the Board members were aware of the regulatory risks posed by HG Vora through their service on PENN's Compliance Committee, the Board relied specifically on the advice of Mr. Soriano. Mr. Soriano continuously advised the Board that HG Vora either directly violated a directive, such as when it was deemed out of compliance with its institutional waivers, or that certain conduct presented considerable regulatory risk to PENN, such as its conversion to derivatives or attempts to influence PENN's governance.[31] Thus, when the Board considered its decision at the April 25, 2025 Board meeting, Mr. Soriano advised the Board members that allowing Mr. Clifford on the Board created a substantial regulatory risk to the Company because of the scrutiny with which regulators analyze gaming companies and the entities they associate with and could also constitute an Unsuitable Situation under PENN's Gaming Compliance Review and Reporting Plan. The Board relied on Mr. Soriano's advice.[32]

The BCL also entitles the Board to rely on information, opinions, reports or statements prepared or presented by relevant officers or employees of the corporation, counsel and other professionals. 15 Pa. C.S. § 1712(a). Mr. Soriano, PENN's Chief Compliance Officer, informed the Committee that he expressly advised the Board that allowing HG Vora to force Mr. Clifford

---

[31] Mr. Soriano and Mr. Auriemma would routinely discuss these matters and Mr. Auriemma specifically concurred with Mr. Soriano's conclusions on the existence of the regulatory risk.

[32] It should be noted that Mr. Hayes confirmed that it was not irrational for the Board to rely on Mr. Soriano's advice that allowing Mr. Clifford to go on the Board under the circumstances posed a regulatory risk.

on the Board could pose a regulatory risk to PENN. Mr. Soriano explained that HG Vora has a history of regulatory violations, and its continuing course of conduct demonstrates a disregard for the strict regulatory landscape in which PENN operates. HG Vora's conduct over the last two years directly contributed to this concern of the Board, and the Board properly considered the regulatory risks posed by HG Vora pursuant to the catchall provision in Section 1715(a)(4).

The Board was faced with a difficult decision and, under Pennsylvania law, was required to act in the best interest of the Company. The Board could have allowed Mr. Clifford to run opposed, but PENN's Chief Compliance Officer informed the Board that doing so could lead to regulatory risks. Thus, PENN's decision was not as simple as accepting a candidate the Board did not want. Rather, the Board had to weigh the risks of HG Vora expanding its influence and control and the potential negative regulatory reaction against eliminating the Board seat to determine which decision would be in the Company's best interests. This analysis included consideration of HG Vora's intentions with respect to the Company, which could materially adversely impact the overall prospects for the Company.

The Committee's conclusion is that the Board's decision to eliminate the Board seat was not irrational under these circumstances. The potential harm to PENN was substantial. PENN's reputation with regulators and its licenses are the Company's most valuable assets; without them, the Company cannot operate. If Mr. Clifford were elected to the Board, PENN may have participated in an Unsuitable Situation or otherwise run afoul of state regulations, putting its licenses and reputation in jeopardy. On the other hand, the potential benefits to PENN were minimal.[33]

---

[33] In finding an absence of bad faith, the Committee also considered the contrary recommendations of the proxy advisory firms ISS and Glass Lewis to be indicative that the Board did not act irrationally in determining that eliminating the seat was in the best interest of the Company.

The Committee concludes that a shareholder likely could not meet its burden in proving that the Board acted in bad faith, engaged in self-dealing, was uninformed or acted irrationally in determining that the decision to eliminate the Board seat was in the best interest of the Company.[34] As part of the Committee's investigation, the Committee also considered the relative potential benefits in pursuing the claim as demanded by HG Vora compared to the potential harm to the Company in pursuing those claims.

## VII.  <u>CONCLUSION</u>

In summary, it is the conclusion of the Committee that it would not be in the best interests of the Company to pursue HG Vora's claims. Notably, the Committee appreciates the shareholders' fundamental interest to elect directors. The Committee's conclusions are limited to the circumstances presented here. The Committee's conclusion should not be understood to apply to future conduct that may or may not raise the same concerns.

---

[34] The Committee also concludes that, even if a Pennsylvania court would look to Delaware law, the Board's conduct may not constitute a breach of fiduciary duty because the Board likely had a compelling interest in protecting its licenses. None of the cases cited by HG Vora deal with the same factual circumstances as here where the board is facing a potential takeover attempt by an unlicensed entity in a highly-regulated area.  Under *Coster v. UIP Cos., Inc.*, 300 A.3d 656, 672 (Del. 2023), the Committee believes the Board could likely satisfy its burden of proving that (1) it faced an actual threat to an important corporate interest; and (2) its response was reasonable in relation to the threat posed. Here, the important corporate interest was protecting the Company's licenses and reputation with regulators. In a highly-regulated industry, this is crucial to PENN's operation. Further, PENN faced an actual threat to this interest because, as the Board was advised by Mr. Soriano, HG Vora is an unlicensed entity that continuously disregards regulators' directives. If Mr. Clifford was elected to the Board and acted only on behalf of HG Vora, PENN's licenses and reputation with regulators would be in jeopardy. Finally, the decision to eliminate the Board seat is reasonable in relation to the threat posed. As set forth previously, the threat posed to PENN was substantial. The decision, while major, is distinct from the cases cited by HG Vora because PENN accepted two of HG Vora's three nominees and reelected none of its directors, meaning the Board did not engage in entrenchment.

Signed by:

*Richard L. Bazelon*

**Richard L. Bazelon, Esquire**

DocuSigned by:

*Marc Sonnenfeld*

**Marc J. Sonnenfeld, Esquire**

Dated:    November 24, 2025