**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| HG VORA CAPITAL MANAGEMENT, LLC, HG VORA SPECIAL OPPORTUNITIES MASTER FUND, LTD., and DOWNRIVER SERIES LP – SEGREGATED PORTFOLIO C, on behalf of themselves and derivatively on behalf of PENN ENTERTAINMENT, INC., | |
| | Case No.: 5:25-cv-02313-CH |
| Plaintiffs, | |
| -against- | |
| PENN ENTERTAINMENT, INC., JAY SNOWDEN, VIMLA BLACK-GUPTA, ANUJ DHANDA, DAVID HANDLER, MARLA KAPLOWITZ, JANE SCACCETTI, BARBARA SHATTUCK KOHN, RONALD NAPLES, and SAUL REIBSTEIN | |
| Defendants, | |
| -and- | |
| PENN ENTERTAINMENT, INC., | |
| Nominal Defendant. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
<u>DEFENDANTS' MOTION TO DISMISS</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ............................................................................1

FACTUAL BACKGROUND ...............................................................................3

    A.    The Parties ............................................................................3

    B.    PENN's Board Refuses to Hold Management Accountable....................................3

    C.    HG Vora Nominates Highly Qualified Independent Directors.............................4

    D.    The Board Eliminates a Seat to Prevent Shareholders from Electing William Clifford.............................................................................6

    E.    The Board Refuses to Recognize the Election Results ...........................6

    F.    The Board Appoints a Special Litigation Committee ...........................6

LEGAL STANDARD...........................................................................7

ARGUMENT ...........................................................................8

I.    THE SLC DID NOT ACT INDEPENDENTLY ...........................................9

    A.    The SLC Was Structurally Biased From the Outset .................................9

    B.    The SLC Pursued a One-Sided Investigation .......................................10

    C.    The Report Reveals Disparate Treatment of the Parties .........................11

II.    THE SLC FAILED TO INVESTIGATE THE FACTS WITH REASONABLE CARE .......................................................12

III.    THE SLC DID NOT INVESTIGATE THE GOVERNING LAW WITH REASONABLE CARE .............................................14

    A.    Section 1715(d) Does Not Apply to the Board Reduction Scheme.....................16

    B.    Enhanced Scrutiny Applies to the Board Reduction Scheme..............................19

IV.    PLAINTIFFS ARE ENTITLED TO DISCOVERY ........................................21

CONCLUSION....................................................................25

i

## <u>TABLE OF AUTHORITIES</u>

**<u>Page</u>**

### <u>Cases</u>

*In re Abbott Lab'ys Infant Formula S'holder Derivative Litig.*,
  2025 WL 509286 (N.D. Ill. Feb. 14, 2025) ...................................................................24

*AMP Inc. v. Allied Signal, Inc.*,
  1998 WL 778348 (E.D. Pa. Oct. 8, 1998) ..............................................................17, 18

*Auerbach v. Bennett*,
  47 N.Y.2d 619 (1979) ...................................................................................................22

*Blasius Indus., Inc. v. Atlas Corp.*,
  564 A.2d 651 (Del. Ch. 1988).......................................................................................19

*Brincefield v. Studdard*,
  2018 WL 6323071 (E.D. Va. Dec. 4, 2018) ...................................................................8

*Cuker v. Mikalauskas*,
  547 Pa. 600, 692 A.2d 1042 (Pa. 1997) ...............................................................7, 20, 21, 24

*In re Exelon Corp. Derivative Litig.*,
  No. 1:21-cv-03611 (N.D. Ill., Sept. 7, 2023) ...............................................................24

*Gen. Elec. Co. by Levit v. Rowe*,
  1991 WL 111173 (E.D. Pa. June 18, 1991) ..................................................................23

*Hasan v. CleveTrust Realty Invs.*,
  729 F.2d 372 (6th Cir. 1984) ............................................................................8, 10, 23

*IBS Fin. Corp. v. Seidman & Assoc., L.L.C.*,
  136 F.3d 940 (3d Cir. 1998)....................................................................................16, 17

*Jewelcor Management, Inc. v. Thistle Group Holdings, Co.*,
  60 Pa. D. & C.4th 391 (Pa. Com. Pl. 2002) .................................................................19

*Joy v. North*,
  692 F.2d 880 (2d Cir. 1982)....................................................................................23, 24

*Kokocinski v. Collins*,
  2015 WL 13469995 (D. Minn. Mar. 30, 2015) ..........................................................7, 8

*Lee v. McGarry*,
  No. 2:20-cv-75 (W.D. Pa. June 23, 2020) ...................................................................22

*Lichtenberg v. Zinn*,
    243 A.D.2d 1045, 663 N.Y.S.2d 452 (3rd Dep't 1997)....................................22, 23

*Molly Tracy v. Morris*,
    2025 WL 3190860 (C.D. Cal. July 22, 2025) ...........................................................8

*In re Nine W. LBO Sec. Litig.*,
    505 F. Supp. 3d 292 (S.D.N.Y. 2020)....................................................................16

*Oklahoma Law Enforcement Retirement System v. Nelson*,
    No. GD-12-008785,
    Order of Court (Ct. Com. Pl., Allegheny Cnty. June 11, 2014) ..............................21

*Pell v. Kill*,
    135 A.3d 764 (Del. Ch. 2016)................................................................................20

*Pittsburgh History & Landmarks Found.*,
    161 A.3d 394 (Pa. Commw. Ct. 2017),
    *aff'd in part, vacated in part*, 200 A.3d 58 (Pa. 2019) ........................................21

*Pittsburgh History & Landmarks Found. v. Ziegler*,
    200 A.3d 58 (Pa. 2019)..........................................................................................21

*Ret. Sys. v. Bush*,
    2021 WL 2588979 (N.D. Cal. June 24, 2021) .......................................................24

*Sarnacki v. Golden*,
    4 F. Supp. 3d 317 (D. Mass. 2014) .........................................................................8

*Simmons v. Sutherland*,
    1998 WL 35550554 (Pa. Com. Pl. Nov. 25, 1998) ...............................................16

*Tegra Corp. v. Boeshart*,
    317 Neb. 100, 8 N.W.3d 786 (2024).....................................................................23

## **Statutes**

15 Pa. C.S. § 1715(d) ...............................................................................................15, 16

15 Pa. C.S. § 1783(f)............................................................................................2, 7, 11

Fed. R. Civ. P. 23.1 ........................................................................................................3

Fed. R. Civ. P. 56 ..........................................................................................................4

Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(3)(B)........................25

## <u>Other Authorities</u>

17 CFR § 240.14a-19(d) (SEC Rule 14a-19(d)) ............................................................................5

Plaintiffs HG Vora Capital Management, LLC, HG Vora Special Opportunities Master Fund, Ltd., and Downriver Series LP – Segregated Portfolio C (collectively, "Plaintiffs" or "HG Vora") respectfully submit this opposition to the Motion to Dismiss (Dkt. 46, the "Motion" or "Mot.") filed by Defendants PENN Entertainment, Inc. ("PENN" or the "Company"), Jay Snowden, Vimla Black-Gupta, Anuj Dhanda, David Handler, Marla Kaplowitz, Saul Reibstein, Jane Scaccetti, Ronald Naples, and Barbara Shattuck Kohn (the "Director Defendants," and together with PENN the "Defendants").

