# EXHIBIT A

quinn emanuel  trial lawyers | los angeles
295 5th Avenue, 9th Floor, New York, New York 10016 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7060**

WRITER'S EMAIL ADDRESS
**michaelswartz@quinnemanuel.com**

July 29, 2025

**By Email**

John Higson
Joseph H. Jacovini
Thomas Biemer
Dilworth Paxson LLP
1650 Market Street, Suite 1200
Philadelphia, PA 19103
(215) 575-7152
jhigson@dilworthlaw.com
jjacovini@dilworthlaw.com
tbiemer@dilworthlaw.com

Re:     PENN Entertainment, Inc. Special Litigation Committee Investigation

Counsel:

In our July 8, 2025 meeting, during which you advised us that even if the Special Litigation Committee ("SLC") of PENN Entertainment, Inc. ("PENN" or the "Company") determined that the conduct described in HG Vora's Complaint in *HG Vora Capital Management, LLC v. PENN Entertainment, Inc.*, Case No. 5:25-cv-02313-CH (E.D. Pa.), constitutes a breach of fiduciary duties under Delaware law, it may not matter because PENN is a Pennsylvania corporation—not bound by Delaware law. We write to clarify that Delaware and Pennsylvania law compel the same result on this issue. Like Delaware courts, Pennsylvania courts apply a heightened level of scrutiny to board decisions related to shareholders' rights, even after the 1990 amendments (the "1990 Amendments") to Pennsylvania's Business Corporation Law ("BCL").

Pennsylvania has long considered shareholder voting rights to be "fundamental" and the 1990 Amendments did not change that. Both the 1990 Amendments and *AMP Inc. v. Allied Signal, Inc.*, 1998 WL 778348 (E.D. Pa. Oct. 8, 1998), which you referenced during our meeting, were focused on defensive measures to repel hostile takeover attempts and made clear that there is no heightened scrutiny in *that* context. However, here, there is no takeover attempt, or even a risk of a takeover, and all three candidates nominated by HG Vora, including the candidate at issue—William J. Clifford ("Clifford")—are entirely independent of HG Vora. Moreover, the conduct relates to the

quinn emanuel urquhart & sullivan, llp
ABU DHABI | ATLANTA | AUSTIN | BEIJING | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | SINGAPORE | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | WILMINGTON | ZURICH

election of one board seat out of nine on a three-class staggered board, which means that a change of control cannot occur in any particular year (and could not have been effectuated by Clifford's election). The legislative history of the 1990 Amendments and Pennsylvania judicial decisions (both before and after the 1990 Amendments) confirm that Pennsylvania law does not permit directors to perpetuate themselves in office forever, which is the logical conclusion of the Board Reduction Scheme,[1] and that boards of directors may not otherwise prevent shareholders from exercising their fundamental right to disapprove of, and change, board strategy by electing new directors to office. Thus, for the reasons set forth below, the Board Reduction Scheme is as illegal under Pennsylvania law as it is under Delaware law.

## I. Relevant Factual Background

On January 29, 2025, HG Vora announced its nomination of three highly qualified independent director candidates for the election to PENN's Board at the 2025 Annual Meeting: Clifford, Johnny Hartnett ("Hartnett"), and Carlos Ruisanchez ("Ruisanchez") (together, the "Independent Nominees"). The Company and its Board first fought the nomination by attempting to reject it, and then by attempting to negotiate a resolution by offering to nominate Hartnett, and later to nominate both Hartnett and Ruisanchez, in exchange for avoiding a proxy contest. Apparently, as HG Vora would later learn, the Company's sole objection to offering a third Board seat was to the nomination of Clifford himself. Those negotiations continued through April 2025, as it became clear that shareholders would vote to elect all three Independent Nominees if permitted to do so.