## PRELIMINARY STATEMENT

Defendants' Motion poses a simple question: may the Court rubber-stamp a Special Litigation Committee's recommendation to dismiss a derivative action without first examining whether the Committee conducted its investigation and made its recommendation in good faith, independently and with reasonable care?  Under Pennsylvania law, the answer is plainly no.

On April 25, 2025, Defendants eliminated a board seat to prevent shareholders from electing Plaintiffs' independent nominee, William Clifford, at PENN's 2025 Annual Meeting in June 2025.  Then, after a majority of PENN shareholders, exercising their fundamental rights as shareholders, voted to elect Mr. Clifford as a PENN director at the 2025 Annual Meeting, Defendants refused to recognize the election result and blocked certification of the votes cast for Mr. Clifford.

After HG Vora sued the Board for breaching their fiduciary duties, the Board appointed a Special Litigation Committee ("SLC") to investigate itself.  To no one's surprise, the SLC's Report ("Report"), issued six months later, concludes that the Board acted properly and recommends dismissal of HG Vora's breach of fiduciary duty claim.  Defendants now move to dismiss based on the Report, arguing that the Board's decision to adopt the SLC's recommendation is entitled to deference under the business judgment rule.  But the business judgment rule does not apply unless

the Court first determines that the SLC "conducted its investigation and made its determination or recommendation in good faith, independently and with reasonable care." 15 Pa. C.S. § 1783(f). The Report fails that threshold inquiry on multiple independent grounds.

*First*, the Report makes clear that the SLC's investigation was anything but independent. The Board whose conduct was under investigation controlled the selection of SLC members. One of those members then retained his former law firm—where he worked for fourteen years and was a partner for six years—as counsel to the SLC. And the SLC systematically excluded from its investigation witnesses who could have contradicted the Board's narrative.

*Second*, the SLC failed to investigate the facts with reasonable care. The Report identifies no objective factual basis for the central justification for its recommendation, *i.e.,* that Mr. Clifford's nomination supposedly carried "regulatory risk." The only support the Report musters is a footnote recounting one director's unexplained subjective "impression" that Mr. Clifford "seemed" to represent HG Vora's interests. The Report's discussion of amorphous "regulatory risk" cited by the Board is untethered to any regulatory standard, and the Report never explains why purported regulatory concerns associated with HG Vora applied to Mr. Clifford but not to Messrs. Hartnett and Ruisanchez, whom HG Vora nominated through the identical process. The Report also includes factual omissions and errors regarding HG Vora and Mr. Clifford which clearly evidence the SLC's failure to investigate the facts with reasonable care. On the face of the Report, the SLC's investigation was so hopelessly deficient that it could not rationally support the SLC's recommendation not to pursue Plaintiffs' claims.

*Third*, the SLC failed to investigate the governing law with reasonable care. In claiming that the business judgment rule insulates the Board's conduct, the Report erroneously treats a shareholder election as if it were a hostile takeover. Plaintiffs provided copious legal authority

and legislative history to the SLC on July 29, 2025, showing that the business judgment rule does not apply and Pennsylvania courts instead apply enhanced scrutiny to the Board's conduct, requiring a compelling justification since it was admittedly taken to interfere with PENN shareholders' voting rights. The SLC ignores or dismisses those authorities without meaningful analysis. The SLC's legal errors infect its analysis and further demonstrate that it did not conduct its investigation or make its recommendation with reasonable care.

Accordingly, the Court should deny Defendants' Motion to Dismiss. At a minimum, the Court should defer ruling on the Motion and order discovery into the SLC's investigation because Plaintiffs have raised a substantial issue regarding whether the SLC acted independently and with reasonable care, which entitles Plaintiffs to discovery under well-established Pennsylvania law.

## FACTUAL BACKGROUND

### A.    The Parties

PENN is a Pennsylvania-incorporated gaming and entertainment company that operates casinos, resorts, and racetracks across North America. Plaintiffs' Amended Complaint ("Am. Compl.") ¶ 4. PENN's Board of Directors had nine members divided into three classes, with three directors in each class elected to staggered three-year terms. *Id.* ¶ 15.

Plaintiff HG Vora Capital Management, LLC is an investment adviser that beneficially owns 4.8% of PENN's outstanding common stock. *Id.* ¶ 64.

### B.    PENN's Board Refuses to Hold Management Accountable

In January 2020, PENN promoted Jay Snowden to Chief Executive Officer ("CEO"). *Id.* ¶ 5. Under Snowden's leadership, PENN pursued an aggressive strategy prioritizing its "Interactive" digital gaming and online sports betting segment at the expense of its core brick-and-mortar casino business. *Id.* ¶¶ 5-6. This strategy resulted in spending of nearly $4 billion on poorly

negotiated and overpriced deals. *Id.* ¶ 6. These investments have proven catastrophic: shareholder returns lagged 121% behind the S&P 500 and 94% behind gaming industry peers. *Id.* ¶ 7.

Rather than hold management accountable for this destruction of shareholder value, the Board rewarded Snowden with compensation packages worth nearly $200 million—four times the average CEO compensation at comparable companies. *Id.* ¶¶ 44, 50. Institutional Shareholder Services Inc. ("ISS") gave PENN a score of -100 on its Pay-for-Performance evaluation (the lowest possible score), and Glass, Lewis & Co. similarly awarded PENN an "F," observing that Snowden's "outsized compensation levels come despite performance that is worse than peers." *Id.* ¶ 51. Shareholders voiced their disapproval through Say-on-Pay votes, placing PENN among the bottom 20 companies in the S&P 600 on this metric. *Id.* ¶ 52.

### C.    HG Vora Nominates Highly Qualified Independent Directors

Due to the Company's poor performance and the Board's failure to hold management accountable, HG Vora—a long-term shareholder with substantial experience in the gaming industry—took the initiative to identify and nominate qualified independent directors who could bring accountability to the boardroom. *Id.* ¶ 53.