On April 15, 2025, the Company sent HG Vora a letter noting its intent to nominate a slate of three incumbent directors for election at the 2025 Annual Meeting. Just ten days later, on April 25, 2025, the Company dramatically changed course and issued a surprise press release announcing (i) one director had resigned, (ii) "[t]he Board now comprises eight directors," and (iii) that the Board intended to nominate Hartnett and Ruisanchez "to fill the two Class II director seats available for election at the Annual Meeting." The press release said nothing about Clifford. Nevertheless, it was clear that the Board took this action to entrench themselves in office, while preventing a director (Clifford), whom independent proxy advisory firm Institutional Shareholder Services ("ISS") declared would be a "valuable addition" precisely because he is "not afraid to share a contrarian viewpoint," from being elected.

It was not until a few weeks later, after HG Vora filed the Complaint, that the Board publicly admitted that the motive behind the Board Reduction Scheme was to keep Clifford off the Board because the Board believed Clifford was not a "fitting…candidate," citing his lack of "open-mindedness" to current management.[2] In doing so, the Board identified no other relevant constituency.[3] Consistent with this public disclosure, it is our understanding that the Company's

---

[1] Capitalized terms not defined herein have the meanings ascribed to them in the Complaint.

[2] PENN Entertainment, Inc., *PENN Entertainment Sends Letter to Shareholders* (May 15, 2025), https://investors.pennentertainment.com/node/22151/html.

[3] The Board stated in conclusory fashion that "it is in the best interest of the Company, **all shareholders** and other constituents to nominate Messrs. Hartnett and Ruisanchez for election to

Chief Executive Officer, Jay Snowden, privately told other shareholders that "I worked with Bill [Clifford], he's not the right person for our board" and that "we just didn't have enough time to find the right person for the third seat." Yet, the Board has had the opportunity to search for director candidates since at least December 2023, when HG Vora first advised the Company of its intention to nominate independent directors to the Board. In fact, as ISS observed, "the board was unprepared for these departures (the board was not able to fill a single one of the three seats with a nominee of its own), which in turn suggests that the board has not been as proactive as shareholders should expect." The Board made clear that the purpose of adopting the Board Reduction Scheme was to ensure that shareholders were only permitted to vote for Board-sanctioned candidates.

As you acknowledged, the Board Reduction Scheme likely would have violated the Board's fiduciary duties under Delaware law. The result is no different here even though PENN is a Pennsylvania corporation as the fiduciary duties of directors of Pennsylvania and Delaware corporations both prohibit self-interested interference with the shareholder franchise.

## II.    The 1990 Amendments to the BCL Helped Pennsylvania Corporations to Resist Takeover Attempts Without Changing Shareholders' Rights to Vote for Directors

In 1983, in response to hostile takeovers of Pennsylvania corporations that resulted in loss of government income and jobs, Pennsylvania enacted the Shareholder Protection Act, which provided that:

> In discharging the duties of their respective positions, the board of directors, committees of the board, individual directors and individual officers may, in considering the best interests of the corporation, consider the effects of any action upon employees, suppliers and customers of the corporation, communities in which offices or other establishments of the corporation are located and all other pertinent factors.

15 Pa. Cons.Stat.Ann. § 1408(B) (Purdon 1984-85 Supp.).

During the legislative debate leading up to the passing of that statute, "one state senator objected that the proposed statute 'could protect poor management rather than benefitting shareholders.'" Stephen M. Bainbridge, *Interpreting Nonshareholder Constituency Statutes*, 19 Pepp. L. Rev. 971, 996 n.115 (1992). In response to such concerns, "[t]he bill's principal sponsor reported that the statute 'was meant to benefit shareholders as well as the members of the enumerated classes' of stakeholders" and that the "statute's drafters intended 'to benefit shareholders as well as the other corporate constituencies,' not 'to protect poor corporate management.'" *Id.*

Soon thereafter, the Delaware Supreme Court issued two key decisions applying a higher level of scrutiny for defensive measures taken in response to attempted hostile takeovers. *See Unocal Corp.*

---

the Board while, in the absence of a fitting third candidate, reducing the Board size[.]" PENN Entertainment, Inc., *PENN Entertainment Sends Letter to Shareholders* (May 15, 2025), https://investors.pennentertainment.com/node/22151/html (emphasis added).