On January 29, 2025, HG Vora announced its nomination of three independent director candidates for election at the 2025 Annual Meeting: William Clifford, Johnny Hartnett, and Carlos Ruisanchez. *Id.* ¶ 65. This marked the first time in HG Vora's sixteen-year history that it had nominated director candidates at any of the hundreds of companies in which it has invested. *Id.*

The nominees were eminently qualified. Each possessed decades of experience in the gaming and hospitality industry and satisfied every key qualification PENN itself had identified for Board members. *Id.* ¶¶ 66-67. Mr. Clifford in particular brought more than 30 years of experience delivering excellent returns for shareholders in the gaming industry. *Id.* ¶ 68. During

his 12-year tenure as Chief Financial Officer ("CFO") of Penn National Gaming (PENN's predecessor entity), Clifford was instrumental in the Company's exponential growth, driving an approximately 20x return for shareholders. *Id.* To HG Vora's knowledge, Mr. Clifford has previously been licensed by multiple U.S. gaming authorities and has an unblemished history of obtaining regulatory approvals.

Importantly, all three nominees are independent of HG Vora, with no pre-existing business or financial relationship with HG Vora. *Id*. ¶ 66. Once elected, the nominees would owe fiduciary duties to the Company alone—not to HG Vora. *Id.*

Following HG Vora's nominations, the parties engaged in settlement negotiations so as to avoid a proxy contest. On March 25, 2025, PENN offered to nominate Mr. Hartnett, acknowledging he had "exactly the right profile" for the Board. *Id.* ¶ 75.

On April 10, 2025, when HG Vora reiterated its view that shareholders would be best served by all three independent nominees, PENN representatives warned that gaming regulators could get involved and present gaming regulatory hurdles for HG Vora's nominations if the parties did not amicably resolve their dispute. *Id.* ¶ 79.

As of April 15, 2025, PENN acknowledged there would be three seats available for election, sending HG Vora a notice pursuant to SEC Rule 14a-19(d) confirming a contested election for three Class II director positions. *Id.* ¶ 81.

On April 24, 2025, PENN offered to seat both Mr. Hartnett and Mr. Ruisanchez—but not Mr. Clifford. *Id.* ¶ 82. HG Vora rejected PENN's offer to seat only two of its nominees, and informed the Company it was prepared to let shareholders decide by voting at PENN's 2025 Annual Meeting. *Id.* ¶ 83.

### D. The Board Eliminates a Seat to Prevent Shareholders from Electing William Clifford

On April 25, 2025—just ten days after confirming that three seats would be up for election—the Board eliminated the third seat to ensure that shareholders could not vote for Mr. Clifford (the "Board Reduction Scheme"). *Id.* ¶¶ 81, 86.

On May 7, 2025, HG Vora filed this action, challenging the Board Reduction Scheme as a breach of fiduciary duty and a violation of Pennsylvania corporate law. *Id.* ¶¶ 1-3; Dkt. 1. HG Vora alleged that the Board had acted for the primary purpose of interfering with shareholders' ability to exercise their voting rights in what should have been a contested election for three Board seats. Am. Compl. ¶ 2.

### E. The Board Refuses to Recognize the Election Results

At the 2025 Annual Meeting, held on June 17, 2025, PENN shareholders elected Mr. Clifford to the Board. *Id.* ¶¶ 112, 114. Notwithstanding PENN's omission of Mr. Clifford's name from the Company's proxy card in violation of SEC universal proxy rules, *id.* ¶¶ 97, 139, shareholders used HG Vora's GOLD proxy card to cast 61,962,937 votes—57% of all votes cast—"FOR" Mr. Clifford. *Id.* ¶ 116.

In defiance of the election results, the Board refused to seat Mr. Clifford and obstructed the vote certification process. *Id.* ¶ 117. The Board directed the independent inspector of elections not to count or certify the votes cast for Mr. Clifford. *Id.* The inspector complied, omitting any record of Mr. Clifford's votes from the official Vote Report. *Id.*

### F. The Board Appoints a Special Litigation Committee

On May 8, 2025, the Board appointed a Special Litigation Committee ("SLC") to investigate HG Vora's claim for breach of fiduciary duty against the Board. Report at 12. The Board selected Marc Sonnenfeld and Richard Bazelon to serve on the SLC. *Id.* at 15. Mr.

Sonnenfeld and Mr. Bazelon then retained Dilworth Paxson LLP—a firm where Mr. Bazelon worked for fourteen years and was a partner for six years—as its counsel. *Id.* at 19.

On July 29, 2025, HG Vora sent the SLC a letter providing legal authority and Pennsylvania legislative history demonstrating that Pennsylvania courts apply enhanced scrutiny—requiring a compelling justification—for Board actions taken for the purpose of interfering with a shareholder vote. Ex. A (July 29, 2025 Letter). HG Vora explained that this case involved no takeover attempt, that all three of its nominees were independent, and that the election of a single director to a nine-member board was not a control transaction. *Id.* at 1-2.

On November 24, 2025, the SLC issued its Report. The Report admitted that the Board eliminated the seat to prevent PENN shareholders from electing Mr. Clifford: "PENN had to make a decision: it could either do nothing and allow Mr. Clifford to be elected, or it could eliminate a Board seat." Report at 46. The SLC concluded that the Board did not breach its fiduciary duties and that pursuing HG Vora's derivative claim would not be in the Company's best interests. Report at 7.

## **LEGAL STANDARD**

Pennsylvania law requires that on a motion to dismiss a derivative action, the Court "shall determine" whether a special litigation committee "conducted its investigation and made its determination or recommendation in good faith, independently and with reasonable care." 15 Pa. C.S. § 1783(f). If the Court determines that the SLC did not conduct its investigation or make its recommendation independently and with reasonable care, the Court must dissolve the stay of discovery and allow Plaintiffs to pursue their claim for breach of fiduciary duty. *Id.*

Courts treat SLC-based motions to dismiss as analogous to voluntary dismissals requiring court approval under Federal Rule of Civil Procedure 23.1(c). *See, e.g., Kokocinski v. Collins*, 2015 WL 13469995, at *9 (D. Minn. Mar. 30, 2015) ("[T]he [SLC-based] motions at issue here

are akin to 'voluntary dismissal[s]' under Rule 23.1(c), which require the Court's approval."); *Molly Tracy v. Morris*, 2025 WL 3190860, at \*7 (C.D. Cal. July 22, 2025) (same); *In re Exelon Corp. Derivative Litig.*, No. 1:21-cv-03611, ECF No. 132 at 6 (N.D. Ill. Sept. 7, 2023) (applying Pennsylvania law) ("[T]he Court is not inclined to find that § 1783 requires it to delegate its obligations to the SLC. … Whether under § 1783 or under Rule 23.1, the Court remains obligated to assess the reasonableness of the SLC's determinations in light of the factual record presented.").