*v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del. 1985) (holding that defensive measures taken "to thwart or impede a takeover…must be reasonable in relation to the threat posed"); *Revlon, Inc. v. Macandrews & Forbes Holdings, Inc.*, 506 A.2d 173, 182 (Del. 1986) ("A board may have regard for various constituencies in discharging its responsibilities, provided there are rationally related benefits accruing to the stockholders….However, such concern for non-stockholder interests is inappropriate when an auction among active bidders is in progress, and the object no longer is to protect or maintain the corporate enterprise but to sell it to the highest bidder.").

In response to *Unocal*, *Revlon*, and other hostile takeovers, Pennsylvania further amended the BCL in 1990, adding a subchapter on fiduciary duties (§§ 1711–1719). The "motivation [in enacting the 1990 Amendments] is relatively unambiguous": it was a response to "a contested takeover offer for Armstrong World Industries." Restatement of the Law, Corporate Governance § 2.01 TD No 1 (2022); *see also* Pa.Legis.J., House, Apr. 3, 1990, at 548 ("[T]his bill is about…protecting our corporations, and say[ing] to [corporate raiders] that Pennsylvania is no longer going to be the playground for the greed of Wall Street and of those investment people who come in here and take millions of dollars out of our corporations and take it back and stuff it in their pockets.").

Specifically, BCL § 1715(a) modified § 1408(B) (as shown in red below) to identify shareholders as a constituency that may be considered, and to address additional considerations that may be relevant to hostile takeovers:

> In discharging the duties of their respective positions, the board of directors, committees of the board, and individual directors of a business corporation and individual officers may, in considering the best interests of the corporation, consider to the extent they deem appropriate: (1) The effects of any action upon any or all groups affected by such action, including shareholders, employees, suppliers, and customers and creditors of the corporation, and upon communities in which offices or other establishments of the corporation are located. (2) The short-term and long-term interests of the corporation, including benefits that may accrue to the corporation from its long-term plans and the possibility that these interests may be best served by the continued independence of the corporation. (3) The resources, intent and conduct (past, stated and potential) of any person seeking to acquire control of the corporation. and (4) All other pertinent factors.

15 Pa.C.S.A. § 1715(a). Additional provisions were added to BCL § 1715 related specifically to hostile takeovers, rejecting the standards articulated in *Unocal* and *Revlon*. Subsection (b) was added to make clear that the board "shall not be required, in considering the best interests of the corporation or the effects of any action, to regard any corporate interest or the interests of any particular group affected by such action as a dominant or controlling interest or factor." Similarly, §§ 1715(c)-(d) were added to approve the use of poison pills and other defensive actions related to "acquisitions or potential or proposed acquisitions of control," including rejecting the primacy of "the consideration that might be offered or paid to shareholders in such an acquisition" and rejecting any "greater obligation to justify, or higher burden of proof with respect to, any act" relating to such acquisitions.

The 1990 Amendments also clarified that the board owes fiduciary duties "solely to the business corporation," and that breaches of fiduciary duties can be enforced directly or derivatively by the corporation, and "may not be enforced directly by a shareholder." 15 Pa.C.S.A. § 1717.

Notwithstanding that, as the legislative history makes clear, the 1990 Amendments were *not* intended to give directors *carte blanche* to disregard shareholder rights. As the legislators put it at the time:

- "I guess I have heard, first of all, from Representative Bortner that this legislation will have no effect on the corporations of Pennsylvania" and "is going to be protection against corporate raiders." Pa.Legis.J., House, Apr. 3, 1990, at 546.

- "I am of the belief that this is not going to insulate management to that degree. ***They are still going to have the ability to change the board of directors***. They are still going to have the ability to at least make their thoughts known to the board of their dissatisfaction. They can, if they are successful with enough votes, get control of the board and therefore have new direction on the management." *Id.* at 549 (emphasis added).