Moreover, because SLC-based motions to dismiss necessarily present material outside the pleadings—such as the Report—courts apply summary judgment-like standards to resolve such motions. *See, e.g., Sarnacki v. Golden*, 4 F. Supp. 3d 317, 322 (D. Mass. 2014), *aff'd*, 778 F.3d 217 (1st Cir. 2015) (treating SLC motion as "hybrid" requiring "traditional summary judgment standards"); *Brincefield v. Studdard*, 2018 WL 6323071, at \*3 (E.D. Va. Dec. 4, 2018) ("Because the motion to terminate requires the Court to consider information outside of the complaint, the Court will apply the Rule 56 summary judgment standard."); *Kokocinski*, 2015 WL 13469995, at \*9 (the Court "should borrow heavily from the summary judgment standard in guiding a Court on how deeply to delve into the SLC and its report").

Thus, under Pennsylvania law, the Court must make "factual determinations" into issues disputed by Plaintiffs before ruling on the Motion. *Cuker v. Mikalauskas*, 692 A.2d 1042, 1048 n.2 (Pa. 1997) ("Until factual determinations are made in regard to these disputed issues, a trial court cannot conclude whether or not the business judgment rule requires dismissal of the action.").

## **ARGUMENT**

As set forth below, the Report demonstrates on its face that the SLC failed to conduct its investigation or make its recommendation independently and with reasonable care. The Court should therefore deny Defendants' Motion to Dismiss and permit HG Vora's derivative claims to proceed.

At a minimum, because there is a "substantial issue" regarding whether the SLC acted independently and with reasonable care, *Cuker*, 692 A.2d at 1054, Plaintiffs are entitled to discovery into the SLC's investigation. Therefore, if the Court does not deny the Motion outright, the Court should defer ruling on the Motion and order discovery into the SLC's investigation.

## I.    THE SLC DID NOT ACT INDEPENDENTLY

The SLC's recommendation is entitled to judicial deference only if the committee operated as an independent fact-finder rather than as an arm of the Board whose conduct is under review. The Report makes clear that there was nothing "independent" about the SLC or its process. The SLC's formation, approach, and its skewed treatment of the parties reveal that the SLC operated to serve the Board's interests.

### A.    The SLC Was Structurally Biased From the Outset

The Report asserts that the SLC members are "unquestionably independent and disinterested." Report at 24. The record tells a different story. The very directors whose actions were being challenged controlled the SLC selection process and did not consult HG Vora regarding its selection. As one court has explained, "[t]he delegation of corporate power to a special committee, the members of which are hand-picked by defendant-directors, in fact, carries with it inherent structural biases." *Hasan v. CleveTrust Realty Invs.*, 729 F.2d 372, 376 (6th Cir. 1984).

This structural bias extended to the selection of counsel. SLC member Richard Bazelon selected his former law firm, Dilworth Paxson LLP—where he worked for fourteen years and was a partner for six years—to serve as counsel. Report at 19, 21–22. The hiring of Dilworth plainly undermined the integrity of the SLC's process, creating an incentive for counsel not to render independent advice.

If the Board had a genuine interest in forming a truly independent SLC, it would have appointed Messrs. Hartnett and Ruisanchez to serve on it. Those were the two independent

directors whom HG Vora nominated and whom PENN itself endorsed as fit to serve.  Yet the Board declined to appoint them to the SLC and instead selected members with no knowledge of the underlying facts.

> ### B.    The SLC Pursued a One-Sided Investigation

The SLC claims that it "conducted a thorough, extensive investigation" involving review of documents and interviews of witnesses.  *Id.* at 25–32.  But the investigation was so obviously one-sided that it could only be the process of a captured mindset.

The Report lists thirteen interviews—all of them current or former PENN directors, officers, advisors, and the Chairman Emeritus.  *Id.* at 30.  The SLC interviewed David Handler, the Board Chair who orchestrated the decision to eliminate the seat.  *Id*.  It interviewed Jay Snowden—the CEO whose compensation and strategy were at the heart of shareholder dissatisfaction—twice.  *Id*.  It interviewed every Board member involved in the challenged decision, accepting their self-serving statements without evident challenge.  *Id*.

Stunningly and without explanation, the SLC did ***not*** interview Messrs. Hartnett or Ruisanchez.  *Id.* at 30–31.  Those individuals had deep knowledge of HG Vora's interactions with Mr. Clifford and could have shed light on the very questions the SLC was supposedly investigating.  By the time the SLC was conducting its investigation, both had been elected PENN directors.  Yet the SLC excluded them entirely from the process.  The only logical conclusion is that the SLC did not want to hear what Hartnett and Ruisanchez had to say because it feared their testimony might undermine the conclusion it was hired to reach.

The Report states that the SLC's counsel invited HG Vora to interview with the SLC.  *Id.* at 28–29.  This is misleading.  Importantly, the SLC never disclosed its central thesis—that Mr. Clifford posed supposed "regulatory risk" due to HG Vora's regulatory history—until November

20, when it permitted HG Vora to review the already-completed Report.  Because HG Vora had no idea that its regulatory status was at issue, it had no reason to provide information beyond what was already in the public record.  The SLC thus gave HG Vora no meaningful opportunity to respond to the charges laid against it.  *See, e.g.*, *Hasan*, 729 F.2d at 379 (SLC's investigation was procedurally inadequate where the committee failed to interview witnesses who "could have provided crucial evidence" regarding the contested issues).

### C.    The Report Reveals Disparate Treatment of the Parties

The Report's tone and content confirm that it was written to defend the Board, not to independently assess its conduct.  The Report reads like a litigation brief drafted by PENN's counsel, filled with glowing descriptions of the Company's business, governance, and strategy.  Report at 15–24.  Conspicuously absent is any acknowledgment of PENN's disastrous stock performance or failed strategic initiatives under current leadership.  Am. Compl. ¶¶ 5-7.

In stark contrast, the Report's discussion of HG Vora is riddled with factual errors, distortions, and material omissions that cast doubt on the independence of the SLC's investigation.  For example, the Report claims that HG Vora reduced its ownership stake "in an apparent effort to avoid state gaming licensing requirements."  Report at 2.  This assertion is wrong.  HG Vora was in close consultation with the Massachusetts Gaming Commission (the "MGC") when selling down its voting common stock to under a 5% interest in PENN in January 2025.  HG Vora did so not to evade the MGC's requirements but to ensure continued compliance with them.[1]

---

[1]  HG Vora's factual assertions herein are based on the information that HG Vora either has pled or would plead in an amended complaint if granted leave.  Given the procedural posture, HG Vora submits that fact affidavits are neither required nor appropriate in opposition to a motion to dismiss.  Should the Court nonetheless deem verification necessary and appropriate at this stage, HG Vora is prepared to provide it.