- "We felt it extremely important to preserve those normal shareholders' rights on a whole range of corporate governance questions." *Id.* at 550.

- "It happens all the time where the stockholders challenge the board of directors with respect to the exercise of their fiduciary responsibility. It is a standard stockholder right, and that is not impinged by this piece of legislation." *Id.*

- "The bill is a reasonable bill. It does not, in a technical sense, I submit as a lawyer, do anything to shift the fiduciary things so strongly." Pa.Legis.J., Sen., Dec. 12, 1989, at 1508.

As is clear from the text of the statue and the legislative history, the 1990 Amendments were enacted to empower Pennsylvania corporations to resist takeover attempts (like *Allied Signal*). They were not intended to alter the primacy of the shareholder franchise or interfere with shareholder rights to nominate and vote for directors.

Indeed, legislators took pains to make clear that the legislation was not designed to alter fundamental voting rights. As discussed below, all Pennsylvania courts that have addressed shareholder voting rights after the adoption of the 1990 Amendments have continued to endorse the primacy of shareholder voting rights, with some explicitly approving of the heightened standard of review applicable under Delaware law to board actions taken to disenfranchise shareholders.

### III. Pennsylvania Courts Impose Heightened Judicial Scrutiny for Board Decisions Related to Shareholder Voting

Notwithstanding that Pennsylvania courts have recognized the importance of the shareholder franchise for decades, the Company has argued that Pennsylvania courts would not apply heightened scrutiny for Board decisions made in the shareholder voting context because

5

Pennsylvania applies the business judgment rule differently than Delaware. While it is true that the rules differ, Pennsylvania courts would also apply heightened scrutiny to assess the Board Reduction Scheme at issue here.

### A.  Heightened Scrutiny Applies Before and After the 1990 Amendments

The Pennsylvania Supreme Court has long recognized that shareholding voting rights are "fundamental." *Reifsnyder v. Pittsburgh Outdoor Advert. Co.*, 405 Pa. 142, 149 (1961). As addressed above and discussed further below, the 1990 Amendments did not change that.  Further, Pennsylvania law generally considers Delaware authority "instructive" on Pennsylvania corporate law issues for which there is a dearth of Pennsylvania law. *Johnson v. Farm J., Inc.*, 2019 WL 3530423, at *4 (E.D. Pa. Aug. 1, 2019); *In re Portec Rail Prods.*, 2010 WL 6566604 (Pa. Com. Pl. Apr. 21, 2010) (Trial Order) ("Courts across the country cite to the law of Delaware as persuasive authority on issues relating to the fiduciary duties of boards of directors…."). As such, when assessing the level of scrutiny applicable to board actions taken to suppress shareholder votes, Pennsylvania courts have looked to Delaware law and nothing suggests they would stop doing so.

Around the same time as *Unocal* and *Revlon* (*i.e.*, just before the enactment of the 1990 Amendments), the Delaware Court of Chancery established heightened scrutiny for board decisions made in the shareholder voting context. *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651 (Del. Ch. 1988). Specifically, the *Blasius* court held that "the board bears the heavy burden of demonstrating a compelling justification" for any actions "done for the primary purpose of impeding the exercise of stockholder voting power." *Id.* at 661. This heightened scrutiny was necessary because:

> The shareholder franchise is the ideological underpinning upon which the legitimacy of directorial power rests. Generally, shareholders have only two protections against perceived inadequate business performance. They may sell their stock (which, if done in sufficient numbers, may so affect security prices as to create an incentive for altered managerial performance), or they may vote to replace incumbent board members.

*Id.* at 659. Unlike the provisions of the 1990 Amendments that were clearly intended to reject the heightened standards for hostile takeovers set by *Unocal* and *Revlon*, no provision rejected the implications of *Blasius*, even though it was decided two years earlier, at a time when the legislature was focused on the proper application of director fiduciary duties.