## II.    THE SLC FAILED TO INVESTIGATE THE FACTS WITH REASONABLE CARE

The SLC likewise fails to satisfy Section 1783(f) because it did not conduct its investigation or make its recommendation with reasonable care.  On its face, the Report reveals that it is not the product of an investigation conducted with reasonable care: the Report offers no objective factual support for the central premise underlying its recommendation and omits material facts that directly contradict its conclusions.

The Report's central conclusion is that the Board eliminated a Board seat to avoid "exposure to potential regulatory risk" from Mr. Clifford's election.  *Id.* at 6, 70–76.  The SLC ratifies the Board's decision by concluding that "the Board's actions were taken with due consideration of legitimate regulatory concerns related to HG Vora's conduct."  *Id.* at 46.  But the Report critically fails to identify any objective factual basis showing that it was rational for the Board to conclude Mr. Clifford's election carried any supposed regulatory risk.

*First*, the Report does not state that the Board concluded Mr. Clifford lacked independence from HG Vora, nor identify any facts that could support such a conclusion.  The Report admits that the Board "did not conclude that Mr. Clifford was an Unsuitable Person as that term is defined in PENN's Gaming Compliance Review and Reporting Plan."  *Id.* at 40 n.16.  Thus, the Board did *not* conclude that Mr. Clifford was "[a] person whom the Company determines is unsuitable to be a business associate of the Company based on that person's past activities, associations or financial practices."  *Id.* at 39.

The only reference to any factual nexus regarding a potential relationship between Mr. Clifford and HG Vora appears in the Report's recounting of Board members' subjective impression.  In a footnote, the Report states that "one of the Board members who interviewed Mr. Clifford informed the Committee that Mr. Clifford appeared to 'represent one shareholder,' i.e.

HG Vora." *Id.* at 41 n.17. Evidently, none of the other interviewees communicated such an impression to the SLC.

The Board member's impression is presented without identifying any factual basis for it or explaining how it bears on independence under any applicable regulatory or objective standard. That the SLC uncovered **only** this unexplained subjective impression as support for the notion that Mr. Clifford presented supposed "regulatory risk" highlights the inadequacy of the SLC's investigation.

Likewise, the Report does not so much as attempt to reconcile the Board's decision to eliminate the seat due to supposed regulatory risk from Mr. Clifford with its simultaneous support for HG Vora's other two nominees, Messrs. Hartnett and Ruisanchez. The Report acknowledges that the Board interviewed Messrs. Hartnett and Ruisanchez just as they did Mr. Clifford. *Id.* at 38–42, 51. HG Vora advanced all three of these nominees. Yet the Report offers no explanation as to why purported regulatory concerns associated with HG Vora applied to only one of its three independent nominees.

The selective treatment of Mr. Clifford is left unexplained and appears tied only to the Board's disagreement with his views on corporate strategy. *Id.* at 40–41, 71 (describing Mr. Clifford's purported "antiquated views," "unwilling[ness] to compromise on those views," and "closed mind"). Indeed, the Report admits that the purported "regulatory concerns arose from the fact that Mr. Clifford had already been determined to be an unsuitable candidate for the Board" (*id*. at 75)—implying that the Board only discussed purported regulatory concerns once they decided they did not want Mr. Clifford to join.

**Second**, the SLC fails to identify how the Board had any basis to rely on a purported professional opinion from Christopher Soriano, PENN's Chief Compliance Officer. *Id.* at 46, 74.

The SLC notes that Mr. Soriano advised the Board that Mr. Clifford's election "created a substantial regulatory risk to the Company" and could constitute an "Unsuitable Situation under PENN's Gaming Compliance Review and Reporting Plan." *Id*. at 74. But the Report noticeably lacks description of any specific regulatory concern Mr. Soriano identified or the factual basis for it. Without providing such information—if it exists—in the Report, the SLC fails to show that its investigation uncovered any basis for the Board to reasonably rely on such say-so.

Moreover, the Report acknowledges that the SLC did not retain an independent gaming regulatory expert until September 2025—five months ***after*** the Board's decision. *Id.* at 31–32. The Report states that the Committee retained Kevin Hayes "to advise the Committee and counsel on potentially relevant issues related to the regulatory process in the gaming industry." *Id.* at 31. But the Report does not state that Mr. Hayes concluded that the Board's decision was warranted or that he identified any specific regulatory risk from Mr. Clifford's election.

Indeed, the Report fails to disclose any of the substance of Mr. Hayes' opinion. The SLC only notes that Mr. Hayes "holds [Mr. Soriano] in the highest professional regard," and admits that his opinion of Mr. Soriano was "considered material" to the SLC's conclusion that what Mr. Soriano told that Board had a sufficient factual basis. *Id.* at 43.

Nowhere in the Report does the SLC explain what the supposed regulatory risk was that the Board believed could arise from Mr. Clifford's election. The Report refers only to vague and unspecified risks to PENN's gaming licenses without describing how such risks could materialize. *Id.* at 46–50, 74–76. The Report admits that the Board eliminated the Board seat expressly because it was concerned about "doing nothing and allowing Mr. Clifford to essentially join the Board unopposed," *id*. at 46, but does not explain what specific harm this would cause or how it could possibly jeopardize any license held by the Company.

14

***Third***, the Report ignores the basic mechanics of gaming regulation.  In each gaming jurisdiction relevant to PENN, a director-elect whom a regulator determines must submit for licensing or suitability review cannot be seated and assume duties unless and until regulators have reviewed and approved the individual.  Given this threshold requirement, there is no rational basis to conclude that a shareholder vote could create regulatory exposure: if regulators had any concern about Mr. Clifford, they simply would not approve him to be seated; if they approved him, his service could not rationally have jeopardized PENN's licenses.

The Report does not indicate whether the Board considered this basic feature of the regulatory framework or explain how regulatory risk could arise despite it.  Further, the Report does not reflect that, to HG Vora's knowledge, Mr. Clifford has been licensed by multiple gaming authorities and has an unblemished history of obtaining regulatory approval**s**.  The Report also ignores that U.S. gaming regulators permitted Mr. Clifford's nomination to go forward: if a gaming regulator thought that nominating Mr. Clifford created "regulatory risk" for PENN, the regulator would take steps to block the nomination.