Notably, a decade after the 1990 Amendments were passed, the Pennsylvania Superior Court stated that "[n]ot only do the courts of this commonwealth protect the right of shareholders to vote, but we recognize [*Blasius*] as persuasive." *Warehime v. Warehime*, 2001 PA Super 141, ¶ 33 (Pa. Super. Ct. May 4, 2001), *rev'd on other grounds,* 580 Pa. 201 (2004). The *Warehime* court further explained that "[w]hile the business judgment rule does afford directors significant leeway in decisions that they make in good faith and with due care" the 1990 Amendments do not "validate corporate actions designed to undermine shareholder's voting rights." 2001 PA Super 141, ¶ 39

n.13. Likewise, the Pennsylvania Court of Common Pleas has cited *Blasius* with approval. *See Jewelcor Mgmt., Inc. v. Thistle Grp. Holdings, Co.*, 60 Pa. D. & C.4th 391 (Pa. Com. Pl. 2002).[4]

In those and other cases, Pennsylvania courts have confirmed the importance of shareholder voting rights following the 1990 Amendments. For example:

- "The right to vote is among the most fundamental rights of ownership of voting shares." *Warehime v. Warehime*, 2001 PA Super 141, ¶ 29.

- "Voting rights are considered the basic and fundamental right of a shareholder." *Serota v. London-Towne Homeowners Ass'n.*, 2017 WL 1506219, at *7 (Pa. Cmwlth. Apr. 27, 2017).

- "There is little doubt that the right to vote for a corporation's directors is one of the paramount privileges afforded shareholders." *Jewelcor*, 60 Pa. D. & C.4th 391.

And, like *Blasius,* which noted that a shareholder's right to "vote to replace incumbent board members" is the primary "protection[] against perceived inadequate business performance," 564 A.2d at 659, cases describing Pennsylvania's business judgment rule acknowledge, "[i]f the shareholders conclude that the judgment of the directors in pursuing a particular course of action is not sound, their remedy lies in the replacement of the directors through the corporate voting process—they may vote the management out." *Enterra Corp. v. SGS Associates*, 600 F. Supp. 678, 685 (E.D. Pa. 1985). Nothing in the 1990 Amendments indicates an intent to remove the shareholders' only remedy to disapprove of, and change, board strategy.

---

[4] The Company has argued that *Warehime* and *Jewelcor* should be ignored, but its reasons for doing so are misguided.

*First*, the Company has claimed that *Warehime* is "bad law" which "the Pennsylvania Supreme Court summarily reversed more than two decades ago." Not so. The Supreme Court reversed on the grounds that it applied the wrong standard of review, not because it disagreed with the statements about the importance of a shareholder's right to vote or the persuasiveness of *Blasius*. *See Warehime v. Warehime*, 580 Pa. 201, 208 (2004) ("we conclude that the Superior Court erred in its choice of standard of review for this matter" and applying deferential standard to trial court's decision denying preliminary injunction based on a finding of no irreparable harm).

Similarly, the Company has argued that "Pennsylvania courts have repeatedly disavowed" *Jewelcor*. However, there are only two cases that distinguish *Jewelcor*, and those cases simply held that shareholders could not bring direct claims for breach of fiduciary duties. *Stilwell Value Partners I, L.P. v. Prudential Mut. Holding Co.*, 2007 WL 2345281, at *10-11 (E.D. Pa. Aug. 15, 2007); *Driver Opp. Partners I, LP v. Adams*, 2023 WL 3580039, at *12-13 (W.D. Pa. May 22, 2023). Neither held that *Jewelcor*'s statements about corporate democracy or the validity of corporate actions related to shareholder votes was incorrect or bad law.

B.  Application to the Board Reduction Scheme

Based on the foregoing, whether applying *Blasius*' "compelling justification" standard, or some other standard imposing heightened scrutiny, a Pennsylvania court is likely to conclude that the Board Reduction Scheme—admittedly implemented because the incumbent Board members did not want someone on the Board whom they believed disagreed with their strategy—violated well-established principles of corporate governance that have been recognized before and after the 1990 Amendments.