Likewise, the Report makes clear that the SLC conducted de minimis investigation into the actual details regarding HG Vora's regulatory status.  Nowhere in the Report does the SLC acknowledge that no gaming regulator has issued a monetary fine against HG Vora or initiated a formal enforcement action against HG Vora or its principals during nearly two years of regulatory review with respect to HG Vora's involvement with PENN.  The Report also does not acknowledge that HG Vora and/or its principals have been granted a gaming license or have otherwise been determined to be sufficiently suitable by numerous U.S. gaming regulators; or that HG Vora voluntarily submitted to proceed through the gaming regulatory licensing review process in Nevada despite having no obligation to do so.

In short, the SLC accepted Defendants' conclusion that a shareholder holding under 5% of PENN stock could jeopardize PENN's gaming licenses by nominating a person who was previously licensed in multiple gaming jurisdictions and who has an unblemished regulatory history—without providing independent verification of or any rational basis for these claims. The SLC's investigation apparently failed to uncover any factual basis for the Board's determination that Mr. Clifford's election presented regulatory risk to PENN. That the SLC identified none and still endorsed the Board's conclusion lays bare that the SLC did not conduct its investigation or make its recommendation with reasonable care.

## III.    THE SLC DID NOT INVESTIGATE THE GOVERNING LAW WITH REASONABLE CARE

The SLC fails the "reasonable care" requirement for the separate, independent reason that it applied the wrong legal framework to the Board Reduction Scheme. The SLC asserts that the Board Reduction Scheme is insulated by the business judgment rule because Section 1715(d) applies or otherwise supports application of the business judgment rule to the Board's intentional interference with the voting rights of PENN shareholders. Report at 56-66. The SLC got it wrong.

The Report misconstrues Section 1715(d) and ignores well-established Pennsylvania authority applying the correct legal standard—enhanced scrutiny—to actions taken for the primary purpose of interfering with a shareholder vote. The SLC's legal errors underscore that its investigation into the governing law was inadequate and it did not make its recommendation with reasonable care.

### A.    Section 1715(d) Does Not Apply to the Board Reduction Scheme

The Report distorts the record by confusing a shareholder election with a hostile takeover attempt. The SLC asserts that the Section 1715(d) of the BCL, and its business judgment rule, applies because Mr. Clifford's election somehow constituted a change of control transaction.

Report at 57-58, 65-66.  This is an obvious logical fallacy: Mr. Clifford's election at the 2025 Annual Meeting could not possibly effect a change of control over PENN's nine-member Board.

The SLC then insinuates that Section 1715(d) applies because Mr. Clifford's election was a supposed "first step towards taking control" of the Company.  *Id*. at 65.  Not so.  By its own terms, Section 1715(d) applies only to mergers and acquisitions.  15 Pa. C.S. § 1715(d) (Section 1715 applies to Board decisions "relating to or affecting an acquisition or potential or proposed acquisition of control of the corporation."); *see Simmons v. Sutherland*, 1998 WL 35550554, at *6-7 (Pa. Com. Pl. Nov. 25, 1998) ("In enacting Section 1715, the Pennsylvania legislature specifically intended that Courts defer to directors' decisions concerning mergers and acquisitions"); *In re Nine W. LBO Sec. Litig.*, 505 F. Supp. 3d 292, 310–11 (S.D.N.Y. 2020) ("In the context of mergers and acquisition[s], however, Pennsylvania law affords additional deference to directors.").  There is no sense in which a shareholder's nomination of independent director candidates for election at an annual meeting is a form of merger or acquisition.

In Plaintiffs' July 29, 2025 letter, Plaintiffs directed the SLC to the Third Circuit's decision in *IBS Fin. Corp. v. Seidman & Assoc., L.L.C.*, 136 F.3d 940 (3d Cir. 1998), which rejected the same argument the SLC puts forward.  In *IBS*, the Third Circuit rejected defendants' argument that New Jersey's business judgment rule immunized its decision to reduce the size of its board in the face of a proxy contest.  *Id.* at 949.  While noting that the shareholder election could be characterized as a "step towards control," the Third Circuit held that such a step would not trigger the anti-takeover statute.  *Id*. at 951.  In so holding, the Third Circuit noted that because the company "was not faced with a 'proposal or offer to acquire the corporation,'" the anti-takeover statute providing for the business judgment rule did not "insulate the board's action from judicial scrutiny."  *Id.* at 949.  The Report vaguely attempts to distinguish *IBS* on the ground that

Pennsylvania's statute is "much broader" because it covers actions "relating to or affecting" an acquisition. Report at 69. This attempted distinction is plainly baseless.

The SLC's improper reliance on *AMP Inc. v. Allied Signal, Inc.*, 1998 WL 778348 (E.D. Pa. Oct. 8, 1998) further underscores its defective legal analysis. Report at 62-63. As Plaintiffs advised the SLC in their July 29, 2025 letter, Ex. A at 9-10, *Allied Signal* was a case about defending against a hostile acquirer and thus irrelevant to PENN's shareholder election. *Allied Signal* involved a poison pill deployed in response to a hostile tender offer for all outstanding shares, coupled with a consent solicitation to expand the board from 11 to 28 members with the acquiror's own officers and directors. *Allied Signal*, 1998 WL 778348 at *1-2. An objective SLC exercising reasonable care would have recognized the obvious distinction between a hostile tender offer and an annual shareholder meeting rather than relying on inapposite authority to justify a predetermined conclusion.

Lacking case law support, the SLC engages in questionable statutory interpretation. The SLC argues that because the legislature rejected enhanced scrutiny in the "most contentious" takeover context, "it defies reason that enhanced scrutiny would apply in less contentious situations." Report at 66. This naked assertion is flatly contradicted by the BCL's legislative record, which Plaintiffs provided relevant excerpts of in its July 29, 2025 correspondence to the SLC. Ex. A at 3-5. As Plaintiffs explained then, the legislative history of the 1990 Amendments to the BCL, which added Section 1715, confirms that the amendments were specifically not intended to insulate management from breach of fiduciary duty claims brought against a Board in connection with shareholder elections. *Id*.

During the House debate over the 1990 Amendments, one legislator clarified that "this legislation will have no effect on the corporations of Pennsylvania" in the ordinary course, but

rather was "going to be protection against corporate raiders." Pa. Legis. J., House, Apr. 3, 1990, at 546. Another legislator explained that the amendments were "not going to insulate management" from the will of shareholders, who would "have the ability to change the board of directors" and "get control of the board and therefore have new direction on the management." *Id.* at 549. The legislators emphasized that they "felt it extremely important to preserve those normal shareholders' rights on a whole range of corporate governance questions." *Id.* at 550. They confirmed that shareholders' ability to "challenge the board of directors with respect to the exercise of their fiduciary responsibility…is a standard stockholder right, and that is not impinged by this piece of legislation." *Id.* The SLC's decision to entirely ignore the legislative record that Plaintiffs specifically provided reflects a lack of reasonable care.