Specifically, if boards are free to manipulate the voting process to prevent shareholders from electing directors who disagree with the current course of action, shareholders have no remedy other than to sell their stock. *See also Masimo Corp. v. Politan Cap. Mgmt. LP,* 8:24-CV-01568-JVS-JDE, Dkt. 49-8 at 2 (C.D. Cal. July 30, 2024) (expert explaining that "[t]aking away the[] ability [of shareholder activists] to nominate directors would render them completely powerless" and would prevent them from serving the "integral [purpose] in the market place for holding boards accountable both at underperforming companies and insular companies"). That is why Delaware courts have made clear that shareholders, as owners of the company—not the incumbent Board—have the right to decide whether a duly-nominated board candidate is "fitting." *Vejseli v. Duffy*, 2025 WL 1452842, at *13 (Del. Ch. May 21, 2025). Indeed, as the Delaware Court of Chancery held two months ago in a strikingly similar situation: "Reducing the number of directors so that the Board, rather than the stockholders, could later identify better candidates is not a legitimate corporate purpose" and "[t]he notion that directors know better than the stockholders about who should be on the board is no justification at all." *Id.*[5]

Under the Company's rationale, the Board could perpetuate itself in office indefinitely and without challenge. All it would need to do is declare that the Board "reasonably believes" that it knows better than the shareholders which director candidates are "in the best interests of the corporation," and could subsequently prevent any shareholder-nominated candidates from ever being voted on, let alone elected. In addition, the Board's position here would mean that nothing can stop the Board from expanding its size so that it can fill the seat Clifford should have held, with its selected

---

[5] *See also venBio Select Advisor LLC v. Immunodynamics, Inc.*, Case No. 2017-0108-JTL (Del. Ch. Mar. 9, 2017), Tr. at 12:12-20 (critiquing board for acting "for the purpose of affecting the election contest and because they believed that they knew better than the stockholders who should determine the future path of the Company and what it should be"); *MM Companies, Inc. v. Liquid Audio, Inc.*, 813 A.2d 1118, 1132 (Del. 2003) (noting "the essential role of corporate democracy in maintaining the proper allocation of power between the shareholders and the Board" and holding that board expansion from five to seven members in the face of proxy contest was invalid); *Pell v. Kill*, 135 A.3d 764, 769 (Del. Ch. 2016) ("when facing an electoral contest, incumbent directors are not entitled to determine the outcome for the stockholders. Stockholders elect directors, not the other way around" and therefore board improperly "imposed its favored outcome on the stockholders" and "eliminat[ed] the possibility of success for two seats" by reducing the number of seats up for election from three to one).

candidate remaining in office until a replacement is elected at the 2028 annual meeting. But long-standing principals of corporate governance—including in Pennsylvania—say otherwise.

It simply cannot be in "the best interests of the corporation" to insulate incumbent directors just because they believe they know better than the shareholders, *i.e.*, the company's owners. While the Board was free to nominate a competing director and let the shareholders decide, it could not, consistent with its fiduciary duties, prevent shareholders from voting on a duly-elected candidate (or worse, refuse to seat Clifford even after he received approximately 57% of the votes cast at the 2025 Annual Meeting).

In this regard, the Third Circuit's decision in *IBS Fin. Corp. v. Seidman & Associates, L.L.C.*, 136 F.3d 940 (3d Cir. 1998), rejecting a similar argument based on New Jersey's business judgment rule, is instructive. In *IBS*, the plaintiff argued that New Jersey courts would not apply heightened scrutiny "to action by a board of directors intended to hamper the exercise by some shareholders of their franchise," "because New Jersey's business judgment rule…differs significantly from Delaware's." *Id.* at 949. Specifically, New Jersey's business judgment rule (like Pennsylvania's) provides, among other things, that if the board rejects "any proposal or offer to acquire the corporation" based on its determination that the proposal is not in the best interests of the corporation, "the board of directors shall have no obligation to facilitate, remove any barriers to, or refrain from impeding the proposal or offer." N.J. Stat. Ann. § 14A:6-1(3).