### B.    Enhanced Scrutiny Applies to the Board Reduction Scheme

The Report dismisses time-honored Pennsylvania jurisprudence regarding the shareholder franchise, erroneously concluding that Pennsylvania courts would not apply enhanced scrutiny to the Board's manipulation of voting machinery. Report at 54, 64-66. Under the deferential business judgment rule that the SLC purported to apply, the Board's decision is presumed valid so long as it was made in good faith and with due care, and the burden falls on the plaintiff to rebut that presumption. Report at 54. Under enhanced scrutiny, by contrast, the burden shifts to the Board to demonstrate a "compelling justification" for any action—such as the Board Reduction Scheme—taken for the primary purpose of impeding a shareholder vote. *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 661 (Del. Ch. 1988).

The Report rejects the application of *Blasius*-style scrutiny, asserting that "a court applying Pennsylvania law would likely not shift the burden nor apply the heightened, compelling reasons standards set forth in such Delaware cases as *Blasius*, *Unocal* and/or *Coster*." Report at 54. But

this conclusion rests on the SLC's failure to adequately investigate controlling Pennsylvania authority that recognizes *Blasius* as persuasive.

The Report dismisses *Warehime v. Warehime* by misstating that the case does not remain good law. Report at 69. In reality, the Pennsylvania Supreme Court reversed on procedural grounds, leaving undisturbed the Superior Court's application of enhanced scrutiny to a Board action taken to interfere with shareholder elections and its holding that the Section 1715 does not "validate corporate actions designed to undermine shareholder's voting rights," *Warehime*, 2001 PA Super 141, ¶ 39 n.13. An SLC exercising reasonable care would have accurately characterized the procedural history of this binding Pennsylvania authority rather than dismissing it with a misleading suggestion that it is no longer good law.

Likewise, the Report entirely ignores *Jewelcor Management, Inc. v. Thistle Group Holdings, Co.*, 60 Pa. D. & C.4th 391 (Pa. Com. Pl. 2002), which cited *Blasius* with approval and observed that "[t]here is little doubt that the right to vote for a corporation's directors is one of the paramount privileges afforded shareholders." An investigation conducted with reasonable care would have engaged with this authority.

The SLC's application of the wrong legal framework is not a harmless error—it infected every aspect of the SLC's analysis and improperly tilted its conclusion in the Board's favor. Had the SLC applied the correct legal framework, it would have examined whether eliminating a board seat on the eve of a contested election—for the express purpose of preventing a particular nominee from being seated—constituted action taken for the primary purpose of impeding the shareholder franchise. *Pell v. Kill*, 135 A.3d 764, 787 (Del. Ch. 2016). The SLC did not do so. Instead, as described above, it undertook no meaningful inquiry into whether the Board's stated justifications were pretextual. It accepted without scrutiny the Board's vague and unsubstantiated assertions of

"regulatory risk."  The SLC's recommendation that the Board not pursue Plaintiffs' breach of fiduciary duty claim is not the product of reasonable care and is not entitled to judicial deference. Accordingly, the Court should deny Defendants' Motion.

## IV.    PLAINTIFFS ARE ENTITLED TO DISCOVERY

At a minimum, the Report's numerous deficiencies create a "substantial issue" as to whether the SLC conducted its investigation and made its recommendation independently and with reasonable care.  *Cuker*, 692 A.2d at 1054.  Accordingly, if the Court does not deny the Motion outright, the Court should defer ruling on the Motion and order discovery into the SLC's investigation.

In arguing that Plaintiffs are not entitled to discovery into the SLC's investigation, (Mot. 12-15), Defendants misconstrue Pennsylvania law.  While Defendants cite *Cuker* for the proposition that the business judgment rule applies to SLC determinations (Mot. at 14-15), they ignore that Pennsylvania Supreme Court expressly adopted a procedural framework that provides for discovery to enable courts to adjudicate motions to dismiss based on SLC reports.

The Pennsylvania Supreme Court held that where plaintiffs contend that a "special litigation committee was not disinterested or independent, counsel was not disinterested or independent, the investigation was inadequate, and that directors breached their fiduciary duties," a court must make "factual determinations … in regard to these disputed issues."  *Cuker*, 692 A.2d at 1048 n.2.  To enable courts to make the requisite factual determinations, *Cuker* "specifically adopt[ed] §§ 7.02–7.10, and § 7.13 of the ALI Principles."  *Id*. at 1049.

As the Pennsylvania Supreme Court later confirmed, Section 7.13 "provides the derivative plaintiff with a path to challenge the validity of an independent committee's decision not to pursue derivative litigation and allows limited discovery, including some privileged material which would

otherwise not be permissible in standard litigation." *Pittsburgh History & Landmarks Found. v. Ziegler*, 200 A.3d 58, 81 (Pa. 2019) (emphasis added). Specifically, Section 7.13 provides:

> [I]f the plaintiff has demonstrated that a substantial issue exists whether the applicable standards . . . have been satisfied and if the plaintiff is unable without undue hardship to obtain the information by other means, the court may order such limited discovery or limited evidentiary hearing, as to issues specified by the court, as the court finds to be (i) necessary to enable it to render a decision on the motion . . . and (ii) consistent with an expedited resolution of the motion.

*Cuker*, 692 A.2d at 1054. Defendants' brief conspicuously fails to mention Section 7.13— the very provision that governs discovery on motions to dismiss based on SLC reports. That omission is telling.

Contrary to Defendants' suggestion, it is well-established that discovery is available under Pennsylvania law. The proper scope of that discovery centers on the documents and information the SLC utilized or relied on during its investigation. *See Pittsburgh History & Landmarks Found.*, 161 A.3d 394, 400 (Pa. Commw. Ct. 2017), *aff'd in part, vacated in part*, 200 A.3d 58 (Pa. 2019) ("[I]n order to determine the independence and investigative adequacy of a special litigation committee . . . [Plaintiffs'] counsel must be allowed to access [non-attorney-client privileged] documents to which the committee itself had access."); *Oklahoma Law Enforcement Retirement System v. Nelson*, No. GD-12-008785, Order of Court (Ct. Com. Pl., Allegheny Cnty. June 11, 2014) (ordering production of "[d]ocuments and datasets reviewed or relied upon by the SLC in preparing" its report).