The Third Circuit rejected the plaintiff's position, concluding that because the company "was not faced with a 'proposal or offer to acquire the corporation,'" the statute did not "insulate the board's action from judicial scrutiny." *IBS*, 136 F.3d at 949. Further, the Third Circuit noted that because there were no "New Jersey cases that have addressed the level of scrutiny to be applied to action by a board of directors intended to hamper the exercise by some shareholders of their franchise," New Jersey courts would look to Delaware law, "especially because New Jersey shares Delaware's interest in providing significant protection to a shareholder's right to vote." *Id.* at 949–50. The Third Circuit then affirmed the district court's holding that "New Jersey courts would look to *Blasius* to assess the propriety of the board's reduction in size." *Id.* at 950. The result would be no different in Pennsylvania.

      C.     Allied Signal Is Inapposite

*AMP Inc. v. Allied Signal, Inc.*, 1998 WL 778348 (E.D. Pa. Oct. 8, 1998), the case you referenced at our meeting, does not alter the analysis as to how Pennsylvania courts would analyze board action targeting the shareholder franchise. This is so because *Allied Signal* is a poison pill case related to a hostile takeover attempt rather than to regular shareholder elections.

Specifically, shareholder Allied Signal made an unsolicited conditional tender offer for all the outstanding shares of common stock of AMP, coupled with a shareholder consent proposal to amend the company's bylaws to expand the board so that Allied Signal could nominate new directors who would approve the tender offer. *Id.* at *1–2. Allied Signal sought to increase the board from 11 to 28 members and nominated 17 of Allied Signal's current directors and officers to serve as directors of AMP. *Id.* In response, AMP made its poison pill non-redeemable and non-amendable should AMP's interested-director majority be elected. *Id.* at *2. Allied Signal then

revised its shareholder consent proposal to transfer authority related to the poison pill from the board to a three-person committee. *Id.* at *3. AMP further modified the poison pill to reduce the trigger to 10% and made the pill non-redeemable and non-amendable if the three-person committee proposal was approved. *Id.* Allied Signal, in turn, amended its tender offer to buy only 9% of AMP's outstanding shares. *Id.* Both Allied Signal and AMP sought declarations that the other parties' conduct was unlawful. *Id.*

The facts of *Allied Signal* could not be more different than the facts here. *First*, *Allied Signal* related to the corporate takeover concerns that the 1990 Amendments were directly intended to address. *Id.* at *5 (noting that the BCL explicitly validates the use of poison pills, and "protects the actions of a majority board of disinterested directors in resisting unsolicited takeovers by retaining the ordinary business judgment rule with respect to the adoption of defensive measures"); *see also* 15 Pa.C.S.A. § 2513 cmt. (1988) ("This section, in conjunction with 15 Pa.C.S.A. § 1525, is intended to validate expressly as a matter of state corporation law the adoption of shareholder rights plans or 'poison pills,' including the provisions of such plans commonly referred to as 'flip-ins' and 'flip-overs.'"). In fact, the federal court in *Allied Signal* acknowledged that the "the presumptions of good faith for disinterested majorities" are limited to "matters dealing with potential or proposed acquisition of control of the corporation." 1998 WL 778348, at *8 (citing 15 Pa.C.S.A. § 1715(d)); *see also id.* at *12 ("Under Section 1715(d), because the record date relates to a proposed acquisition, AMP's board is entitled to the presumption that its actions were in the best interests of the corporation.").

*Second*, the challenged defensive measures in *Allied Signal* were not a response to a shareholder's fundamental right to nominate and vote for directors. Instead, the measures taken in *Allied Signal* were a response to (i) a shareholder effort to effectuate an illegal transfer of power from the board to a three-person committee and (ii) a potential acquisition of control. *Id.* at *6 ("The attempt by AMP's disinterested director majority to counter an anticipated unlawful act by Allied Signal and other shareholders to take away statutory board authority is not a breach of fiduciary duty to the corporation. Nor is it an infringement upon shareholder rights.").