Likewise, while Defendants invoke *Lee v. McGarry* as the lodestar for this Court's analysis (Mot. at 11), they conveniently omit that the court in *Lee* ordered discovery into the SLC's investigation before ruling on the motion to dismiss. Specifically, the court ordered production of the underlying evidentiary support for the SLC's recommendation: "non-privileged agendas, minutes, and materials from SLC meetings," the "documents relied upon" by the SLC, and

"transcripts of witness interviews, summaries, and notes." *Lee v. McGarry*, No. 2:20-cv-75, ECF No. 39 at 2 (W.D. Pa. June 23, 2020).

Defendants' cursory argument that Plaintiffs are not entitled to discovery into the SLC's investigation (Mot. at 11-15) distorts the governing standard. While Pennsylvania follows New York's *Auerbach* standard rather than Delaware's *Zapata* standard, Defendants ignore that *Auerbach* expressly contemplates the availability of discovery to assess "the disinterested independence of the members of that committee and … the appropriateness and sufficiency of the investigative procedures chosen and pursued by the committee." *Auerbach v. Bennett*, 47 N.Y.2d 619, 623-24 (1979). The *Auerbach* court explained that "[w]hat evidentiary proof may be required to this end will, of course, depend on the nature of the particular investigation, and the proper reach of disclosure at the instance of the shareholders will in turn relate inversely to the showing made by the corporate representatives themselves." *Id.* at 634.

Cases applying *Auerbach* have confirmed that discovery into an SLC's investigation is permitted under the *Auerbach* standard and have ordered defendants to produce such discovery. *See Lichtenberg v. Zinn,* 663 N.Y.S.2d 452, 453 (3rd Dep't 1997) ("[W]hile the Court of Appeals in *Auerbach v. Bennett* … clearly held that the business judgment rule barred judicial probing into the substantive aspects of a special litigation committee's decision not to pursue claims advanced in a derivative action, nothing therein specifically limits a party's ability to engage in discovery."); *see, e.g., Gen. Elec. Co. by Levit v. Rowe*, 1991 WL 111173, at *3 (E.D. Pa. June 18, 1991) (ordering discovery into "all documents and materials" concerning the special litigation committee's investigative approach and its "ultimate substantive decision not to pursue the claims" advanced by the plaintiffs) (cleaned up); *Lichtenberg*, 243 A.D.2d at 1045-47 (affirming trial court's decision to order discovery including "several thousands of pages of documents and …

several days of depositions of the three individual defendants, the members of the SLC and the SLC's counsel").

Defendants also wrongly contend that cases like *Joy v. North*, *Abbott Laboratories*, and *Exelon* cited in Plaintiffs' Motion for Status Conference (Dkt. 45) are inapposite because they apply the *Zapata* standard.  Mot. at 13-14.  Defendants grossly overstate the distinction between the *Zapata* standard and the *Auerbach* standard.

As numerous courts have noted, the *Zapata* standard and the *Auerbach* standard both require courts to assess the independence and sufficiency of a special litigation committee's investigation.  *See Joy v. North*, 692 F.2d 880, 897 (2d Cir. 1982) (Cardamone, J., concurring) (noting that "[u]nder the first [step of *Zapata*], which mirrors *Auerbach*, the corporation seeking dismissal must establish the independence, good faith and thoroughness of the investigative efforts of the committee of the board reaching the decision to terminate the litigation."); *Tegra Corp. v. Boeshart*, 317 Neb. 100, 116 (2024) ("[t]he *Zapata* approach essentially adds a second step to the *Auerbach* analysis"); *Hasan*, 729 F.2d at 378 ("While those cases [applying *Zapata* and *Auerbach*] diverge on the issue of the judicial deference appropriate to the substantive business judgments of a special committee, they are convergent in their approach to the issues of good faith and thoroughness.").

Because both the *Zapata* and *Auerbach* standards require a court to assess the independence and sufficiency of an SLC's investigation, cases applying *Zapata* are highly apposite regarding the scope of available discovery into an SLC's investigation.  *Joy*, 692 F.2d at 893 ("[I]f the special litigation committee recommends termination and a motion for judgment follows, the committee must disclose to the court and the parties not only its report but all underlying data."); *In re Abbott Lab'ys Infant Formula S'holder Derivative Litig.*, 2025 WL 509286, at *5 (N.D. Ill. Feb. 14, 2025)

("[C]ourts generally permit plaintiffs to review everything the special litigation committee reviewed and relied on in its investigation and conclusions."); *City of Pontiac Gen. Empl. Ret. Sys. v. Bush*, 2021 WL 2588979, at *1, *6-7 (N.D. Cal. June 24, 2021) (dissolving PSLRA stay and ordering discovery of materials on which SLC relied, holding such discovery "necessary to prevent undue prejudice" because it was "the only way Plaintiff will have a fighting chance to oppose" defendants' motion) (cleaned up).

As set forth in detail above, *see supra* Sections I-III, the Report's numerous deficiencies create a "substantial issue" as to whether the SLC conducted its investigation and made its recommendation independently and with reasonable care. *Cuker*, 692 A.2d at 1054. Accordingly, Plaintiffs respectfully request that the Court order discovery including: (1) the documents and materials the SLC reviewed during its investigation, *see* Report at 27-28; (2) the notes, summaries, and transcripts of the SLC's witness interviews, *see id.* at 30; and (3) up to three depositions concerning the SLC's investigation and Report. Plaintiffs further request that within thirty days of the close of the aforementioned discovery, Plaintiff may submit a supplemental brief in opposition to Defendants' Motion.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss. In the alternative, at a minimum, the Court should defer ruling on Defendants' Motion and order discovery into the SLC's investigation.

Dated: December 19, 2025

 /s/ Michael E. Swartz
Michael E. Swartz (*pro hac vice*)
Manisha M. Sheth (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN LLP
295 5th Avenue, 9th Floor
New York, New York 10016
Tel: 212-849-7000
michaelswartz@quinnemanuel.com
manishasheth@quinnemanuel.com

Daniel E. Rhynhart (PA Bar No. 78248)
BLANK ROME LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Tel: 215-569-5371
dan.rhynhart@blankrome.com

Richard M. Brand (*pro hac vice*)
WHITE & CASE LLP
1221 6th Avenue
New York, New York 10020
Tel: 212-819-8200
richard.brand@whitecase.com

*Counsel for Plaintiffs HG Vora Capital*
*Management, LLC, HG Vora Special*
*Opportunities Master Fund, Ltd., and*
*Downriver Series LP – Segregated Portfolio C*