*Third*, in *Allied Signal*, the competing slate of directors was not independent (*i.e.*, they were officers and directors appointed by, and who owed fiduciary duties to, Allied Signal, a Delaware corporation), and would have constituted a majority of the board. Even then, the court acknowledged the shareholders' rights to nominate and vote for this interested majority, despite both the company's and the court's concerns of the prudence of doing so. *Id.* at *8 ("[T]he AMP shareholders have a right to elect Allied Signal's nominees as a majority to AMP's board to attempt to consummate a merger for the profit objectives of Allied Signal and AMP shareholders….").

In any event, here, Clifford is fully independent and his election would not come close to changing control of the Board. As noted above, the Company has a three-class staggered board so that a change of control cannot occur in any particular year (and would not have been effectuated by Clifford's election to one of three seats up for election on a nine-seat board). The six incumbent directors and two newly elected directors can easily overrule Clifford if they disagree with him. Therefore, the concerns raised by the *Allied Signal* court about shareholders electing interested directors that would take control over the board are not applicable here.

### IV. The Board Reduction Scheme Would Not Survive Even the Business Judgment Rule

Finally, even if the SLC disagrees with the unbroken line of Pennsylvania cases decided before and after the 1990 Amendments establishing the importance of shareholder voting rights and believes the business judgment rule applies, the Board Reduction Scheme still would not withstand scrutiny. This is because under Pennsylvania law, "[t]he duty of loyalty requires that corporate officers devote themselves to the corporate affairs with a view to promote the common interests and not their own." *Tyler v. O'Neill*, 994 F. Supp. 603, 612 (E.D. Pa. 1998), *aff'd*, 189 F.3d 465 (3d Cir. 1999). Thus, the business judgment rule does not protect directors who "acted in fraud, bad faith or self-interest." *In re Total Containment, Inc.*, 335 B.R. 589, 606 (Bankr. E.D. Pa. 2005); *In re Nine W. LBO Sec. Litig.*, 505 F. Supp. 3d 292, 310 (S.D.N.Y. 2020) (applying Pennsylvania law and noting that business judgment rule only protects "a director from liability for decisions made: (1) in good faith; [and] (2) where the director or officer is not interested in the subject of the business judgment"); *In re Zambrano Corp.*, 478 B.R. 670, 686 (Bankr. W.D. Pa. 2012) (board "cannot rely on the business judgment rule as a defense to his fiduciary breaches" where "there is a prima facie showing" of self-interest); 15 Pa. C.S. § 1712 (business judgment rule applies to decisions made "in good faith" and "in a manner the director reasonably believes to be in the best interests of the corporation"); Bainbridge, *Interpreting Nonshareholder Constituency Statutes*, at 995 ("The business judgment rule…is an inappropriate standard for situations implicating the directors' duty of loyalty" because "[c]onstraining corporate directors and officers from pursuing their own self-interest at the expense of the firm's interest has long been one of corporate law's central purposes.").

Here, as described in Section I, *supra*, the Board did not act in good faith, nor are they disinterested in the subject of the purported business judgment, *i.e.*, the Board Reduction Scheme. It is self-evident that incumbent directors facing a proxy contest have a conflict of interest and a personal interest in the outcome of the election, preferring their candidates "to be elected rather than defeated." *Pell*, 135 A.3d at 786. And, in appointing the SLC consisting of two non-Board members, the Board acknowledged the incumbent directors are inherently conflicted due to their personal interest in the Board Reduction Scheme. Therefore, because of their bad faith and self-interest, the Board Reduction Scheme violates the Board's fiduciary duties to the Company even under the traditional framework set out by the business judgment rule.

We are available to discuss any of the above with you and invite you to identify any deficiencies that you might perceive in our analysis so we have an opportunity to address them.

Sincerely,

*/s/ Michael E. Swartz*

Michael E. Swartz

cc: Dan Rhynhart